**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

STATE OF CALIFORNIA, by and through GOVERNOR GAVIN NEWSOM, ATTORNEY GENERAL XAVIER BECERRA, and the CALIFORNIA AIR RESOURCES BOARD, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, PEOPLE OF THE STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, STATE OF WISCONSIN, DISTRICT OF COLUMBIA, CITY OF LOS ANGELES, and CITY OF NEW YORK,

Petitioners,

v.

ANDREW R. WHEELER, in his official capacity as Administrator, United States Environmental Protection Agency; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; ELAINE L. CHAO, in her official capacity as Secretary, United States Department of Transportation; UNITED STATES DEPARTMENT OF TRANSPORTATION;

No. 19-1239

JAMES C. OWENS, in his official capacity as Acting Administrator, National Highway Traffic Safety Administration; NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION,

Respondents.

**PETITION FOR REVIEW**

Pursuant to 42 U.S.C. § 7607(b)(1) (Clean Air Act § 307(b)(1)), Rule 15 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 15, the States of California, by and through Governor Gavin Newsom, Attorney General Xavier Becerra, and the California Air Resources Board, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, the People of the State of Michigan, the District of Columbia, and the Cities of Los Angeles and New York (collectively, Petitioners) hereby petition this Court for review of the final actions of Respondents United States Environmental Protection Agency and Administrator Andrew R. Wheeler set forth in the attached Federal Register notice published at 84 Federal Register 51,310 (September 27, 2019) and titled "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program."

Petitioners also hereby protectively petition this Court for review of the actions of Respondents United States Department of Transportation (US DOT), Secretary Elaine L. Chao, National Highway Traffic Safety Administration (NHTSA), and Acting Administrator James C. Owens set forth in the same, attached Federal Register notice and designated for codification at 49 C.F.R. Part 533, Appendix B. The portion of this petition challenging actions by US DOT, Secretary Chao, NHTSA, and Acting Administrator Owens is protective in nature because Petitioners believe the district courts have exclusive original jurisdiction to review these NHTSA regulations under 5 U.S.C. Chapter 7 and 28 U.S.C. § 1331. Accordingly, Petitioners have challenged NHTSA's actions in the U.S. District Court for the District of Columbia. *California v. Chao*, No. 19-cv-2826-KBJ (filed September 20, 2019). However, the federal government has moved to dismiss that case on the grounds that it belongs in this Court instead. Petitioners disagree but include the protective portion of this Petition in order to protect Petitioners' right to judicial review in the event the district court is found to lack jurisdiction.

Dated: November 15, 2019

Respectfully Submitted,

FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General of California
ROBERT BYRNE
SALLY MAGNANI
Senior Assistant Attorneys General
GARY E. TAVETIAN
DAVID A. ZONANA
Supervising Deputy Attorneys General
JESSICA BARCLAY-STROBEL
JULIA K. FORGIE
MEREDITH HANKINS
JONATHAN A. WIENER
Deputy Attorneys General

*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Telephone: (510) 879-0299
Fax: (510) 622-2270
Elaine.Meckenstock@doj.ca.gov

*Attorneys for Petitioner State of California, by and through its Governor Gavin Newsom, Attorney General Xavier Becerra, and California Air Resources Board*

FOR THE STATE OF COLORADO

PHIL WEISER
Colorado Attorney General

<u>*/s/ Eric R. Olson*</u>
ERIC R. OLSON
Solicitor General
Office of the Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6562
eric.olson@coag.gov

*Attorneys for Petitioner State of Colorado*

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General of Connecticut
MATTHEW I. LEVINE
Assistant Attorney General

<u>*/s/ Scott N. Koschwitz*</u>
SCOTT N. KOSCHWITZ
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Telephone: (860) 808-5250
Fax: (860) 808-5386
Scott.Koschwitz@ct.gov

*Attorneys for Petitioner State of Connecticut*

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General of the State of Delaware

*/s/ Kayli H. Spialter**
KAYLI H. SPIALTER
CHRISTIAN WRIGHT
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street, 6th Floor
Wilmington, DE 19801
Telephone: (302) 395-2604
Kayli.spialter@delaware.gov

** Application for Admission Pending*

*Attorneys for Petitioner State of Delaware*

FOR THE DISTRICT OF COLUMBIA

*/s/ Loren L. AliKhan*
LOREN L. ALIKHAN
Solicitor General
Office of the Attorney General for the District of Columbia
One Judiciary Square
441 4th Street, NW, Suite 630 South
Washington, D.C. 20001
Telephone: (202) 727-6287
Fax: (202) 730-1864
Loren.AliKhan@dc.gov

*Attorneys for Petitioner District of Columbia*

FOR THE STATE OF HAWAII

CLARE E. CONNORS
Attorney General

*/s/ William F. Cooper*
WILLIAM F. COOPER
Deputy Attorney General
State of Hawaii Office of the Attorney General
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-4070
Bill.F.Cooper@Hawaii.gov

*Attorneys for Petitioner State of Hawaii*

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General of Illinois
MATTHEW J. DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division
JASON E. JAMES
Assistant Attorney General

*/s/ Daniel I. Rottenberg*
DANIEL I. ROTTENBERG
Assistant Attorney General
69 W. Washington St., 18th Floor
Chicago, IL 60602
Telephone: (312) 814-3816
DRottenberg@atg.state.il.us

*Attorneys for Petitioner State of Illinois*

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General of Maine

*/s/ Laura E. Jensen*
LAURA E. JENSEN
Assistant Attorney General
6 State House Station
Augusta, ME 04333
Telephone: (207) 626-8868
Fax: (207) 626-8812
Laura.Jensen@maine.gov

*Attorneys for Petitioner State of Maine*

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland

*/s/ Roberta R. James*
ROBERTA R. JAMES
Assistant Attorney General
Office of the Attorney General
Maryland Department of the Environment
1800 Washington Blvd.
Baltimore, MD 21230
Telephone: (410) 537-3748

JOHN B. HOWARD, JR.
JOSHUA M. SEGAL
STEVEN J. GOLDSTEIN
Special Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
Telephone: (410) 576-6300

*Attorneys for Petitioner State of Maryland*

FOR THE COMMONWEALTH OF MASSACHUSETTS

MAURA HEALEY
Attorney General
CHRISTOPHE COURCHESNE
Assistant Attorney General
Chief, Environmental Protection Division
CAROL IANCU
Assistant Attorney General
MEGAN M. HERZOG
Special Assistant Attorney General

*/s/ Matthew Ireland*
MATTHEW IRELAND
Assistant Attorney General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
matthew.ireland@mass.gov

*Attorneys for Petitioner Commonwealth of Massachusetts*

FOR THE PEOPLE OF THE STATE OF MICHIGAN

DANA NESSEL
Attorney General of Michigan

*/s/ Neil D. Gordon*
NEIL D. GORDON
GILLIAN E. WENER
Assistant Attorneys General
Michigan Department of Attorney General
Environment, Natural Resources and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
Telephone: (517) 335-7664
gordonn1@michigan.gov

*Attorneys for Petitioner People of the State of Michigan*

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General of Minnesota

*/s/ Peter N. Surdo*
PETER N. SURDO
Special Assistant Attorney General
445 Minnesota Street, Suite 900
St. Paul, MN, 55101
Telephone: (651) 757-1061
Peter.Surdo@ag.state.mn.us

*Attorneys for Petitioner State of Minnesota*

FOR THE STATE OF NEVADA

AARON D. FORD
Attorney General of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN
Solicitor General
DANIEL P. NUBEL
Deputy Attorney General
Office of the Nevada Attorney General
100 N. Carson Street
Carson City, NV 89701
HStern@ag.nv.gov

*Attorneys for Petitioner State of Nevada*

FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General of New Jersey

*/s/ Aaron A. Love*
AARON A. LOVE
Deputy Attorney General
25 Market St., PO Box 093
Trenton, NJ 08625-0093
Telephone: (609) 376-2762
Fax: (609) 341-5031
aaron.love@law.njoag.gov

*Attorneys for Petitioner State of New Jersey*

FOR THE STATE OF NEW MEXICO

HECTOR BALDERAS
Attorney General of New Mexico

*/s/ Anne E. Minard*
ANNE E. MINARD
Special Assistant Attorney General
State of New Mexico Office of the Attorney General
Consumer & Environmental Protection Division
408 Galisteo Street
Santa Fe, NM 87501
Telephone: (505) 490-4045
aminard@nmag.gov

*Attorneys for Petitioner State of New Mexico*

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General of New York
YUEH-RU CHU
Chief, Affirmative Litigation Section
Environmental Protection Bureau
AUSTIN THOMPSON
Assistant Attorney General

*/s/ Gavin G. McCabe*
GAVIN G. MCCABE
Assistant Attorney General
28 Liberty Street, 19th Floor
New York, NY 10005
Telephone: (212) 416-8469
gavin.mccabe@ag.ny.gov

*Attorneys for Petitioner State of New York*

FOR THE STATE OF NORTH CAROLINA

JOSHUA H. STEIN
Attorney General
DANIEL S. HIRSCHMAN
Senior Deputy Attorney General
FRANCISCO BENZONI
Special Deputy Attorney General

*/s/ Asher P. Spiller*
ASHER P. SPILLER
TAYLOR CRABTREE
Assistant Attorneys General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Telephone: (919) 716-6400

*Attorneys for Petitioner State of North Carolina*

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General of Oregon

/s/ Paul Garrahan
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4593
Paul.Garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

*Attorneys for Petitioner State of Oregon*

FOR THE COMMONWEALTH OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General of Pennsylvania

/s/ Michael J. Fischer
MICHAEL J. FISCHER
Chief Deputy Attorney General
JACOB B. BOYER
Deputy Attorney General
Office of Attorney General
1600 Arch St. Suite 300
Philadelphia, PA 19103
Telephone: (215) 560-2171
mfischer@attorneygeneral.gov

*Attorneys for Petitioner Commonwealth of Pennsylvania*

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General of Rhode Island

/s/ Gregory S. Schultz
GREGORY S. SCHULTZ
Special Assistant Attorney General
Office of Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
gschultz@riag.ri.gov

*Attorneys for Petitioner State of Rhode Island*

FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General

/s/ Nicholas F. Persampieri
NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3186
nick.persampieri@vermont.gov

*Attorneys for Petitioner State of Vermont*

FOR THE COMMONWEALTH OF VIRGINIA

MARK R. HERRING
Attorney General
PAUL KUGELMAN, JR.
Senior Assistant Attorney General
Chief, Environmental Section

*/s/ Caitlin C. G. O'Dwyer*
CAITLIN C. G. O'DWYER
Assistant Attorney General
Office of the Attorney General
Commonwealth of Virginia
202 North 9th Street
Richmond, VA 23219
Telephone: (804) 786-1780
godwyer@oag.state.va.us

*Attorneys for Petitioner Commonwealth of Virginia*

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General

*/s/ Emily C. Nelson*
EMILY C. NELSON
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, WA 98504
Telephone: (360) 586-4607
emily.nelson@atg.wa.gov

*Attorneys for Petitioner State of Washington*

FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
Attorney General of Wisconsin

/s/ Jennifer L. Vandermeuse
JENNIFER L. VANDERMEUSE
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53702-7857
Telephone: (608) 266-7741
Fax: (608) 267-2223
vandermeusejl@doj.state.wi.us

*Attorneys for Petitioner State of Wisconsin*

FOR THE CITY OF LOS ANGELES

MICHAEL N. FEUER
Los Angeles City Attorney
MICHAEL J. BOSTROM
Assistant City Attorney

/s/ Michael J. Bostrom
MICHAEL J. BOSTROM
Assistant City Attorney
200 N. Spring Street, 14th Floor
Los Angeles, CA 90012
Oakland, CA 94612
Telephone: (213) 978-1882
Fax: (213) 978-2286
Michael.Bostrom@lacity.org

*Attorneys for Petitioner City of Los Angeles*

FOR THE CITY OF NEW YORK

JAMES E. JOHNSON
New York City Corporation Counsel
CHRISTOPHER G. KING
ROBERT L. MARTIN
Senior Counsel
SHIVA PRAKASH
Assistant Corporation Counsel

*/s/ Christopher G. King*
CHRISTOPHER G. KING
Senior Counsel
New York City Law Department
100 Church Street
New York, New York
Telephone: (212) 356-2074
Fax: (212) 356-2084
cking@law.nyc.gov

*Attorneys for Petitioner City of New York*

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to Circuit Rule 15(a), a copy of the foregoing Petition for Review was served on November 15, 2019 by certified mail, return receipt requested, on the following:

Hon. Andrew R. Wheeler
Office of the Administrator (1101A)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460

Hon. William Barr
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Correspondence Control Unit
Office of General Counsel (2311)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460

Hon. James C. Owens
Acting Administrator
National Highway Traffic Safety Administration
1200 New Jersey Avenue, SE
West Building
Washington, D.C. 20590

National Highway Traffic Safety Administration
NHTSA Headquarters
1200 New Jersey Avenue, SE
West Building
Washington, D.C. 20590

Hon. Elaine L. Chao
Office of the Secretary
United States Department of Transportation
1200 New Jersey Avenue, SE
West Building
Washington, D.C. 20590

Office of the General Counsel
United States Department of Transportation
1200 New Jersey Avenue, SE
West Building
Washington, D.C. 20590

*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK

# Attachment 1

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 85 and 86**

**DEPARTMENT OF TRANSPORTATION**

**National Highway Traffic Safety Administration**

**49 CFR Parts 531 and 533**

**[NHTSA–2018–0067; EPA–HQ–OAR–2018–0283; FRL 10000–45–OAR]**

**RIN 2127–AL76; 2060–AU09**

## The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program

**AGENCY:** Environmental Protection Agency and National Highway Traffic Safety Administration, Department of Transportation.

**ACTION:** Withdrawal of waiver; final rule.

**SUMMARY:** On August 24, 2018, the Environmental Protection Agency (EPA) and the Department of Transportation's National Highway Traffic Safety Administration (NHTSA) jointly published in the **Federal Register** a notice of proposed rulemaking entitled, ''The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks.'' In the NPRM, the agencies proposed new and amended greenhouse gas (GHG) and Corporate Average Fuel Economy (CAFE) standards for model year 2021 to 2026 light duty vehicles. EPA also proposed to withdraw the waiver it had previously provided to California for that State's GHG and ZEV programs under section 209 of the Clean Air Act. NHTSA also proposed regulatory text implementing its statutory authority to set nationally applicable fuel economy standards that made explicit that those State programs would also be preempted under NHTSA's authorities. In this action, the agencies finalize the two actions related to the waiver and preemption. Accordingly, in this document: EPA announces its decision to withdraw the waiver; and NHTSA finalizes regulatory text related to preemption. The agencies anticipate issuing a final rule on standards proposed in the NPRM in the near future.

**DATES:** This joint action is effective November 26, 2019.

*Judicial Review:* Pursuant to Clean Air Act section 307(b), any petitions for judicial review of this action must be filed in the United States Court of Appeals for the D.C. Circuit by November 26, 2019. Given the inherent relationship between the agencies' actions, any challenges to NHTSA's regulation should also be filed in the United States Court of Appeals for the D.C. Circuit. *See also* Sections III.G and IV.Q of this preamble.

**ADDRESSES:** EPA and NHTSA have established dockets for this action under Docket ID No. EPA–HQ–OAR–2018–0283 and NHTSA 2018–0067, respectively. All documents in the docket are listed in the *http://www.regulations.gov* index. Although listed in the index, some information is not publicly available, *e.g.,* confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available in hard copy in EPA's docket, and electronically in NHTSA's online docket. Publicly available docket materials can be found either electronically in *www.regulations.gov* by searching for the dockets using the Docket ID numbers above, or in hard copy at the following locations: EPA: EPA Docket Center, EPA/DC, EPA West, Room 3334, 1301 Constitution Ave. NW, Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744. NHTSA: Docket Management Facility, M–30, U.S. Department of Transportation (DOT), West Building, Ground Floor, Rm. W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590. The DOT Docket Management Facility is open between 9 a.m. and 5 p.m. Eastern Time, Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:**

*EPA:* Christopher Lieske, Office of Transportation and Air Quality, Assessment and Standards Division, Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; telephone number: (734) 214–4584; fax number: (734) 214–4816; email address: *lieske.christopher@epa.gov,* or contact the Assessment and Standards Division, email address: *otaqpublicweb@epa.gov*.

*NHTSA:* James Tamm, Office of Rulemaking, Fuel Economy Division, National Highway Traffic Safety Administration, 1200 New Jersey Avenue SE, Washington, DC 20590; telephone number: (202) 493–0515.

**SUPPLEMENTARY INFORMATION:**

I. Overview
II. Preemption Under the Energy Policy and Conservation Act
III. EPA's Withdrawal of Aspects of the January 2013 Waiver of CAA section 209(b) Preemption of the State of California's Advanced Clean Car Program
IV. Regulatory Notices and Analyses

## I. Overview

On August 24, 2018, the Environmental Protection Agency (EPA) and the Department of Transportation's National Highway Traffic Safety Administration (NHTSA) (collectively, ''the agencies'') jointly published in the **Federal Register** a notice of proposed rulemaking entitled, ''The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks'' (the SAFE Vehicles rule).[1] In the NPRM, EPA proposed new greenhouse gas (GHG) standards and NHTSA proposed new Corporate Average Fuel Economy (CAFE) standards for model years (MY) 2021 to 2026 light duty vehicles. The agencies also proposed to take two actions, separate from the proposed standards, needed to ensure the existence of one Federal program for light vehicles. First, EPA proposed to withdraw the waiver it had previously provided to California for that State's GHG program and Zero Emissions Vehicle (ZEV) mandate. Second, NHTSA proposed regulatory text that made explicit that State programs to limit or prohibit tailpipe GHG emissions or establish ZEV mandates are preempted, to carry out its statutory authority to set nationally applicable fuel economy standards and consistent with the express preemption provisions of the Energy Policy and Conservation Act (EPCA).

The SAFE Vehicles Rule received several hundred thousand public comments, which discussed in great detail all aspects of the proposal. The nature of the comments received related to the proposed standards and the proposed actions on preemption, though, were considerably different. That is, the vast majority of comments, whether one considers the number of commenters, the number of issues raised by commenters, or the length and level of detail of those comments, focused primarily on the agencies' proposed standards. In contrast, the comments to the preemption issues, though substantive and thorough, were fewer in number and length, and raised primarily legal issues, rather than the technical or economic issues that were the focus of many comments to the standards. Both the proposed waiver withdrawal and discussion of EPCA

[1] 83 FR 42986.

preemption are legal matters that are independent of the technical details of the proposed standards and, as such, took up a relatively small part of the NPRM.

Recent actions by the State of California taken after the publication of the NPRM have confirmed the need for final decision from the agencies that States do not have the authority to set GHG standards or establish ZEV mandates. First, on December 12, 2018, California unilaterally amended its ''deemed to comply'' provision, such that CARB's GHG standards can be satisfied only by complying with EPA's standards as those standards were promulgated in 2012.[2] More recently, on July 25, 2019, California announced a so-called ''voluntary framework'' with four automakers, which purported, without analysis of the terms of the existing waiver, California law, or how this ''framework'' is permissible under Federal law, to allow those automakers to meet reduced standards on a national basis if they promise not to challenge California's authority to establish GHG standards or the ZEV mandate.[3] These two actions, both of which conflict with the maintenance of a harmonized national fuel economy and tailpipe GHG emissions program and the terms of the agreement reached in 2012 and 2013, confirm that the only way to create one actual, durable national program is for GHG and fuel economy standards to be set by the Federal government, as was intended by Congress in including express preemption provisions in both the Clean Air Act (for new motor vehicle emissions standards) and EPCA (for fuel economy).[4]

In light of the divergence in the type of comments received to the proposal (*i.e.,* between the standards-related proposal and the waiver and preemption proposals), and in light of the recent actions taken by California, the agencies have determined it is appropriate to move forward with the two actions related to preemption now, while continuing work on a final rule to establish the CAFE and GHG standards that were within the scope of the NPRM. This decision is appropriate, as agencies have authority to finalize different parts of proposed actions at different times. Further, the agencies previewed this possibility in the NPRM by emphasizing the severability of the standards from the actions being finalized in this document. EPA's action in this document does not add or amend regulatory text pursuant to the Clean Air Act and, thus, issuing this decision on the waiver and the later rulemaking on the standard makes clear the difference between EPA's two actions and their independence from one another. NHTSA's action in this document is not to set standards for particular model years, but rather is an exercise of its authority under 49 U.S.C. 32901 through 32903, necessary to maintain the integrity of the corporate average fuel economy program and compliance regime established by Congress as a nationwide program, and consistent with Congress' statement of express preemption in 49 U.S.C. 32919. These two general aspects of the SAFE Vehicles Rule are independent of the CAFE and GHG standards for Model Years 2021–2026.[5] For that reason, the decision in this document to finalize the waiver and preemption issues does not require the agencies to reopen the comment period for the standards, as it does not have any effect on either agency's standards.

The agencies note that several comments claimed that the comment period of 63 days was inadequate or that the agencies did not hold a sufficient number of public meetings. Although the agencies will address this comment more directly in the forthcoming final rulemaking to establish standards, for purposes of this action, it is clear to the agencies that commenters had adequate time to respond to the issue of the waiver and EPCA preemption. Courts give broad discretion to agencies in determining whether the length of a comment period is reasonable and, in assessing the sufficiency of a comment period, look to whether the public had a meaningful opportunity to comment on a proposed action. *See, e.g., Rural Cellular Ass'n* v. *FCC,* 588 F.3d 1095, 1101 (D.C. Cir. 2009); *Connecticut Light & Power Co.* v. *Nuclear Regulatory Comm'n,* 673 F.2d 525, 534 (D.C. Cir. 1982). There was unquestionably a meaningful opportunity to comment here. The agencies received several hundred thousand comments, which included highly detailed and technical comments on all aspects of the proposal from seemingly all relevant stakeholders, including numerous comments related to EPA's action on the waiver and NHTSA's proposal on preemption. The agencies also note that the NPRM was initially issued and made public on August 2, 2018, over three weeks prior to publication in the **Federal Register**, and received extensive media coverage immediately thereafter, and giving a total of 86 days to review and comment. Furthermore, the agencies held three public hearings during the comment period, including one in Fresno, California on September 24, 2018, where the agencies heard from several hundred commenters in person.

## II. Preemption Under the Energy Policy and Conservation Act

### *A. NHTSA Is Finalizing Its Preemption Proposal*

NHTSA is finalizing its proposal concerning preemption of State and local laws and regulations related to fuel economy standards. Congress passed EPCA to help achieve the important national objective of protecting the United States against petroleum price shocks through improvements in fuel efficiency for the light duty vehicle fleet. But Congress did not seek to do so at any cost—instead directing the Secretary of Transportation to balance statutory factors, such as the need of the nation to conserve energy, technological feasibility, and economic practicability, to arrive at stringent, but feasible, standards on a Federal basis.

Increasing fuel economy is an expensive undertaking for automakers, the costs of which are necessarily passed on to consumers, thereby discouraging new vehicle purchases and slowing the renewal of the nation's light duty fleet. That is why fuel economy standards must be set considering other critical factors.

This is also why the notion of national applicability and preemption of State or local laws or regulations related to fuel economy standards is so critical. Allowing State or local governments to establish their own fuel economy standards, or standards related to fuel

[2] *See In re: Air Resources Board,* Notice of Approval of Regulatory Action, No. 2018–1114–03 (State of California, Office of Administrative Law Dec. 12, 2018), *available at https://ww3.arb.ca.gov/regact/2018/leviii2018/form400dtc.pdf?_ga=2.183723951.866759811.1568583699–1441462912.1552677736* (last visited Sept. 15, 2019).

[3] *See* California and Major Automakers Reach Groundbreaking Framework Agreement on Clean Emission Standards, Office of Gov. Gavin Newsome (July 25, 2019), *available at https://www.gov.ca.gov/2019/07/25/california-and-major-automakers-reach-groundbreaking-framework-agreement-on-clean-emission-standards/* (last visited Sept. 14, 2019); Terms for Light-Duty Greenhouse Gas Emissions Standards, *available at https://ww2.arb.ca.gov/sites/default/files/2019–07/Auto%20Terms%20Signed.pdf* (last visited Sept. 14, 2019).

[4] At the time this joint action was signed, California had not submitted or demonstrated any intention to submit an application for a waiver for either its December 2018 amendment to its regulations or its July 2019 ''framework.''

[5] The agencies note that the South Coast Air Quality Management District commented that EPA should not take an action on the waiver in the same notice as a rule that would change EPA's GHG standards. *See* South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813. Although the agencies do not acknowledge the validity of this argument, any such concern is rendered moot by this action.

economy, would provide for a universe in which automakers are placed in the untenable situation of having to expend resources to comply not only with Federal standards, but also meet separate State requirements. If State or local governments are allowed to require—directly or indirectly—automakers to develop and implement additional technologies to improve fuel economy (or reduce or eliminate tailpipe greenhouse gas emissions for all or a portion of a fleet), the fuel economy-related expenses of automakers increase beyond those considered in establishing federal standards. This would render the critical balancing required by EPCA devoid of meaning.

Uniform national fuel economy standards are essential to accomplishing the goals of EPCA. To ensure that the fuel economy standards NHTSA adopts constitute the uniform national requirements that Congress intended, NHTSA must address the extent to which State and local laws and regulations are preempted by EPCA.

Furthermore, EPCA states: ''When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.'' 49 U.S.C. 32919(a). As a limited exception, a State or local government ''may prescribe requirements for fuel economy for automobiles obtained for its own use.'' 49 U.S.C. 32919(c). In addition, when a Federal fuel economy labeling or information requirement is in effect, pursuant to 49 U.S.C. 32908, a State or local government may adopt or enforce an identical requirement on ''disclosure of fuel economy or fuel operating costs.'' 49 U.S.C. 32919(b). Absent this limited circumstance, a State or local government cannot even have laws in place that are identical to the Federal standards.

NHTSA will first summarize its discussion of preemption in the proposal before turning to discussion of issues raised by the comments. In this final rule, NHTSA fully reaffirms the discussion of preemption set forth in the proposal, which provides additional detail regarding NHTSA's views.[6]

In the proposal, NHTSA described its preemption discussions in prior rulemakings, which are consistent with the views on preemption that NHTSA is finalizing in this document.[7] NHTSA has asserted preemption of certain State emissions standards under EPCA on multiple occasions since 2002. The United States explained in a 2002 amicus brief that EPCA preempted California's then-existing zero-emissions vehicle (ZEV) regulations.[8] NHTSA continued the discussion of preemption later that year in a notice of proposed rulemaking setting CAFE standards for model year 2005 through 2007 light trucks, and reiterated its position in the 2003 final rule.[9] NHTSA's 2005 notice of proposed rulemaking setting standards for model year 2008 through 2011 light trucks also discussed preemption and the 2006 final rule elaborated on the issue at length, including in a specific discussion finding California's then-existing tailpipe greenhouse gas emissions regulations were preempted.[10] NHTSA's 2008 proposed rule for model year 2011 through 2015 passenger cars and light trucks also addressed preemption and proposed adding a summary of NHTSA's position on the issue to the Code of Federal Regulations.[11] That proposed rule also addressed recent developments, specifically the Supreme Court's decision in *Massachusetts* v. *EPA,* the enactment of EISA, and two district court decisions finding that State tailpipe greenhouse gas emissions standards were not preempted by EPCA.[12] NHTSA explained that those developments did not change its view of preemption and it reaffirmed the detailed analysis and conclusions from the 2006 final rule.[13] Subsequent CAFE rulemaking documents, prior to the August 2018 proposal, did not discuss EPCA preemption.[14] Thus, this final rule is consistent with NHTSA's longstanding position on EPCA preemption over the course of nearly two decades.

In the proposal, NHTSA also described certain developments, including the Supreme Court's decision in *Massachusetts* v. *EPA,* that preceded EPA's regulation of tailpipe greenhouse gas emissions through joint rulemaking with NHTSA.[15] In addition, NHTSA described the Obama Administration's creation of a framework that was intended to allow a manufacturer to ''meet all standards with a single national fleet.'' [16] Appeals of the two district court decisions holding that the California regulation and Federal regulation could co-exist were withdrawn as part of the negotiated agreement for the National Program.[17] The announcement of the framework was followed by EPA's decision less than two months later to grant a waiver to California for its own greenhouse gas emissions standards, without taking any substantive position on EPCA preemption.[18] The national framework was a negotiated agreement between the Federal government, California, and the automotive industry.[19]

NHTSA confirms its view, stated in the proposal on preemption, that the agencies' consideration in 2012 of California's ''deemed to comply''

[6] *See* 83 FR 42986, 43232–39 (Aug. 24, 2018).

[7] *Id.* at 43232. As NHTSA noted in the proposal, it had not previously directly addressed preemption of California's ZEV program. *Id.* at 43233.

[8] Brief for the United States as Amicus Curiae in Support of Affirmance, *Cent. Valley Chrysler-Plymouth Inc., et al,* v. *Kenny,* No. 02–16395 (9th Cir. 2002).

[9] 68 FR 16868, 16895 (Apr. 7, 2003); 67 FR 77015, 77025 (Dec. 16, 2002). In the notice of proposed rulemaking, NHTSA specifically rejected the argument made by California in litigation that NHTSA had not treated EPCA as preempting State efforts to engage in CAFE-related regulation, explaining that States may not ''issue a regulation that relates to fuel economy and which addresses the same public policy concern as the CAFE statute. Our statute contains a broad preemption provision making clear the need for a uniform, federal system. . . . The fact that NHTSA had not expressly addressed this particular aspect of California's requirements should not have been interpreted as tacit acceptance.'' 67 FR 77015, 77025 (Dec. 16, 2002).

[10] 71 FR 17566, 17654–70 (Apr. 6, 2006); 70 FR 51414, 51457 (Aug. 30, 2005).

[11] 73 FR 24352, 24478–79 (May 2, 2008). NHTSA finalized only standards for model year 2011 through that rulemaking action, and subsequently began a new rulemaking for model year 2012 and later passenger cars and light trucks. In the final rule for model year 2011, NHTSA stated: ''NHTSA has decided not to include any provisions addressing preemption in the Code of Federal Regulations at this time. The agency will re-examine the issue of preemption in the content of its forthcoming rulemaking to establish Corporate Average Fuel Economy standards for 2012 and later model years.'' 74 FR 14196, 14200 (Mar. 30, 2009).

[12] 73 FR 24352, 24478 (May 2, 2008).

[13] *Id.*

[14] As noted above, in NHTSA's final rule for model year 2011, it stated that ''[t]he agency will re-examine the issue of preemption in the content of its forthcoming rulemaking to establish Corporate Average Fuel Economy standards for 2012 and later model years.'' 74 FR 14196, 14200 (Mar. 30, 2009). However, in the NHTSA's 2009 proposal and 2010 final rule setting standards for model year 2012 through 2016 automobiles, NHTSA stated that is was ''deferring further consideration of the preemption issue.'' 75 FR 25324, 25546 (May 7, 2010); 74 FR 49454, 49635 (Sept. 28, 2009).

[15] 83 FR 42986, 43232–33 (Aug. 24, 2018).

[16] *Id.* at 43233; 76 FR 74854, 74863 (Dec. 1, 2011).

[17] *See* 83 FR 42986, 43233 (Aug. 24, 2018); Association of Global Automakers, Docket No. NHTSA–2018–0067–12032.

[18] In other words, the National Program included State requirements not nationally applicable. 83 FR 42986, 43233 (Aug. 24, 2018); *see also* 74 FR 32744, 32783 (July 8, 2009) (''EPA takes no position regarding whether or not California's GHG standards are preempted under EPCA.'').

[19] After President Obama announced the agreement, NHTSA and EPA subsequently adopted CAFE and greenhouse gas emissions standards through rulemaking. *See* 75 FR 25324 (May 7, 2010).

regulatory provision as obviating NHTSA's consideration of preemption was erroneous.[20] This, too, was part of the negotiated agreement described above.[21] Under California's regulatory provision, California deemed manufacturers to be in compliance with certain of California's requirements if they complied with EPA's standards.[22] However, EPCA explicitly provides that all State requirements ''related to'' fuel economy standards, even those that may be identical or equivalent to Federal requirements are preempted by EPCA.[23] Moreover, as discussed in additional detail below, California recently changed its regulations so that it has no such ''deemed to comply'' provision should the forthcoming SAFE final rule adopt any regulatory alternative other than the no action alternative.[24] This change sets up a direct conflict between Federal and State requirements, exacerbating the conflict that exists even now.

Congress's intent to provide for uniform national fuel economy standards is frustrated when State and local actors regulate in this area. In the proposal, NHTSA explained that the need for regulatory certainty, along with the clear prospect of disharmony, required it to address preemption.[25] NHTSA also explained its desire to seek comments on this important issue from State and local officials, along with other interested members of the public.[26] NHTSA in fact received many comments from State and local governments, NGOs, industry, and others concerning preemption.[27] This comment process helped ensure that the agency considered all facets of this significant issue before reaching a final determination in this rule.

NHTSA also discussed the broad and clear text of EPCA's express preemption provision.[28] As NHTSA explained in the proposal, unlike the Clean Air Act, there is no set of circumstances under EPCA in which it would be appropriate or permissible for NHTSA to waive preemption or allow States or local governments to adopt or enforce identical or equivalent requirements.[29] EPCA does not provide NHTSA with any waiver authority whatsoever. To ensure Federal primacy over this area, EPCA broadly preempts all State and local laws ''related to'' fuel economy standards or average fuel economy standards.[30] NHTSA reiterates, consistent with the proposal, that in this rulemaking NHTSA is concluding that State and local requirements that relate to fuel economy standards by directly or substantially affecting corporate average fuel economy levels are preempted.[31]

NHTSA also described Supreme Court precedent interpreting the meaning of ''related to.'' [32] In addition to the plain language of the statute, NHTSA applied to EPCA the guidance from Supreme Court case law to consider both the objectives of the statute and the effect of the State laws on the Federal standards.[33] As NHTSA explained, the primacy of a single national fuel economy standard, set by the Federal government, was an important objective of Congress in enacting EPCA.

In adopting EISA, Congress did not repeal or amend EPCA's express preemption provision.[34] While Congress included in EISA a savings provision preventing EISA from limiting preexisting authority or responsibility conferred by any law, or from authorizing violation of any law,[35] the savings clause did not purport to expand either EPA's or NHTSA's preexisting authority or responsibility.[36] NHTSA recognized that during debate on the floor, some Members of Congress made statements about the savings provision's impact on California's ability to set tailpipe greenhouse gas emissions standards.[37] NHTSA affirms its view, consistent with Supreme Court precedent, that such legislative history does not alter the plain text of the statute.[38] In the end, Congress did not change EPCA's preemption provision when it adopted EISA, despite clearly having the opportunity to do so.[39] Because States lacked preexisting authority to set tailpipe greenhouse gas emissions standards, as a result of EPCA's preemption provision, EISA's savings clause did not give them that authority.

In the proposal, NHTSA also described in detail the reasons that tailpipe carbon dioxide emissions regulations or prohibitions are ''related to'' fuel economy standards.[40] NHTSA explained that carbon dioxide emissions are a necessary and inevitable byproduct of burning gasoline: The more fuel a vehicle burns or consumes, the more carbon dioxide it emits.[41] Based on the physical and mathematically measurable relationship between carbon dioxide emissions and fuel economy, EPCA has always specified that compliance with fuel economy standards is determined through tests and calculation procedures established by EPA.[42] Specifically, compliance with fuel economy standards is based almost entirely on carbon dioxide emission rates.[43] As NHTSA noted, it is significant that in enacting EPCA, Congress both adopted test procedures reliant on the direct relationship between carbon dioxide emissions and fuel economy, and preempted State and local governments from adopting requirements related to fuel economy standards in the same law.[44]

NHTSA affirms in this final rule that a State or local requirement limiting tailpipe carbon dioxide emissions from automobiles has the direct and substantial effect of regulating fuel consumption and, thus, is ''related to'' fuel economy standards. Likewise, since carbon dioxide emissions constitute the overwhelming majority of tailpipe carbon emissions, a State regulation of all tailpipe greenhouse gas emissions from automobiles or prohibiting all tailpipe emissions is also ''related to'' fuel economy standards and preempted by EPCA.

NHTSA is also finalizing its conclusion that EPCA does not preempt all potential State or local regulation of greenhouse gas emissions from vehicles. As NHTSA explained in the proposal,

[20] *See id.;* 77 FR 62624, 62637 (Oct. 15, 2012).

[21] *See* 75 FR 25324, 25328 (May 7, 2010).

[22] 83 FR 42986, 43233 (Aug. 24, 2018).

[23] *See id.* at 43233–34.

[24] *See* 83 FR 42986, 42990 tbl. I–4 (Aug. 24, 2018); Cal. Code Regs. tit. 13, sec. 1961.3(c). California changed its regulation following issuance of NHTSA and EPA's proposed rule. *See* State of Cal., Office of Admin. Law, Notice of Approval of Regulatory Action (Dec. 12, 2018), *https://www.arb.ca.gov/regact/2018/leviii2018/form400dtc.pdf*. NHTSA recognized the potential for such a change in the proposal. 83 FR 42986, 43233 n.495 (Aug. 24, 2018).

[25] 83 FR 42986, 43233 (Aug. 24, 2018).

[26] *Id.*

[27] *See, e.g.,* California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; Alliance of Automobile Manufacturers, Docket No. NHTSA–2018–0067–12073; Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

[28] 83 FR 42986, 43233–34 (Aug. 24, 2018).

[29] *Id.* at 43233.

[30] 49 U.S.C. 32919(a).

[31] 83 FR 42986, 43233 (Aug. 24, 2018).

[32] *Id.*

[33] *Id.* at 43233–34.

[34] *See* EISA, Public Law 110–140 (2007).

[35] 42 U.S.C. 17002.

[36] *See id.*

[37] 83 FR 42986, 43234 (Aug. 24, 2018).

[38] *See Food Mktg. Inst.* v. *Argus Leader Media,* 139 S. Ct. 2356, 2364 (2019) (''In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. Where, as here, that examination yields a clear answer, judges must stop. Even those of us who sometimes consult legislative history will never allow it to be used to 'muddy' the meaning of 'clear statutory language.' '') (internal citations omitted).

[39] *See* EISA, Public Law 110–140 (2007); 83 FR 42986, 43234 (Aug. 24, 2018).

[40] 83 FR 42986, 43234 (Aug. 24, 2018).

[41] *Id.*

[42] 49 U.S.C. 32904(c).

[43] *See* 83 FR 42986, 43234 (Aug. 24, 2018).

[44] *Id.*

some greenhouse gas emissions from vehicles are not related to fuel economy because they have either no effect on fuel economy, or only an insignificant effect on fuel economy.[45] NHTSA provided an example of a requirement with no bearing on fuel economy: a State regulation of vehicular refrigerant leakage.[46] NHTSA also explained that State safety requirements that have only an incidental impact on fuel economy, such as a requirement to use child seats, is not preempted because it does not sufficiently relate to fuel economy standards.[47] NHTSA also confirms its view that, if preempted requirements are combined with requirements not related to fuel economy, ECPA would void only the preempted portion of the law.

In addition, NHTSA and EPA are confirming their determination, in this joint final action, that a Clean Air Act waiver does not waive EPCA preemption. As explained in the proposal, a State or local law or regulation related to automobile fuel economy standards is void *ab initio* under the preemptive force of EPCA.[48] As support, the proposal cited longstanding Supreme Court case law concerning the Supremacy Clause and action in violation of a statutory prohibition.[49] In sum, ''[i]t is basic to this constitutional command [in the Supremacy Clause] that all conflicting state provisions be without effect.'' [50]

As explained in the proposal, avoiding preemption under one Federal law has no necessary bearing on another Federal law's preemptive effect.[51] For purposes of the present rule, this conclusion is confirmed by Section 209 of the Clean Air Act, which explicitly states that a waiver of preemption pursuant to that provision of the Clean Air Act only relieves ''application of this section.'' [52] NHTSA also confirms its view that a Clean Air Act waiver does not ''federalize'' State or local requirements preempted by EPCA.

NHTSA and EPA also explained in the proposal their disagreement with decisions from district courts in California and Vermont that held that EPCA did not preempt State tailpipe greenhouse gas emissions standards.[53] The agencies particularly disagree with those district courts' characterization of the ''related to'' language in EPCA's preemption provision as narrow, their reliance on California's application for a Clean Air Act waiver, and the courts' implied preemption analyses.[54] As the proposal explained, these decisions are legally flawed, and NHTSA is not barred from proceeding with its preemption determination here.[55]

NHTSA also reaffirms its views on implied preemption, as described in the proposal.[56] State or local limitations or prohibitions on tailpipe carbon dioxide emissions from automobiles directly conflict with the objectives of EPCA. NHTSA balances statutory factors in setting CAFE standards at ''the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year'' (49 U.S.C. 32902(a)).[57] State requirements, made based on State-specific determinations unbound by the considerations in EPCA, frustrate NHTSA's statutory role. If one or more States may issue competing or overlapping requirements affecting fuel economy standards, industry must also apply resources and effort at meeting standards applicable only to discrete parts of the country in addition to those spent to comply with the Federal standards. In accordance with EPCA, manufacturers' ''average fuel economy'' is calculated based on specific statutory requirements. 49 U.S.C. 32901(a)(5), 32904. Manufacturers earn credits for exceeding average fuel economy standards. 49 U.S.C. 32903. This statutory compliance structure is impeded when States or local governments attempt to set or enforce their own requirements, which necessarily apply to manufacturers at a State or local level. This interferes with the national ''average fuel economy'' program. The broad preemption provision adopted by Congress in EPCA clearly demonstrates the intention for a single national set of standards that consider, among other things, economic feasibility and consumer choice. Indeed, the entire purpose of a balanced standard is defeated if a State can place its thumb on the scale. Likewise, separate State or local requirements interfere with the compliance regime under EPCA of performance determined based on nationwide fleet averages, which determine manufacturers' credits or shortfalls. *See* 49 U.S.C. 32903.

NHTSA also finalizes the view, as discussed in the proposal, that ZEV mandates are preempted by EPCA.[58] Such laws, which require that a certain number or percentage of vehicles sold or delivered in a State by a manufacturer meet ZEV requirements, directly and substantially affect fuel economy standards by requiring manufacturers to eliminate fossil fuel use in a portion of their fleet. Like State or local tailpipe GHG emissions standards, ZEV mandates require the application of additional efforts and resources beyond those needed to comply with Federal standards. ZEV mandates also directly conflict with the goals of EPCA as they apply irrespective of the Federal statutory factors the Secretary of Transportation (through NHTSA) is required to consider in setting fuel economy standards, including technological feasibility and economic practicability. In the proposal, NHTSA described, as an example, California's ZEV mandate, which manufacturers must comply with individually for each State adopting California's mandate.[59] This regime of State mandates forces manufacturers to expend scarce resources on specific technology regardless of consumer demand, and regardless of what the Secretary has determined in her judgment to be the appropriate expenditure of resources necessary to comply with fuel economy standards set in accordance with the balancing required by EPCA.

NHTSA also confirms its view that the preemption portion of this joint final action is a statement of what Federal law requires and is effective without regard to any particular model year of vehicles and without regard to the details of the fuel economy and greenhouse gas emissions standards the agencies have set previously or set in the future.[60] In other words, NHTSA's regulation concerning EPCA preemption is independent of and severable from the specific standards it ultimately adopts for model year 2021 through 2026 automobiles. Given the need for clarity on this issue, NHTSA has decided to issue this as a separate final rule and will later finalize the standards for model year 2021 through 2026 automobiles. NHTSA's preemption regulation formalizes its longstanding position on preemption and incorporates that position into the Code of Federal Regulations provisions concerning passenger automobile

[45] *Id.* at 43234–35.

[46] *Id.* at 43235.

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Maryland* v. *Louisiana,* 451 U.S. 725, 746 (1981) (citing *McCulloch* v. *Maryland,* 4 Wheat. 316, 427 (1819)).

[51] 83 FR 42986, 43235 (Aug. 24, 2018).

[52] 42 U.S.C. 7543(b)(1).

[53] 83 FR 42986, 43232–38 (Aug. 24, 2018); *see Green Mountain Chrysler* v. *Crombie,* 508 F. Supp. 2d 295 (D. Vt. 2007); *Cent. Valley Chrysler-Jeep, Inc.* v. *Goldstene,* 529 F. Supp. 2d 1151 (E.D. Cal. 2007), as corrected (Mar. 26, 2008).

[54] 83 FR 42986, 43232–38 (Aug. 24, 2018).

[55] *See id.* at 43235.

[56] *See id.* at 43237–38.

[57] 49 U.S.C. 32902(f).

[58] *See id.* at 43238–39.

[59] *Id.*

[60] *See id.* at 43239.

average fuel economy standards at 49 CFR 531.7 and 49 CFR part 531, appendix B, and light truck fuel economy standards at 49 CFR 533.7 and 49 CFR part 533, appendix B. These portions of the regulations are operable without regard to any specific Federal standards and requirements in 49 CFR parts 531 and 533 or other parts of the Code of Federal Regulations. Likewise, NHTSA's determination that a State or local law or regulation of tailpipe greenhouse gas emissions from automobiles is related to fuel economy standards is severable from NHTSA's determination that State or local ZEV mandates are related to fuel economy standards.

*B. Scientific Relationship Between Tailpipe Carbon Dioxide Emissions and Fuel Economy Standards*

NHTSA is finalizing its conclusion that State requirements regulating tailpipe carbon dioxide emissions from automobiles are related to fuel economy standards. The relationship between fuel economy standards and regulations that limit or prohibit tailpipe carbon dioxide emissions from automobiles is a matter of science and mathematics. Commenters did not and cannot dispute the direct scientific link between tailpipe carbon dioxide emissions from automobiles and fuel economy. Thus, State and local laws and regulations that regulate such tailpipe emissions are preempted under EPCA.

The relationship between carbon dioxide and fuel economy is described in several statements in an appendix to parts 531 and 533 that NHTSA is finalizing in this document.

First, ''[a]utomobile fuel economy is directly and substantially related to automobile tailpipe emissions of carbon dioxide.'' 49 CFR part 531, appx. B, section (a)(1)(A); 49 CFR part 533, appx. B, section (a)(1)(A).[61] No commenters disputed or otherwise specifically commented on this statement.

Second, ''[c]arbon dioxide is the natural byproduct of automobile fuel consumption.'' 49 CFR part 531, appx. B, section (a)(1)(B); 49 CFR part 533, appx. B, section (a)(1)(B).[62] One comment identified this as a correct statement,[63] and another highlighted this fact in noting NHTSA's longstanding and consistent view on preemption.[64] No commenters disagreed with this factual statement.

Third, ''[t]he most significant and controlling factor in making the measurements necessary to determine the compliance of automobiles with the fuel economy standards in this part [531 and 533] is their rate of tailpipe carbon dioxide emissions.'' 49 CFR part 531, appx. B, section (a)(1)(C); 49 CFR part 533, appx. B, section (a)(1)(C).[65] The Alliance of Automobile Manufacturers similarly stated that the measurements for CAFE compliance involved ''the same tests, vehicles, sales data, and emissions measurements that the EPA uses to measure carbon dioxide and tailpipe GHG emissions.'' [66] Fiat Chrysler Automobiles (FCA) also reiterated this point from the Alliance's comments,[67] and the Competitive Enterprise Institute highlighted NHTSA's discussion of compliance measurement in agreeing that fuel economy standards and greenhouse gas emissions standards are inherently related.[68] CARB did not dispute this factual statement, but pointed out that carbon dioxide emissions are only one part of the compliance testing regime Congress approved—a fact that NHTSA had already recognized in its proposal.[69] As NHTSA explained in the proposal, as specified by EPCA, compliance with the CAFE standards is and has always been based on the rates of emission of carbon dioxide, carbon monoxide, and hydrocarbons from covered vehicles, but primarily on the emission rates of carbon dioxide.[70] The role of carbon dioxide is approximately 100 times greater than the combined role of the other two relevant carbon exhaust gases.[71]

Fourth, ''[a]lmost all technologically feasible reduction of tailpipe emissions of carbon dioxide is achievable through improving fuel economy, thereby reducing both the consumption of fuel and the creation and emission of carbon dioxide.'' 49 CFR part 531, appx. B, section (a)(1)(D); 49 CFR part 533, appx. B, section (a)(1)(D).[72] The South Coast Air Quality Management District (South Coast) commented that NHTSA previously proposed, in 2008, adopting similar regulatory text that used the word ''most'' instead of ''almost all.'' [73] South Coast asserts that the 2008 proposal shows that NHTSA ''strains to exaggerate'' the overlap between greenhouse gas emissions standards and fuel economy standards.[74] NHTSA disagrees. While South Coast points to hybrid electric vehicles and ZEVs, it offers no evidence to refute the fact that almost all technologically feasible reduction of tailpipe emissions of carbon dioxide is achievable through improving the fuel economy levels of the vehicles in question.

Fifth, ''as a practical matter, regulating fuel economy controls the amount of tailpipe emissions of carbon dioxide, and regulating the tailpipe emissions of carbon dioxide controls fuel economy.'' 49 CFR part 531, appx. B, section (a)(1)(E); 49 CFR part 533, appx. B, section (a)(1)(E).[75] No commenter disputed this statement. The National Automobile Dealers Association agreed, putting it this way: ''the physics and chemistry involved with fuel economy and GHG emissions standards are such that controlling fuel economy controls GHGs and controlling GHGs controls fuel economy.'' [76] It is also worth noting that technology cannot reduce the amount of carbon dioxide produced by combusting one gallon of gas. Instead, only technology that reduces the amount of gas needed to drive one mile (fuel economy) will reduce the amount of carbon dioxide generated per mile.

These statements in the regulatory appendix concerning the scientific relationship between automobile carbon dioxide emissions and fuel economy provide the foundation for NHTSA's preemption analysis. Due to this scientific relationship, which no commenter refuted, a regulation of tailpipe carbon dioxide emissions from automobiles that does not explicitly state that it is regulating fuel economy nevertheless has the effect of doing so. The label a State chooses to put on its regulations certainly is not dispositive in a preemption analysis. *See, e.g., Nat'l Meat Ass'n.* v. *Harris,* 565 U.S. 452, 464 (2012). One comment, from the Northeast States for Coordinated Air Use Management (NESCAUM), asserted that ''California's GHG standards do not mention fuel economy or attempt to

[61] 83 FR 42986, 43489 (Aug. 24, 2018).

[62] *Id.*

[63] Walter Kreucher, Docket No. NHTSA–2018–0067–0444.

[64] Association of Global Automakers, Docket No. NHTSA–2018–0067–12032.

[65] 83 FR 42986, 43489 (Aug. 24, 2018).

[66] Alliance of Automobile Manufacturers, Docket No. NHTSA–2018–0067–12073.

[67] Fiat Chrysler Automobiles (FCA), Docket No. NHTSA–2018–0067–11943.

[68] Competitive Enterprise Institute, Docket No. NHTSA–2018–0067–12015.

[69] *See* California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; 83 FR 42986, 43234 (Aug. 24, 2018).

[70] *See* 83 FR 42986, 43234 (Aug. 24, 2018).

[71] 71 FR 17566, 17655–56 (Apr. 6, 2006); 83 FR 42986, 43234 (Aug. 24, 2018).

[72] 83 FR 42986, 43489 (Aug. 24, 2018).

[73] South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[74] *Id.*

[75] 83 FR 42986, 43489 (Aug. 24, 2018).

[76] National Automobile Dealers Association, Docket No. NHTSA–2018–0067–12064.

regulate fuel economy.''[77] To such comments, the agencies must ask ourselves the age-old question: ''What's in a name?'' and conclude ''[t]hat which we call a rose by any other name would smell as sweet.''[78] Arguments focused on form, or worse—labels—over substance are not persuasive. Moreover, it is indisputable that EPCA preemption reaches beyond explicit regulations of fuel economy and into regulations ''related to'' fuel economy. The words ''related to'' cannot be read out of the statute or narrowed in a way that undermines Congress's broad preemption intent.

It is a matter of undisputed fact that the more fuel a vehicle burns or consumes, the more carbon dioxide it emits. There is a necessary relation between the regulation of one side of this equation and the regulation of the other. In other words, improving fuel economy has two inherently related benefits: Reducing fuel consumption and reducing carbon dioxide emissions. State and local governments cannot evade the preemptive sweep of EPCA by emphasizing only one side of these benefits and downplaying or ignoring the other when describing their regulations.

To further illustrate the situation, consider types of regulations for a swimming pool. If the pool has a hose on one side that is filling the pool and a hose on the other side that is draining the pool, you can regulate the water level in the pool by controlling either hose. Limiting the amount of water released by the inflow hose, is not itself a regulation of the outflow hose. But it is nonsensical to say that regulating the pool's inflow is not related to regulating its outflow. A regulation of either hose necessarily affects the level of water in the same pool. The Supreme Court has recognized preemption should appropriately apply in such contexts. *See Rowe* v. *N.H. Motor Transp. Ass'n,* 552 U.S. 364, 368, 72 (2008) (looking at effect of regulation to determine it was preempted even though ''it tells *shippers* what to choose rather than *carriers* what to do'' where Federal law preempted State laws ''related to a price, route, or service of any motor carrier . . . with respect to the transportation of property''); *Engine Mfrs. Ass'n.* v. *South Coast Air Quality Mgmt. Dist.,* 541 U.S. 246, 255 (2004) (explaining that it ''would make no sense'' to allow a State regulation to evade preemption simply because it addressed the purchase, rather than manufacture, of a federally regulated product).

*C. Importance of One National Standard*

To ensure uniform national fuel economy standards, Congress determined that it was appropriate to preempt States and local governments from adopting or enforcing laws or regulations related to the Federal standards. Effectuating Congress's goal requires NHTSA to address preemption. Preemption is necessary to the effectiveness of NHTSA's existing and forthcoming fuel economy standards and regulatory certainty into the future, specifically, one set of national standards. Congress made clear, through the required comprehensive balancing of factors and underlined by its inclusion of an express preemption provision, that State and local requirements impede the national fuel economy program. Thus, NHTSA is exercising its authority in this document, under 49 U.S.C. 32901 through 32903, to promulgate regulations to protect the integrity of the national program. This confirms the clear preemptive nature of NHTSA's standards, as stated in 49 U.S.C. 329219 and provides additional clarity on the scope of preemption, to carry out NHTSA's statutory authority to set nationally applicable standards.

A consistent refrain throughout many of the comments NHTSA received on its preemption proposal was the need for one national standard.[79] Preemption provides for just that uniformity. Indeed, that was the very purpose for Congress's including the express preemption provision in EPCA.

In enacting EPCA's preemption provision, Congress explicitly recognized the need to avoid a patchwork of requirements related to fuel economy standards, and gave NHTSA the exclusive authority to set and enforce fuel economy standards with discrete and limited exceptions as set forth in 49 U.S.C. 32919. NHTSA's exclusive authority is exercised through joint rulemaking with EPA for the very reason that tailpipe carbon dioxide emissions standards are directly and substantially related to fuel economy standards and apply concurrently to the same fleet of vehicles. This joint action enables the Federal government to administer its overlapping obligations while avoiding inconsistency. *See Massachusetts* v. *EPA,* 549 U.S. 497, 532 (2007).

Recent developments in California provide good examples of the need for a national standard and the problem that Congress sought to address in enacting EPCA's preemption provision. After the agencies published the proposal, California amended its regulations such that manufacturers are bound to comply with requirements consistent with the no action alternative for model years 2021 through 2026,[80] regardless of what the Federal standards are ultimately adopted. Moreover, even as to the existing Federal standard, California's regulations are impermissible under EPCA because only a Federal standard can apply nationally. State or local standards necessarily apply at the State and local level, and therefore are inherently inconsistent with the nationwide average standards pursuant to EPCA. *See* 49 U.S.C. 32901(a)(5)–(6), (13). Likewise, State and local compliance regimes interfere with the national program of credits and shortfalls for nationwide fleet performance by making compliance across the country inordinately complicated, inefficient, and expensive. *See id.* 32903.

Despite a widespread shared belief in the importance of one national standard, NHTSA's proposal on preemption received a mix of support and opposition in comments. Some commenters weighed in on preemption largely only to emphasize the importance of having a national standard.[81] Other commenters that supported the substance of the proposal agreed with NHTSA's analysis of both express and implied preemption, as well as the conclusion that both State laws that limit and State laws that prohibit carbon dioxide tailpipe emissions from automobiles, or have the direct or substantial effect of doing so, are preempted.[82] On the other hand, those commenters that opposed the substance of the proposal asked NHTSA to withdraw and not finalize any regulatory text concerning preemption.[83] Doing so would ignore the very purpose of EPCA's fuel economy provisions and NHTSA's statutory obligation under EPCA: To balance statutory factors in order to

[77] Northeast States for Coordinated Air Use Management (NESCAUM), Docket No. NHTSA–2018–0067–11691.

[78] W. Shakespeare, Romeo & Juliet, II, ii (47–48) (1597).

[79] *See, e.g.,* Alliance of Automobile Manufacturers, Docket No. NHTSA–2018–0067–12073; Association of Global Automakers, Docket No. NHTSA–2018–0067–12032.

[80] 83 FR 42986, 42990 tbl. I–4 (Aug. 24, 2018).

[81] *See, e.g.,* Toyota Motor North America, Docket No. NHTSA–2018–0067–12150.

[82] *See, e.g.,* Alliance of Automobile Manufacturers, Docket No. NHTSA–2018–0067–12073; Competitive Enterprise Institute, Docket No. NHTSA–2018–0067–12015.

[83] *See, e.g.,* Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

establish standards that are ''the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year.'' [84] NHTSA disagrees with the comments that ask it to withdraw its proposal and not finalize any regulatory text on preemption. Given the present circumstances, failing to address this issue amounts to ignoring the existence of EPCA's preemption provision, and allowing for State and local requirements that interfere with NHTSA's statutory duty to set nationally consistent fuel economy standards.

The rule NHTSA is adopting in this document, under its authority to implement a national automobile fuel economy program in 49 U.S.C. 32901 through 32903, will ultimately provide needed certainty concerning preemption into the future. While EPCA's preemption provision has been in place for decades, the present circumstances demonstrate the need for greater clarity on this issue.

NHTSA's statutory role is to set nationwide standards based on a reasoned balancing of statutory factors. State and local requirements—unbound by these considerations—undermine NHTSA's ability to set standards applicable across the entire country. NHTSA is obliged to set standards at ''the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year.'' 49 U.S.C. 32902(a). The regulation NHTSA is finalizing in this document implements that authority in 49 U.S.C. 32902 by clarifying the State requirements that impermissibly interfere with its statutory role to set nationally applicable standards. As explained in the proposal, as a practical matter, State and local actors would generally only set requirements that have the effect of requiring a *higher* level of average fuel economy (lest their standards lack impact).[85] That supposition has now been demonstrated by California's preemptive action to effectively set higher standards than the Federal standards, should the forthcoming final SAFE rule finalize anything lower than the no action alternative described in the NPRM for model years 2021 through 2026. This state of regulatory inconsistency—and even the potential for such inconsistency—is anathema to the express terms and purposes of EPCA, which does not even permit States to set fuel economy standards identical to those set by NHTSA in accordance with the statutory requirements.[86] Even identical standards interfere with the national program by imposing requirements not applicable to nationwide fleets and impose compliance regimes inconsistent with EPCA. *See, e.g.,* 49 U.S.C. 32903 (establishing specific requirements for earning and using credits based on nationwide average fuel economy performance).

California's recent action also demonstrates disregard for NHTSA's mandate to set standards in no more than 5 model year increments.[87] To avoid inconsistent State standards, California's regulatory change would require NHTSA to adopt the most stringent of nine regulatory alternatives it considered in the proposal.[88] NHTSA did not bind itself in any way to that regulatory alternative in its 2012 final rule, and to do so would have been contrary to law.[89]

Automakers must comply with the Federal fuel economy and GHG emissions requirements, and do so at significant cost. States like California that do not abide by the constraints of Federal law, and instead set inconsistent or even duplicative requirements related to fuel economy standards unjustifiably increase manufacturers' compliance costs, which must be either passed along to consumers or absorbed by the industry. Clarity on preemption is therefore essential to ensure the industry has the ability to efficiently expend its resources to comply with the nationally applicable standards determined by the Federal government in light of the Federal statutory factors that must be balanced, without the need to separately account for or comply with State or local requirements.

While it is of course ideal for States to independently abide by the constraints of Federal law, this does not reflect the current state of affairs. NHTSA's awareness of laws and regulations already in place, as well as the public comments it received in response to its proposal, confirm the need for additional clarity on the boundaries of EPCA preemption. Wrongly decided decisions by district courts in California and Vermont (appeals of which were abandoned as a condition of the negotiated agreement prior to the 2012 rulemaking), as well as NHTSA's own silence on this issue in recent years, are sowing confusion, emphasizing the need for the clarity provided by this final rule affirmatively establishing One National Program.[90]

*D. NHTSA's Final Rule Provides Clarity and Certainty on EPCA Preemption*

This final rule provides needed clarity on the scope of EPCA preemption. NHTSA is adopting regulatory text, including a detailed appendix, in addition to discussing this issue in the preamble to the rule, specifically to provide clarity on EPCA's preemption provision.

NHTSA rejects the assertion advanced in one comment that NHTSA did not provide notice and a fair opportunity to comment on its interpretation of EPCA preemption.[91] Any such suggestion is negated by the host of commenters that addressed the issue of preemption in response to the proposal. NHTSA proposed codifying its preemption interpretation in parts 531 and 533, and all commenters were explicitly asked to comment on the specific proposed regulatory text as well as on the explanation of NHTSA's interpretation set out in the preamble to the NPRM.

NHTSA also disagrees with a comment from the California Air Resources Board (CARB) that asserted the proposal was not clear on the scope of preemption.[92] The regulatory text articulates the boundaries of both express and implied preemption, with appropriate limitation to State or local laws or regulations that: (1) Regulate or prohibit tailpipe carbon dioxide emissions from automobiles, or (2) have the direct or substantial effect of regulating or prohibiting tailpipe carbon

[84] 49 U.S.C. 32902(a), (f).

[85] 83 FR 42986, 43238 (Aug. 24, 2018).

[86] *See* 49 U.S.C. 32902(a), 32919(a).

[87] *See id.* 32902(a), (b)(3)(B).

[88] *See* Cal. Code Regs. tit. 13, section 1961.3(c); *see* 83 FR 42986, 42990 tbl. I–4 (Aug. 24, 2018) (listing augural standards as baseline/no action alternative, and eight other alternatives under consideration).

[89] *See* 49 U.S.C. 32902(b)(3)(B); 77 FR 62624, 62627 (Oct. 15, 2012).

[90] As described in the proposal, NHTSA's views on preemption are longstanding. However, NHTSA has not directly addressed preemption in its most recent CAFE rulemakings. South Coast disputes that NHTSA's views on preemption are longstanding, pointing to legal and factual developments since. South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813. That NHTSA has not opined on developments does not mean that its views have changed. South Coast also points to some wording changes to argue that NHTSA has shifted positions. NHTSA disagrees. It has consistently held the position that State regulation of tailpipe greenhouse gas emissions from automobiles is preempted, and South Coast has not identified any statements to the contrary. In any event, the fact that NHTSA has not addressed EPCA preemption in its most recent rulemakings highlights the need to address the issue without further delay.

[91] Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

[92] California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

dioxide emissions from automobiles or automobile fuel economy. In the proposal, NHTSA provided examples of laws that would not be preempted.[93] CARB did not identify any examples of laws where additional clarity was needed.

It should not be difficult for States or local governments to ascertain whether their laws or regulations regulate or prohibit tailpipe carbon dioxide emissions. As NHTSA explained in the proposal and reiterates in this document, both requirements specific to tailpipe carbon dioxide emissions from automobiles and those that address all tailpipe greenhouse gas emissions from automobiles are preempted, given that carbon dioxide emissions constitute the overwhelming majority of those emissions.[94] Likewise, ZEV mandates are also preempted.[95]

NHTSA also does not believe it should be difficult for States or local governments to determine if their laws or regulations have the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy.[96] To aid in this effort, in the proposal, NHTSA described requirements that would not be preempted because they have only incidental impact on fuel economy or carbon dioxide emissions.[97] The examples NHTSA provided were child seat mandates and laws governing vehicular refrigerant leakage.[98]

Moreover, contrary to assertions in some comments, NHTSA's adoption of regulatory text does provide a limiting principle[99] and is not overbroad.[100] Congress set the extraordinarily broad boundaries of preemption in EPCA, where it specified that State and local laws ''related to fuel economy standards'' are preempted. The words ''related to'' have meaning and cannot be read out of the statute. To the extent that questions of interpretation remain about the scope of preemption, that is a consequence of the statute, and is far from unique—particularly with respect to the ''related to'' language, which Congress has used in multiple contexts.[101] The Supreme Court has opined on the meaning of similar terms. However, NHTSA recognizes the concerns about the appropriate limitations of preemption. Notwithstanding the broad sweep of EPCA preemption, NHTSA intends to assert preemption only over State or local requirements that directly or substantially affect corporate average fuel economy standards.

Through its adoption of specific regulatory text in this document, NHTSA is providing guidance on the boundary set by Congress, as well as under principles of implied preemption. Notably, NHTSA has not concluded that implied preemption broadens the scope of preemption established by Congress. As NHTSA recognized in its proposal, some greenhouse gas emissions from automobiles have no relation to fuel economy and therefore may be regulated by States or local governments without running afoul of EPCA preemption. NHTSA provided examples of State or local requirements that are not preempted. It also specifically invited comment on the extent to which State or local requirements can have some incidental impact on fuel economy or carbon dioxide emissions without being related to fuel economy standards, and thus are not preempted. NHTSA did not receive any directly responsive comments regarding this issue, including from State and local government commenters, suggesting that they do not currently have questions about how preemption would apply to their laws or regulations.[102]

As an additional limiting principle, NHTSA reiterates the statement in its proposal that only a portion of a law or regulation would be preempted, where possible. This would be the case if the law or regulation combined multiple severable elements that were allowable and not allowable, such as with a regulation of both vehicular refrigerant leakage and tailpipe carbon dioxide emissions—refrigerant leakage requirements could remain in place while tailpipe carbon dioxide emissions regulations would necessarily be preempted.

NHTSA rejects the argument made by certain commenters that the presumption against preemption applies in this context.[103] The presumption is not appropriate given EPCA's express statutory preemption provision. *See Puerto Rico* v. *Franklin Cal. Tax-Free Trust,* 136 S. Ct. 1938, 1946 (2016) (explaining that ''because the statute 'contains an express pre-emption clause,' we do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.' '') (quoting *Chamber of Commerce of United States of Am.* v. *Whiting,* 563 U.S. 582, 594 (2011)).

NHTSA reaffirms the view that EPCA's express preemption provision is broad and clear. NHTSA's review and assessment of comments has not changed its view. Some comments noted that the statute specifically preempts laws or regulations related to fuel economy *standards.*[104] They assert that States and local governments are unconstrained by EPCA preemption in regulating future model year vehicles, before they are covered by a fuel economy standard issued by NHTSA. NHTSA disagrees.

EPCA preempts State and local laws and regulations that relate to: (1) Fuel economy standards, *or* (2) average fuel economy standards for automobiles covered by an average fuel economy standard under 49 U.S.C. Chapter 329. Currently, automobiles through model year 2021 are covered by an average fuel economy standard under Chapter 329.[105] NHTSA will continue setting standards for future model years, pursuant to the mandate in 49 U.S.C. 32902(a) that ''[a]t least 18 months

[93] 83 FR 42986, 43235 (Aug. 24, 2018).

[94] *Id.* at 43234.

[95] *See id.* at 43238–39.

[96] South Coast argued that EPCA preemption would not reach possible State and local requirements concerning lease arrangements or requirements for used vehicles. South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813. NHTSA does not agree. EPCA preempts requirements related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under EPCA. If a State requirement falls within this scope, it is preempted. For example, a State could not prohibit dealers from leasing automobiles or selling used automobiles unless they meet a fuel economy standard.

[97] 83 FR 42986, 43235 (Aug. 24, 2018).

[98] *Id.*

[99] Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

[100] *Id.;* California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[101] *See Rowe* v. *N.H. Motor Transp. Ass'n,* 552 U.S. 364, 370–73 (2008); *Am. Airlines* v. *Wolens,* 513 U.S. 219, 226–27 (1995); *Shaw* v. *Delta Airlines, Inc.,* 463 U.S. 85, 97 (1983).

[102] Some commenters did assert that California's greenhouse gas emissions standards or ZEV mandates have only an incidental impact on fuel economy, or that NHTSA was not clear why those requirements have more than an incidental impact on fuel economy. California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; Northeast States for Coordinated Air Use Management (NESCAUM), Docket No. NHTSA–2018–0067–11691; South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813. NHTSA disagrees. It discussed these issues in detail in parts b, f, and g of the preemption discussion of the proposed rule and incorporates those discussions here. 83 FR 42986, 43234, 37–39 (Aug. 24, 2018).

[103] *See* California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; Center for Biological Diversity et al., Docket No. NHTSA–2018–0067–12000; South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[104] South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813; *see also* Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

[105] *See* 77 FR 62624, 62637 (Oct. 15, 2012).

before the beginning of *each* model year, the Secretary of Transportation shall prescribe by regulation average fuel economy standards for automobiles manufactured by a manufacturer in that model year.'' [106] NHTSA prescribes ''average fuel economy standards for at least 1, but not more than 5, model years.'' 49 U.S.C. 32902(b)(3)(B). State and local requirements that address automobiles beyond model year 2026 are therefore preempted if they relate to ''fuel economy standards'' that NHTSA is required to establish in the future. To conclude otherwise would be to make the impermissible assumption that NHTSA will not carry out Congress's command.

The regulation NHTSA is finalizing in this document implements that authority in 49 U.S.C. 32902 by making clear that State and local requirements that relate to fuel economy standards for future model year vehicles conflict with NHTSA's ability to set nationally applicable standards for those vehicles in the future and thus are impliedly preempted. Manufacturers make design decisions well in advance of production, as Congress recognized by adding ''lead time'' provisions to the statute. State and local requirements for automobiles not yet covered by a NHTSA standard could force manufacturers into plans that are not economically practical or otherwise inconsistent with EPCA's statutory factors—since States and local governments are not bound by those considerations. By the time future model year vehicles are produced, they will be covered by a NHTSA standard. If States or local governments were permitted to issue regulations related to fuel economy for future model year vehicles, manufacturers would at least act at risk of running afoul of those non-Federal regulations. At least some manufacturers would undoubtedly feel compelled to conform with such non-Federal regulations until the Federal government sets its own standards. Even if non-Federal regulations are not ultimately enforceable as to produced vehicles (since a Federal fuel economy standard will be adopted, in time), they clearly conflict with the congressionally imposed constraint of issuing standards for not more than 5 model years. Such far-reaching regulations are based on predictions about the future that are inevitably less reliable the further in time they reach. Manufacturers are therefore put in an untenable position of either planning towards State and local regulations based on potentially outdated or unrealistic expectations about the future, or ignoring them before knowing the Federal standards that will eventually apply and acting at risk of enforcement by non-Federal actors. Moreover, different States could impose different and conflicting fuel economy requirements on manufacturers for future model years, a result directly at odds with the single national standard established by EPCA. Any of these scenarios demonstrates that the position that EPCA preemption does not reach regulation of model year vehicles not currently covered by a NHTSA standard is flawed. State or local requirements related to fuel economy standards for any model year automobiles are preempted.

The regulatory text and preamble discussion clearly articulates NHTSA's views on the meaning of ''related to'' in EPCA's express preemption provision, which are confirmed following NHTSA's review and assessment of comments. As discussed in the proposal, EPCA is not unique in using the phrase ''related to'' to set the scope of preemption.[107] NHTSA described prior Supreme Court case law interpreting this phrase as broad and including such conceptual relationships as having an ''association with'' or ''connection to.'' In its comments, South Coast asserted that NHTSA's discussion was ''legally erroneous'' because it did not include ''discussion and analysis'' of a line of Supreme Court cases that began with *New York State Conference of Blue Cross* v. *Travelers Ins. Co.,* 514 U.S. 645 (1995).[108] South Coast's criticism is unfounded; NHTSA directly recognized the *Travelers* line of cases which look to the objectives of the statute as a guide to the scope of preemption. *See Travelers,* 514 U.S. at 656. In the proposal, NHTSA specifically applied this analysis to the CAFE context and cited a 1997 case quoting *Travelers.*[109] The *Travelers* line of cases supports NHTSA's position on preemption. As NHTSA explained in the proposal, EPCA's preemption provision demonstrates that one of Congress's objectives was to create a single set of national fuel economy standards. The language Congress enacted preempts all State and local laws and regulations that relate to fuel economy standards, and does not exempt even State requirements that are identical to Federal requirements. Moreover, NHTSA's proposal was not intended as a comprehensive recitation of all case law addressing the use of ''related to'' in statutory preemption provisions. There are many Supreme Court decisions that support the breadth of that language beyond those specifically cited in the proposal.[110] For example, in *Rowe,* the Court recognized that a State statute that forbid certain retailers from employing a delivery service unless it followed certain delivery procedures was preempted by the Federal Aviation Administration Authorization Act, which preempted States from enacting or enforcing laws ''related to a price, route, or service of any motor carrier.'' *Rowe,* 552 U.S. at 368, 71–73. The Court recognized that the State law was directed at shippers rather than carriers, but found that the *effect* of the requirements impacted carriers. *Id.* at 372. The Court explained that State laws ''whose 'effect' is 'forbidden' under federal law are those with a '*significant* impact' on carrier rates, routes or services.'' *Id.* at 375 (emphasis in original). Likewise, here, regulation of tailpipe carbon dioxide emissions has a direct and undeniably substantial effect on fuel economy.

However, NHTSA, of course, agrees that ''related to'' is not unlimited.[111] NHTSA specifically discussed the limitations of preemption in its proposal, which only seeks to preempt State or local requirements that directly or substantially affect corporate average fuel economy. NHTSA also provided specific examples of State laws and regulations that would not be preempted, as well as clearly articulating some that are preempted. As discussed above, the regulatory text NHTSA is adopting in this document is appropriately limited and consistent with the scope of preemption established by Congress.

With respect to implied preemption, NHTSA agrees with comments that assert it is a fact-driven analysis.[112] However, NHTSA disagrees that there was an insufficient factual record for it to evaluate the conflict either at the time of the proposal or now.[113] NHTSA is well aware of State regulations of tailpipe greenhouse gas emissions (including carbon dioxide) and ZEV mandates, and described several of these in the proposal. The foundational

[106] 49 U.S.C. 32902(a) (emphasis added).

[107] 83 FR 42986, 43233 (Aug. 24, 2018).

[108] South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[109] 83 FR 42986, 43233 (Aug. 24, 2018).

[110] *See, e.g., Rowe* v. *N.H. Motor Transp. Ass'n,* 552 U.S. 364, 367–72 (2008).

[111] As the Supreme Court has stated, ''the breadth of the words 'related to' does not mean the sky is the limit.'' *Dan's City Used Cars, Inc.* v. *Pelkey,* 569 U.S. 251, 260 (2013).

[112] California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

[113] California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873.

factual analysis involves the scientific relationship between automobile fuel economy and automobile tailpipe emissions of carbon dioxide. NHTSA discussed this scientific relationship in detail. No commenter contested the scientific and mathematical relationship between them.

Contrary to CARB's contention in its comments, the fact that NHTSA acknowledged that some State requirements that incidentally affect greenhouse gas emissions are not preempted does not demonstrate that there is an insufficient record for finding that other laws do pose a conflict to NHTSA's statutory role to set nationwide fuel economy standards for automobiles.[114] To the contrary, NHTSA carefully considered and acknowledged the limitations of EPCA preemption by discussing a variety of types of laws, and providing specific examples.

NHTSA also disagrees with the claim made in some comments that it does not have delegated authority to issue a regulation on this topic, and is not owed deference or weight for its regulation implementing EPCA's express preemption provision or the conflict resulting from State or local laws or regulations.[115] Congress gave the Secretary of Transportation express authorization to prescribe regulations to carry out her duties and powers. 49 U.S.C. 322(a).[116] NHTSA has delegated authority to carry out the Secretary's authority under Chapter 329 of Title 49, which encompasses EPCA's preemption provision, as well as EISA.[117] NHTSA therefore has clear authority to issue this regulation under 49 U.S.C. 32901 through 32903 to effectuate a national automobile fuel economy program unimpeded by prohibited State and local requirements. As explained here, the statute is clear on the question of preemption, and NHTSA must carry it out. *See Coventry Health Care of Missouri, Inc.* v. *Nevils,* 137 S. Ct. 1190, 1193 n.3 (2017) (holding that preemption applies and ''the statute alone resolves this dispute''). However, to the extent there is any ambiguity, NHTSA is the expert agency and its regulation adopted in this document is entitled to deference.[118] As explained in the proposal, NHTSA is the expert agency given authority to administer the Federal fuel economy program and has expert authority to interpret and apply the requirements of EPCA, including preemption. *See Medtronic, Inc.* v. *Lohr,* 518 U.S. 470 (1996) (''Because the FDA is the federal agency to which Congress has delegated its authority to implement the provisions of the Act, the agency is uniquely qualified to determine whether a particular form of state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Hines* v. *Davidowitz,* 312 U.S. 52, 67, 61 S. Ct. 399, 404, 85 L. Ed. 581 (1941), and, therefore, whether it should be pre-empted.''); *see also Nat'l Rifle Ass'n* v. *Reno,* 216 F.3d 122 (D.C. Cir. 2000) (rejecting argument that Attorney General lacked authority to issue regulation that she described as clarifying that certain State requirements were not preempted by Federal law). This is particularly true given the scientific nature of the relationship between fuel economy and greenhouse gas emissions. *See Geier* v. *Am. Honda Motor Co., Inc.,* 529 U.S. 861 (2000) (''Congress has delegated to DOT authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive. The agency is likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely qualified' to comprehend the likely impact of state requirements.'').

NHTSA is also finalizing its view that its regulation concerning EPCA preemption is independent and severable from any particular CAFE standards adopted by NHTSA. NHTSA's implementation of its authority to set nationally applicable fuel economy standards under 49 U.S.C. 32902, by clarifying the scope of preemption, is separate from its decision on the appropriate standards for any given model years. No commenter disagreed that this portion of the proposed rule is severable. The Alliance of Automobile Manufacturers agreed, noting case law stating that whether a regulation is severable depends on the agency's intent and whether the remainder of the regulation may still function sensibly.[119] Both these considerations support severability here. Given the lack of any comments to the contrary, NHTSA is finalizing its conclusion that the standards for model year 2021 through 2026 automobiles are independent of and severable from the decision NHTSA is finalizing in this document on EPCA preemption. Moreover, given the need for clarity on preemption, and in order to give effect to existing standards established pursuant to 49 U.S.C. 32902, NHTSA is issuing this final rule now before making a final determination on the standards portion of the proposal.

### *E. Direct and Substantial Relationship Between ZEV Mandates and Fuel Economy Standards*

NHTSA is also finalizing its conclusion that a State law or regulation that either explicitly prohibits tailpipe carbon dioxide emissions from automobiles or has the direct or substantial effect of doing so is preempted, both pursuant to the express preemption provision in 49 U.S.C. 32919 and implied preemption, as an obstacle to NHTSA's national program pursuant to 49 U.S.C. 32901–32903.

As explained in greater detail in the proposal, carbon dioxide emissions constitute the overwhelming majority of tailpipe carbon emissions.[120] The only feasible way of eliminating tailpipe carbon dioxide emissions altogether is to eliminate the use of fossil fuel. Thus, regulations that require a certain number or percentage of a manufacturer's fleet of vehicles sold in a State to be ZEVs that produce no carbon dioxide tailpipe emissions necessarily affect the fuel economy achieved by the manufacturer's fleet as well as the manufacturer's strategy to comply with applicable standards, and are therefore preempted under EPCA. These regulations therefore have just as a direct and substantial impact on corporate average fuel economy as regulations that explicitly eliminate carbon dioxide emissions, and are therefore preempted. NHTSA described types of ZEV mandates in detail in its proposal, including California's ZEV mandate, which has been adopted by ten other States.[121]

ZEV mandates force the development and commercial deployment of ZEVs, irrespective of the technological feasibility or economic practicability of doing so. The Alliance of Automobile Manufacturers commented that this interference with NHTSA's balancing of

[114] *Id.*

[115] *Id.; Center for Biological Diversity et al.,* Docket No. NHTSA–2018–0067–12000; Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735; South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[116] 49 U.S.C. 322(a) specifically states: ''The Secretary of Transportation may prescribe regulations to carry out the duties and powers of the Secretary. An officer of the Department of Transportation may prescribe regulations to carry out the duties and powers of the officer.''

[117] 49 CFR 1.95(a), (j).

[118] *See, e.g., Chevron USA, Inc.* v. *Nat'l Res. Defense Council, Inc.,* 467 U.S. 837, 843–45 (1984).

[119] Alliance of Automobile Manufacturers, Docket No. NHTSA–2018–0067–12073.

[120] 83 FR 42986, 43234 (Aug. 24, 2018).

[121] *See id.* at 43239. At the time of the proposal, nine States had adopted California's ZEV mandate. Since that time, a tenth State—Colorado—has also done so. *https://www.colorado.gov/pacific/cdphe/aqcc* (indicating that ZEV standards were adopted on August 16, 2019).

statutory factors and forced adoption of specific design approaches are grounds for finding ZEV mandates preempted.[122] NHTSA agrees.

In setting fuel economy standards, among the factors that NHTSA must consider are technological feasibility and economic practicability. 49 U.S.C. 32902(f). NHTSA is also required to set performance-based standards, and not design mandates.[123] *See* 49 U.S.C. 32902(b)(2). These considerations are at odds with ZEV mandates.

NHTSA disagrees with comments that expressed the view that ZEV mandates are not related to fuel economy standards because ZEVs emit no criteria pollutants or greenhouse gases.[124] Just as a State may not require a specific level of tailpipe carbon dioxide emissions from automobiles, since doing so effectively sets a specific level of fuel economy, a State may not prohibit tailpipe carbon dioxide emissions from automobiles. That is the equivalent of setting a specific emissions level—zero, which also prohibits the use of fossil fuel. In fuel economy terms, that is akin to requiring a vehicle to having the maximum conceivable level of fuel economy. A prohibition on ozone-forming emissions has the same effect, since the only vehicles capable of emitting no ozone-forming emissions are vehicles that do not use fossil fuels. As NHTSA explained, this type of regulation poses a direct conflict with EPCA, particularly as it relates to requiring a percentage of technological fleet penetration—represented by credits or actual vehicles—that an automaker must distribute into a State. ZEV mandates force investment in specific technology (battery electric and fuel cell technology) rather than allowing manufacturers to improve fuel economy by whatever technological path they choose, allowing them to pursue more cost-effective technologies that better reflect consumer demand, as is the case under the CAFE program. ZEV mandates also create an even more fractured regulatory regime. As NHTSA explained in the proposal, manufacturers must satisfy ZEV mandates in *each* State individually.[125]

NHTSA also disagrees with a comment that argued ZEV mandates are not preempted because the definition of fuel economy in EPCA is in reference to gasoline or equivalent fuel.[126] EPCA preempts State and local requirements related to fuel economy standards. That ZEV mandates are not themselves expressed as mile-per-gallon standards for fossil-fuel powered vehicles is not dispositive. NHTSA explained the relationship between ZEV mandates and fuel economy standards in detail in the proposal and reiterates that discussion here.[127]

Many commenters expressed support for ZEV mandates as matter of policy.[128] NHTSA does not take issue with those policy objectives to the extent they do not conflict with EPCA or otherwise impermissibly interfere with the Federal regulation of fuel economy. NHTSA notes that States and local governments are able to continue to encourage ZEVs in many different ways, such as through investments in infrastructure and appropriately tailored incentives.[129] States and local governments cannot adopt or enforce regulations related to fuel economy standards, which include ZEV mandates, but they are able to pursue their policy preferences, as long as the manner in which they do so does not conflict with Federal law.

### *F. EISA Did Not Narrow or Otherwise Alter EPCA Preemption*

NHTSA reiterates, as it discussed in the proposal, that EISA did not narrow the express preemption clause in 49 U.S.C. 32919. In fact, EISA did not alter EPCA's express preemption clause in any way. As a factual matter, Congress neither amended or nor repealed EPCA's preemption clause with the enactment of EISA. EISA's savings clause did not amend EPCA. The savings clause, codified at 42 U.S.C. 17002, states: ''Except to the extent expressly provided in this Act or an amendment made by this Act, nothing in this Act or an amendment made by this Act supersedes, limits the authority provided or responsibility conferred by, or authorizes any violation of any provision of law (including a regulation), including any energy or environmental law or regulation.'' [130]

As described in the proposal, EISA's savings clause does not expand any pre-existing authority. Instead, the clause expressly states that it did not impose a new limitation on such authority. By its plain text, EISA also does not authorize any violation of any provision of law. This includes EPCA's express preemption clause. Thus, activities prohibited by the express preemption clause before EISA, such as State laws related to fuel economy standards, continued to be prohibited after EISA.

The text of the savings clause is what controls its meaning, not statements by individual Members of Congress. South Coast claims that NHTSA did not discuss such statements in detail, including statements by Senator Feinstein.[131] NHTSA did recognize in the proposal that the Congressional Record contains statements by certain Members of Congress about their individual views, but explained that such statements lack authority. As NHTSA explained in the proposal, such statements cannot expand the scope of the savings clause or clarify it. Individual Members, even those who may have played a lead role in drafting a particular bill, cannot speak for the body of Congress as a whole.[132] NHTSA interprets the statutory language based on the words actually adopted by both Houses and signed by the President.

NHTSA likewise does not find persuasive the argument that Congress did not enact additional statutory language in EISA preempting California from regulating tailpipe greenhouse gas

[122] Alliance of Automobile Manufacturers, Docket No. NHTSA–2018–0067–12073.

[123] South Coast asserts that ZEV mandates are performance based because any vehicle meeting the requirements can be certified as a ZEV. South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813. But, it is inherent that the requirements—ZEV means zero-emissions vehicle—dictate a particular design. In any event, for the reasons described above, ZEV mandates are related to fuel economy standards however framed.

[124] South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[125] 83 FR 42986, 43239 (Aug. 24, 2018); *see* Competitive Enterprise Institute, Docket No. NHTSA–2018–0067–12015.

[126] California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873.

[127] *See* 83 FR 42986, 43238–39 (Aug. 24, 2018).

[128] National Coalition for Advanced Transportation (NCAT), Docket No. NHTSA–2018–0067–11969; Union of Concerned Scientists, Docket No. NHTSA–2018–0067–12039.

[129] Certain incentives are preempted by EPCA. *See Metro. Taxicab Bd. of Trade* v. *City of New York,* 615 F.3d 152 (2d Cir. 2010) (holding that New York City rule that incentivized hybrid taxis by allowing taxi owners to charge more for the lease of hybrid vehicles were ''based expressly on the fuel economy of a leased vehicle, [and] plainly fall within the scope of the EPCA preemption provision.'').

[130] One commenter pointed out that the proposal did not include the clause before the first comma when it quoted the language of the savings provision. South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813. However, NHTSA disagrees with the commenter that the introductory clause has a substantive impact on this issue. That clause states: ''Except to the extent expressly provided in this Act or an amendment made by this Act . . .'' But, EISA did not expressly authorize States to regulate or prohibit tailpipe greenhouse gas emissions from automobiles.

[131] South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[132] *N.L.R.B.* v. *SW Gen., Inc.,* 137 S. Ct. 929, 942–43 (2017) (''Passing a law often requires compromise, where even the most firm public demands bend to competing interests. What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators. . . .[F]loor statements by individual legislators rank among the least illuminating forms of legislative history.'' (citations omitted)).

emissions from automobiles. A comment from three Senators provides documents related to potential proposals to do so.[133] There are many reasons for Congress not to adopt proposals set forward by one interest group or another, including, of course, because they were unnecessary. That is the case here where EPCA's preemption provision already prevented States from adopting and enforcing requirements related to fuel economy standards.

Given the words of the savings clause, NHTSA rejects the argument made by South Coast that the ''EISA saving provision designedly narrows EPCA's express preemption provision, and Congress intended this result.'' [134] The savings clause did not amend the preemption provision in EPCA. Moreover, what the savings clause actually says is that it does *not* limit authority. If a regulation is preempted by EPCA, a State has no authority to enforce it, and EISA did not change that status quo. If Congress wanted to amend the broad and clear express preemption provision in EPCA, it could have and would have done so. It did not.

Because NHTSA disagrees that States could permissibly regulate tailpipe greenhouse gas emissions from automobiles prior to EISA, it also disagrees with comments that argue that Congress ''preserved'' the ability of States to do so through the savings clause (or, alternatively, that efforts to ''revoke'' such preexisting authority failed).[135]

NHTSA also disagrees with a comment by South Coast that argues that EISA's savings provision forecloses implied preemption.[136] The specific words that South Coast points to are the opening clause: ''Except to the extent expressly provided in this Act or an amendment made by this Act.'' This language does not address preemption under EPCA. That introductory clause merely modifies the remainder of the savings provision, which goes on to say that ''nothing in this Act or an amendment made by this Act . . . limits the authority provided . . . or authorizes any violation of any provision of law . . . .'' This statutory language prevents EISA from limiting preexisting authority or responsibility conferred by any law or from authorizing violation of any law. States and local governments had no preexisting authority or responsibility to set requirements related to fuel economy standards. Such requirements are void *ab initio.* The savings provision also does not purport to expand pre-existing authority or responsibility, nor did Congress amend in any way the broad express preemption provision in EPCA when it enacted EISA. Moreover, implied preemption as applied here is not a limitation based in EISA or the Clean Air Act. Implied preemption is instead based on the Secretary of Transportation's preexisting responsibility under EPCA to balance statutory factors in setting nationwide fuel economy standards for automobiles.

The provision in EISA concerning minimum requirements for Federal government vehicles also does not change NHTSA's view. Several comments referenced this provision, which states that the EPA ''Administrator shall take into account the most stringent standards for vehicle greenhouse gas emissions applicable to and enforceable against motor vehicle manufacturers for vehicles sold anywhere in the United States'' in identifying vehicles for the Federal government fleet. 42 U.S.C. 13212(f)(3)(B).[137] Commenters argued that the phrase ''the most stringent standards'' would be superfluous if only EPA were allowed to set standards and, in addition, if EPA had not set any such standards at the time EISA was enacted. On the contrary, this provision is fully consistent with NHTSA's view of preemption, based on the plain text of EPCA's express preemption provision. The language in the EISA provision specifically indicates that it applies only to ''the most stringent standards . . . *enforceable* against motor vehicle manufacturers.'' [138] This means that EPA could consider only otherwise lawful standards. States and local governments are not permitted to enforce standards preempted by EPCA. 49 U.S.C. 32919(a).

However, EPCA *does* specifically permit a State or local government to ''prescribe requirements for fuel economy for automobiles obtained for its own use.'' 49 U.S.C. 32919(c). It is logical that the Federal government would consider the requirements for States and local government vehicle fleets in evaluating vehicles for its own Federal government fleet. Such requirements would be applicable to and could be enforced against manufacturers in contractual procurement relationships with States or local governments. In any event, this provision concerning a limited set of vehicles (Federal government vehicles) is not grounds for undoing the uniform national fuel economy standards applicable to all light vehicles as prescribed by Congress in EPCA.

In enacting this provision in EISA, Congress required the EPA Administrator to ''issue guidance identifying the makes and model number of vehicles that are low greenhouse gas emitting vehicles'' to aid in identifying vehicles for the Federal government's own fleet. 42 U.S.C. 13212(f)(3)(A). The provision requiring the Administrator to ''take into account the most stringent standards for vehicles greenhouse gas emissions'' provides a consideration for that guidance. *Id.* 13212(f)(3)(B). It is not plausible that Congress intended this limited provision concerning guidance on Federal government procurement to disrupt the longstanding express preemption provision in EPCA.

Further, to read this procurement-related provision as somehow showing that Congress intended to allow California to establish laws related to fuel economy standards is unreasonable, as doing so would put California in an unequal setting vis-a-vis other states, and that would not make sense in this context. ''The Act also differentiates between the States, despite our historic tradition that all the States enjoy 'equal sovereignty.' '' *Northwest Austin Municipal Utility District Number One* v. *Holder,* 557 U.S. 193, 203 (2009). A ''departure from the fundamental principal of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets.'' *Id.* Congress rejected any such prospect in the area of fuel economy by adding an unwaivable preemption clause in EPCA. NHTSA does not presume that Congress, when adopting EISA, impliedly discarded the equal application of EPCA to the States without a clear statement of intent to do so and a recitation of the ''extraordinary conditions'' permitting California special authority related to fuel economy. *Id.* at 211. ''Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.'' [139]

[133] U.S. Senators Tom Carper, Diane Feinstein and Edward J. Markey, Docket No. NHTSA–2018–0067–11938

[134] South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[135] Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

[136] South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[137] California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

[138] 42 U.S.C. 13212(f)(3)(B) (emphasis added).

[139] *Whitman* v. *Am. Trucking Ass'ns,* 531 U.S. 457, 468 (2001).

*G. Prior Case Law Does Not Preclude Preemption*

Certain comments opposed to NHTSA's proposal rely upon the Supreme Court's decision in *Massachusetts* v. *EPA* to argue that regulation of tailpipe emissions is separate and distinct from regulation of fuel economy.[140] NHTSA disagrees with attempts to stretch the holding of this decision well beyond the issues addressed by the Court. The Court did not address EPCA preemption in *Massachusetts* v. *EPA,* or State regulations pursuant to a Clean Air Act waiver. The Court addressed only EPA's own statutory obligations, which have no bearing on EPCA preemption.

Moreover, as discussed above, NHTSA and EPA conduct joint rulemaking consistent with the Supreme Court's decision. The Court acknowledged that NHTSA and EPA's statutory obligations may overlap, but that the agencies may both administer those obligations while avoiding inconsistency.[141] NHTSA therefore disagrees with the comment's assertion that regulations of tailpipe greenhouse gas emissions and fuel economy are truly separate and distinct. The agencies issue joint rules precisely because of the unavoidable scientific relationship between the two.

A number of comments also rely on the prior district court decisions in California and Vermont in opposing NHTSA's proposal on preemption.[142] As NHTSA discussed in the proposal, those courts previously concluded that State tailpipe greenhouse gas emissions standards were not preempted by EPCA.[143] NHTSA continues to disagree with both of these district court decisions, as described in detail in the proposal.[144] This includes the California district court's erroneous view of the requirement in EPCA for NHTSA to consider ''other standards'' in setting fuel economy standards.[145] In reaching its conclusion, the court misconstrued a separate provision of EPCA that, by its explicit terms, has had no effect for decades. Importantly, neither district court considered NHTSA's views on preemption in construing the statute NHTSA administers.[146] Although the United States filed an amicus brief opposing the Vermont court's decision in the Second Circuit, that appeal was not decided on the merits due to the automotive industry's withdrawal of the appeal as a part of a negotiated agreement connected to the national framework. In its brief, the United States specifically raised the district court's failure to consider NHTSA's views concerning preemption, let alone give them weight.[147] Withdrawal of appeals was expressly part of the agreement to establish the national framework.

The Vermont district court also attempted to reconcile EPCA and the Clean Air Act by asserting that a Clean Air Act waiver converts State requirements to ''other motor vehicle standards'' that NHTSA must consider in setting fuel economy standards. As NHTSA noted in the proposal, even the California district court found that there was no legal foundation for the view that a State regulation pursuant to a Clean Air Act waiver becomes the equivalent of a Federal regulation.[148] This is an erroneous finding not based on precedent and is unsupported by applicable law.

As described in the proposal, NHTSA also disagrees with the California and Vermont district courts' implied preemption analyses.[149] NHTSA does not believe those courts fully considered the conflict posed by State regulations and, in one case, even went so far as to assert erroneously that NHTSA could simply defer to California in revising its standards.[150] Those decisions are not binding on NHTSA.

Given NHTSA's previously stated views on those decisions, arguments that rely on the decisions are not persuasive. Commenters did not provide any new information or analysis of those district court decisions that caused the agency to change its view on the decisions.[151] NHTSA incorporates the prior discussion of those decisions from the proposal here.

While NHTSA need not belabor its views again here, it is worth emphasizing, as did commenters, that both district courts ignored NHTSA's published prior statements on preemption in rendering their decisions.[152] Some comments seem to suggest that this failure to address NHTSA's views represents a substantive rejection of those views.[153] NHTSA disagrees. The district courts simply entirely failed to consider the agency's views; they did not consider and reject them or even find that they were not due any weight. This is among the reasons that NHTSA is formalizing its views in a regulation. As the expert agency charged with administering EPCA, NHTSA is tasked with balancing the four statutory factors in determining the ''maximum feasible average fuel economy standards'' for each model year.[154] In doing so, NHTSA has the unique ability to determine whether State or local regulations would undermine this balancing.[155] NHTSA's views on preemption certainly should be considered by any court evaluating this issue. This is particularly true given that the relationship between fuel economy standards and greenhouse gas emissions is a matter of science.

One commenter also erroneously asserts that collateral estoppel will bar the Department of Justice from defending a final rule that asserts State greenhouse gas emissions regulations are preempted by EPCA.[156] Nonmutual offensive collateral estoppel does not apply to the United States. *United States* v. *Mendoza,* 464 U.S. 154, 162 (1984). Moreover, the Federal government was not even a party to the prior litigation involving EPCA preemption. The assertion that the Department of Justice would be barred from defending this final rule lacks merit.

[140] California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; *see* Northeast States for Coordinated Air Use Management (NESCAUM), Docket No. NHTSA–2018–0067–11691.

[141] *Massachusetts* v. *EPA,* 549 U.S. 497, 532 (2007).

[142] Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735; South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[143] 83 FR 42986, 43235 (Aug. 24, 2018).

[144] *Id.* at 43235–38.

[145] *Id.* at 43236–37.

[146] *Id.* at 43236; Proof Brief for the United States as Amicus Curiae, 07–4342–cv (2d Cir. filed Apr. 16, 2008).

[147] *See* Proof Brief for the United States as Amicus Curiae, 07–4342–cv (2d Cir. filed Apr. 16, 2008). NHTSA also was not a litigant in the district court cases and, therefore, did not have a full opportunity to raise its views.

[148] 83 FR 42986, 43236 (Aug. 24, 2018).

[149] *Id.* at 43238.

[150] *Cent. Valley Chrysler-Jeep, Inc.,* 529 F. Supp. 2d at 1179. NHTSA has a statutory obligation to set standards at ''the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year,'' in accordance with the statutory considerations. 49 U.S.C. 32902(a), (f). Thus, NHTSA cannot simply defer to a State. For example, the only standards that California would permit to satisfy California requirements for model years 2021 through 2025 are the augural standards. *See* Cal. Code Regs. tit. 13, § 1961.3(c). If NHTSA finalizes a determination that the augural standards are not ''maximum feasible,'' as discussed in the proposal, then it would be contrary to law for NHTSA to nevertheless adopt them in deference to California.

[151] As noted by a commenter, the appeals were dismissed before decision as a practical matter, and despite strong arguments on the merits. Fiat Chrysler Automobiles (FCA), Docket No. NHTSA–2018–0067–11943.

[152] 83 FR 42986, 43236 (Aug. 24, 2018).

[153] *See* California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873.

[154] 49 U.S.C. 32902(f).

[155] *See id.*

[156] *See* South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

### *H. A Clean Air Act Waiver and SIP Approvals Do Not Foreclose EPCA Preemption*

Both agencies are finalizing their tentative conclusion from the proposal that a Clean Air Act waiver does not also foreclose EPCA preemption. EPCA does not provide for a waiver of preemption, either by NHTSA or by another Federal agency. EPA, like NHTSA, does not have the authority to waive EPCA preemption. Therefore, its grant of a Clean Air Act waiver cannot operate to waive EPCA preemption. NHTSA discussed the basis for its view that a Clean Air Act waiver does not ''federalize'' EPCA-preempted State requirements in detail in its proposal. NHTSA reaffirms that discussion.

Several comments recited the district court's holding in *Green Mountain Chrysler* that it need not consider EPCA preemption due to the EPA waiver.[157] NHTSA discussed in detail in the proposal its reasons for disagreeing with that decision and commenters did not identify any new information that caused NHTSA to change its view. NHTSA agrees with commenters that reject the flawed reasoning of the district court.[158] As one commenter explained, the argument that an EPA waiver federalizes State requirements renders the EPCA preemption provision a nullity.[159] As the commenter noted, this incorrect interpretation would enable States to even issue explicit fuel economy requirements so long as they were under cover of a waiver from EPA. EPA does not have authority to waive any aspect of EPCA preemption, nor does NHTSA.

NHTSA also finalizes its view that preempted standards are void *ab initio.* No commenters presented information that altered NHTSA's view, which is based on longstanding Supreme Court case law, as cited by the proposal.

NHTSA agrees with South Coast, which suggested in its comments that EPCA does not outweigh the Clean Air Act.[160] Likewise, the Clean Air Act does not outweigh EPCA. Just as manufacturers must comply with requirements under both statutes, both statutes apply to State and local governments as well. Moreover, EPCA's preemption provision is fully consistent with the Clean Air Act. EPCA's preemption provision does not implicitly repeal parts of Section 209(b), contrary to the assertion in one comment.[161] States must simply act in accordance with both statutes. *Cf. Massachusetts* v. *EPA,* 549 U.S. 497, 532 (2007) (finding no inconsistency between obligations of EPA under Clean Air Act and NHTSA under EPCA).

NHTSA has rejected the argument that a Clean Air Act waiver renders EPCA preemption inapplicable, and likewise rejects the even more attenuated argument concerning EPA's approval of preempted State requirements as a part of a State Implementation Plan (SIP) submission for areas that do not meet National Ambient Air Quality Standards (NAAQS). A State has no authority to adopt or enforce a requirement that falls within the scope of EPCA preemption. 49 U.S.C. 32919(a). This is true even if adopting the unlawfully enacted requirement would assist the State in coming into compliance with the NAAQS. The inclusion of an invalid fuel economy requirement in an air quality SIP does not render the requirement suddenly valid.[162] NHTSA therefore disagrees with comments that suggest that EPCA preemption no longer applies simply because an unauthorized requirement is included in a SIP that is subsequently approved.[163] It is inappropriate for a State to take action unauthorized and rendered void by one statutory scheme to meet the requirements of a different statutory scheme.

Moreover, EPCA preemption applies directly to States and local governments which are obliged to adhere to the constraints of the Supremacy Clause. EPCA explicitly prohibits States and local governments from adopting or enforcing a law or regulation related to fuel economy standards. It is unreasonable for States to expect a Federal agency (EPA) acting under one statutory scheme (the Clean Air Act) to analyze whether the State has adopted preempted regulations in contravention of an entirely separate statute (EPCA) administered by a different Federal agency (NHTSA). In fact, as noted above, historically EPA has declined to address questions unrelated to CAA section 209, such as preemption analysis, in its waiver decisions. NHTSA strongly disagrees with the assertion that EPA's approval of a SIP silently acts as an implied waiver of EPCA preemption. This suggestion is particularly hollow given that neither EPA nor NHTSA has the authority to waive EPCA preemption.

NHTSA agrees with the general principle that an approved SIP is enforceable as a matter of Federal law.[164] However, the case law does not support the argument made by CARB and South Coast's comments. The case law explains that a SIP approved by EPA creates binding obligations, pursuant to the Clean Air Act.[165] There is no indication that Congress intended to permit one agency to legitimize an otherwise EPCA-preempted State provision by ''federalizing'' it. As an analogy, the IRS requires individuals to report and pay taxes on money earned from illegal activity, such as dealing drugs.[166] A drug dealer who complies with Federal tax law is not relieved of the prohibitions on possessing and selling drugs that apply under other Federal laws.

Since SIPs are binding on States, the agencies recognize that certain States may need to work with EPA to revise their SIPs in light of this final action.[167] As stated in the proposal, EPA may subsequently consider whether to employ the appropriate provisions of the Clean Air Act to identify provisions of States' SIPs that may need review because they include preempted ZEV mandates or greenhouse gas emissions standards.[168] However, this practical consideration is not grounds for ignoring EPCA's limitations on State action. SIPs are not written in stone. They are subject to revision, including based on changed circumstances. The Clean Air Act allows SIPs to be revised for various reasons, including that part of the plan was approved in error, that the plan is ''substantially inadequate,'' or that the State is suspending or

---

[157] *See, e.g.,* California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; Class of 85 Regulatory Response Group, Docket No. NHTSA–2018–0067–12070; Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

[158] *See, e.g.,* American Fuel & Petrochemical Manufacturers, Docket No. NHTSA–2018–0067–12078.

[159] Competitive Enterprise Institute, Docket No. NHTSA–2018–0067–12015.

[160] *See* South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[161] Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

[162] SIPs must include ''enforceable emission limitations.'' 42 U.S.C. 7410(a)(2)(A). An EPCA preempted requirement is not enforceable. 49 U.S.C. 32919(a).

[163] *See* South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[164] *See* California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[165] *See, e.g., Safe Air for Everyone* v. *United States Envt'l Prot. Agency,* 488 F.3d 1088, 1091 (9th Cir. 2007).

[166] Internal Revenue Service, Publication 525: Taxable and Nontaxable Income 32 (Mar. 8, 2019), *https://www.irs.gov/pub/irs-pdf/p525.pdf.*

[167] EPA explains below that it will consider whether and how to address SIP implications of this action, to the extent that they exist, in separate actions; EPA believes that it is not necessary to resolve those implications in the course of this action.

[168] 83 FR 42986, 43244 (Aug. 24, 2018).

revoking a program included in a plan. 42 U.S.C. 7410(a)(5)(iii), (k)(5)–(6).

### *I. NHTSA Has Appropriately Considered the Views of States and Local Governments Consistent With Law*

NHTSA considers the views of all interested stakeholders—including States and local governments—in carrying out its statutory obligation to set nationally applicable fuel economy standards. However, EPCA does not permit States or local governments to act as co-regulators with NHTSA in the process of setting fuel economy standards. Indeed, EPCA precludes them from doing so, with the sole exception of information disclosure requirements identical to Federal requirements, and for requirements for fuel economy for automobiles obtained for a State or local governments' own use. A number of commenters urged NHTSA to work cooperatively with California, and to negotiate with and reach a compromise with California.[169] NHTSA appreciates such comments, and seeks to foster a collaborative regulatory approach to the extent possible. That said, California is not permitted by Federal law to have its own separate laws or regulations relating to fuel economy standards. 49 U.S.C. 32902 makes clear that NHTSA sets nationally applicable fuel economy standards, and NHTSA is implementing its authority to do so through this regulation clarifying the preemptive effect of its standards consistent with the express preemption provision in 49 U.S.C. 32919.

The very limited exceptions to preemption set forth in EPCA—covering vehicles for a government's own use, and for disclosure requirements that are identical to Federal requirements—only confirm the breadth of preemption. *See* 49 U.S.C. 32919(b)–(c). States or localities cannot adopt or enforce requirements related to fuel economy standards unless they fall into one of these two discrete exceptions. This means requirements related to fuel economy standards for automobiles for use by a State's citizens, and not merely the State itself, are not permitted. Since States are not permitted to adopt or enforce requirements related to fuel economy standards for vehicles sold or delivered to the public, Federal law does not allow California (or any other State or local government) to regulate in this area.

For California, or any other State or local government, to regulate in this area would require NHTSA to waive EPCA preemption, but commenters did not and cannot identify any statutory authorization for NHTSA to do so and no such authority exists, either expressly or impliedly. The Clean Air Act requires EPA to waive Clean Air Act preemption under a specific section of that statute unless it makes certain findings. But because EPCA does not enable NHTSA to issue a waiver of preemption, it also does not set forth terms upon which a waiver would be appropriate.[170] Thus, NHTSA lacks a legal basis for approving of or consenting to State or local requirements related to fuel economy standards.

Absent the affirmative authority to approve of or consent to State or locality's requirements related to fuel economy standards, commenters appear to ask NHTSA to simply to look aside. That is inconsistent with NHTSA's legal responsibility to set nationally applicable standards. It is also inconsistent with the self-executing nature of EPCA preemption, meaning that State or local requirements related to fuel economy standards are void *ab initio.* Even if NHTSA wanted to do so, it cannot breathe life into an expressly preempted State law. And doing so would effectively result in NHTSA's purporting to rewrite a statute, which is beyond the power of a regulatory agency.

NHTSA also disagrees that it is appropriate to ignore EPCA preemption as a strategy to avoid litigation over this issue, a strategy strongly suggested by a large number of commenters. NHTSA understands the concerns of such commenters who hope to avoid prolonged litigation.[171] However, NHTSA believes that long-term certainty is best achieved by applying the law as written. NHTSA agrees with commenters who acknowledge the disruption to the automotive marketplace that would come if preempted standards remained in place.[172] Addressing preemption directly, as NHTSA has done through its adoption of regulatory text in this document, will ultimately provide the needed regulatory certainty into the future.

Those commenters that ask NHTSA to negotiate with California demonstrate the nature of the problem.[173] The underlying reason commenters are concerned about the absence of a compromise resolution is because of the conflict that will result if States proceed with regulations that are inconsistent with Federal requirements.[174] Such commenters, appropriately, have recognized the disruptive effect of continuing to tolerate multiple regulators in this area. Moreover, as discussed in additional detail below, a negotiated resolution is inconsistent with the APA's notice and comment rulemaking process. NHTSA has no basis in law to ignore the substantive comments received on its proposal from many stakeholders and instead determine an outcome through negotiation with a regulatory agency in California. NHTSA is a safety agency with different priorities than CARB, with a different set of factors to balance, including safety implications.

As discussed above, many comments emphasized a desire for maintaining a National Program. Neither California nor any other State, of course, has the authority to set national standards in any area. If California were to adopt and enforce requirements related to fuel economy standards, there could only be uniform standards applicable throughout the country if California agrees with the standards set by NHTSA or vice versa. But EPCA requires that ''[e]ach standard shall be the maximum feasible average fuel economy level that the Secretary''—not a regulatory agency in the State of California—''decides that the manufacturers can achieve in that model year.'' [175] 49 U.S.C. 32902(a).

[169] *See, e.g.,* American Honda Motor Company, Inc., Docket No. NHTSA–2018–0067–11818; Sen. T. Carper, United States Senate, Docket No. NHTSA–2018–0067–11910; Maryland Department of the Environment, Docket No. NHTSA–2018–0067–12044; Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735; Manufacturers of Emission Controls Association, Docket No. NHTSA–2018–0067–11994; North Carolina Department of Environmental Quality, Docket No. NHTSA–2018–0067–12025.

[170] EPA also does not have authority to waive EPCA preemption, under the Clean Air Act or otherwise.

[171] American Honda Motor Company, Inc., Docket No. NHTSA–2018–0067–11818; Ford Motor Company, Docket No. NHTSA–2018–0067–11928.

[172] Fiat Chrysler Automobiles (FCA), Docket No. NHTSA–2018–0067–11943.

[173] *See, e.g.,* American Honda Motor Company, Inc., Docket No. NHTSA–2018–0067–11818; Sen. T. Carper, United States Senate, Docket No. NHTSA–2018–0067–11910; Manufacturers of Emission Controls Association, Docket No. NHTSA–2018–0067–11994.

[174] *See* Cal. Code Regs. tit. 13, section 1961.3(c).

[175] As NHTSA explained in the proposal, it disagrees with the implication of the district court's statement in *Central Valley* that ''NHTSA is empowered to revise its standards'' to take into account California's regulations. 83 FR 42986, 43238 (Aug. 24, 2018); *see Cent. Valley Chrysler-Jeep, Inc.,* 529 F. Supp. 2d at 1179. NHTSA's duty under EPCA is to balance the statutory factors, not to acquiesce to the views of one State (which by its own assertion is attempting to address State-specific concerns, including the geography of its population centers). *See, e.g.,* California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873 (stating that California's ''population continues to live predominantly in basins bounded by mountains, in which air quality is poor'').

Moreover, a faithful application of EPCA requires more than just avoiding inconsistency. For that reason, it is unavailing that CARB has previously implemented its program purportedly consistent with the Federal government.[176] EPCA requires NHTSA to set nationally applicably standards. EPCA does not permit States or local governments to adopt or enforce even identical or equivalent standards.[177] EPCA allows for only a single regulator—NHTSA—to set fuel economy standards. Moreover, it is now clear it does not intend to do so for model year 2021 through 2026 vehicles, should the forthcoming final SAFE rule finalize standards other than the no action alternative as described in the NPRM.[178] And even consistent programs subject manufacturers to duplicative enforcement regimes, in conflict with EPCA.[179] State standards that are identical or equivalent standards to the Federal standards manufacturers nevertheless obligate manufacturers to meet more onerous requirements. That is because States, of course, lack authority to set nationwide requirements. Therefore, manufacturers must meet State standards within *each* State that has adopted them. Since fuel economy standards are *fleetwide average* standards, it is more difficult to achieve a standard in a particular State, averaged across a smaller pool of vehicles, than it is to achieve the Federal standard, averaged across the pool of vehicles for all States.

In addition, there is no legal basis in EPCA or the APA for California or any other State to receive preferential treatment for their views in this statutory scheme or rulemaking process.[180] Nor is California, or any other State, entitled to negotiate the appropriate standards with NHTSA. Commenters appear to suggest closed-door negotiations, and not an alternative rulemaking process (such as negotiated rulemaking), that would ensure procedural fairness.[181] NHTSA disagrees that negotiation is the appropriate mechanism to set nationally applicable policy with billions of dollars of impacts. The notice-and-comment rulemaking process used by the agencies is the appropriate mechanism for setting standards under EPCA and the Clean Air Act, with due consideration to the views of all interested parties and transparency. NHTSA certainly would prefer a result that is satisfactory to all interested stakeholders, but it may not set aside its own considered views on the appropriate standards to reach a negotiated resolution, nor may it set aside Congress's commands in EPCA.

While States or local governments may not adopt or enforce requirements related to fuel economy standards, NHTSA, of course, is considering their views in setting appropriate standards. Many State and local governments commented at great length on both the preemption and standard setting portions of NHTSA's proposal.[182] NHTSA has taken their views into account in finalizing this rule, along with those of other commenters. States and local governments have had and will continue to have a say in the adoption of fuel economy standards, consistent with the APA. Indeed, many of the technical comments provided by California and other State and local governments and agencies are being considered to improve the analysis regarding the appropriate standards. In an area with express preemption, this APA process is the appropriate means by which the Federal government should consider the views of States and local governments.

NHTSA also disagrees with the view expressed by some commenters that there is not a direct conflict between State regulation of tailpipe carbon dioxide emissions from automobiles issued pursuant to a Clean Air Act waiver and NHTSA's ability to set fuel economy standards under EPCA. South Coast argues that when there are inconsistent standards, automakers can avoid a conflict by complying with the more stringent standard.[183]

NHTSA disagrees that this situation does not pose a conflict. Higher standards than those NHTSA has determined are ''maximum feasible'' after balancing the statutory factors negates the agency's judgment in setting national standards, including traffic safety. NHTSA addressed this conflict in detail in the proposal and reiterates that discussion here.[184] NHTSA also disagrees that all manufacturers should simply comply with a higher standard than the standards set by the Federal government based on statutory considerations. It may not be technically feasible for manufacturers to comply with higher standards or the higher standards may not be economically practicable. These are factors that NHTSA must carefully assess and balance in setting standards under EPCA, and the notion that a State has the unilateral ability to veto or undermine NHTSA's determination by setting higher standards directly conflicts with EPCA.

South Coast also asserted in its comments that there is no direct conflict between the purpose of EPCA to reduce fuel consumption by increasing fuel economy and the purpose of the Clean Air Act to protect public health from air pollution, including by allowing California to establish motor vehicle standards if it meets the criteria for a waiver.[185] While it is true that there need not be a conflict between EPCA and the Clean Air Act, this statement is irrelevant to the determination of whether State standards are preempted by EPCA. NHTSA and EPA conduct joint rulemaking in this area *because* EPA's greenhouse gas emissions standards are inherently related to NHTSA's fuel economy standards. This inherent linkage was recognized by the Supreme Court in *Massachusetts* v.

[176] California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873.

[177] EPCA does allow States or local governments to adopt identical requirements for disclosure of fuel economy or fuel operating costs, but did not allow identical requirements in other areas related to fuel economy. *See* 49 U.S.C. 32919(b).

[178] *See* Cal. Code Regs. tit. 13, section 1961.3(c).

[179] EPCA has an unusual civil penalty provision for violations of fuel economy standards that enables various compliance flexibilities, including use of banked credits, credit plans, credit transfers, and credit trades. *See* 49 U.S.C. 32912. EPCA also requires specific procedures and findings before the Secretary of Transportation may increase the civil penalty rate applicable to violations of fuel economy standards. 49 U.S.C. 32912(c). State and local enforcement of even identical or equivalent requirements interferes with this enforcement structure.

[180] *See Nw. Austin Mun. Util. Dist. No. One* v. *Holder,* 557 U.S. 193, 203 (2009) (stating that ''a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets'').

[181] One comment noted that prior negotiations were ''closed-door, 'put nothing in writing, ever' negotiations.'' Competitive Enterprise Institute, Docket No. NHTSA–2018–0067–12015; *see also* Sen. Phil Berger & Rep. Tim Moore, North Carolina General Assembly, Docket No. NHTSA–2018–0067–11961.

[182] *See, e.g.,* California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; Joint Submission from Governors of Texas, et al., Docket No. NHTSA–2018–0067–11935; Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735; Maryland Department of the Environment, Docket No. NHTSA–2018–0067–12044; Minnesota Pollution Control Agency (MPCA), the Minnesota Department of Transportation (MnDOT), and the Minnesota Department of Health (MDH), Docket No. NHTSA–2018–0067–11706; North Carolina Department of Environmental Quality, Docket No. NHTSA–2018–0067–12025; Pennsylvania Department of Environmental Protection, Docket No. NHTSA–2018–0067–11956; Washington State Department of Ecology, Docket No. NHTSA–2018–0067–11926.

[183] South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[184] See section f of the proposal's preemption discussion. 83 FR 42986, 43237–38 (Aug. 24, 2018).

[185] South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

*EPA.*[186] California and other States have, for many years, regulated ozone-forming emissions from vehicles pursuant to a Clean Air Act waiver without posing a conflict with NHTSA's regulation of fuel economy. It is when States regulate the emission of greenhouse gases, especially carbon dioxide, that the conflict arises because of the direct and substantial relationship between tailpipe emissions of carbon dioxide and fuel economy. Regulation in this area is related to NHTSA's fuel economy standards and impedes NHTSA's ability to set nationally applicable fuel economy standards.

NHTSA also disagrees with comments that assert it did not properly consider federalism concerns. Specifically, South Coast claimed that NHTSA violated the executive order on federalism, Executive Order 13132, although South Coast acknowledges the Executive Order does not create an enforceable right or benefit.[187] Setting aside the Executive Order's non-justiciability for the moment, NHTSA's action complies with Executive Order 13132. Contrary to South Coast's assertion, the executive order recognizes both express preemption and conflict preemption, and it does not bar the application of conflict preemption where a statute contains an express preemption provision.[188] The provisions concerning express preemption and conflict preemption are in separate paragraphs, which are not mutually exclusive. *See* E.O. 13132 section 4(a)–(b).

Moreover, the executive order supports NHTSA's action in construing preemption through rulemaking. *See id.* The executive order explicitly supports the process NHTSA used here to consider the views of States and local governments, stating that: ''When an agency proposes to act through adjudication or rulemaking to preempt State law, the agency shall provide all affected State and local officials notice and an opportunity for appropriate participation in the proceedings.'' E.O. 13132 section 4(e). NHTSA cited to Executive Order 13132 in the preemption portion of its proposal,[189] and specifically solicited comments from State and local officials, as well as other members of the public. As discussed above, NHTSA has considered the extensive comments from State and local governments.

EPCA preemption also does not improperly impinge on the rights of States. Several commenters argued for allowing States to regulate in this area due to asserted benefits of State regulation.[190] CARB's comments went into extensive detail on its history of regulating vehicles.[191] It also asserted that there is industry support for its regulation in this area,[192] and argued that it has reliance interests in its regulations.[193] CARB also argued that NHTSA's proposal would adversely impact its police power and ability to protect its citizens.[194] In addition, it claimed that NHTSA's proposal would impact its State-imposed mandate for emissions reductions by 2030, given the transportation sector's contributions to California's greenhouse gas emissions.[195]

Notwithstanding these asserted interests of policy, Congress determined that NHTSA should have exclusive authority to set fuel economy standards and that States are not authorized to adopt or enforce regulations related to those standards, with limited exceptions described above. No commenter argued that EPCA's preemption provision is unconstitutional. Some commenters, however, have argued that special treatment afforded to the California is problematic.[196] Just as States have no valid police power to set fuel economy standards directly, neither are they permitted under EPCA and the Supremacy Clause to set standards related to fuel economy standards. States do have input into the Federal fuel economy standards established by NHTSA (as well as EPA's related greenhouse gas emissions standards) through the notice-and-comment process, and the interests of California's citizens as well as the citizens of the other 49 States are protected by the standards set by the Federal agencies.

NHTSA recognizes that California may have different policy views, as do many interested parties, including both those who expressed views in favor of and in opposition to the proposal. However, Congress gave NHTSA the duty to balance competing considerations. NHTSA also rejects the notion that California has valid reliance interests in regulations that are void *ab initio.* Indeed, even in the run-up to the 2012 rulemaking, California itself reserved its rights to go in a different direction and recognized that the Federal Government may assert preemption at a later date.[197] The extent to which all or part of industry does or does not support California's ability to regulate in this area is also not a relevant consideration to whether California is legally authorized to do so. NHTSA also notes that industry has expressed a strong preference for one national standard, which is the purpose of EPCA's preemption provision.[198] California has now made clear that it will not accept manufacturers' compliance with Federal standards, unless the agencies adopt the no action alternative from the proposal.[199] EPCA preemption ensures that such State regulations are unenforceable and that one set of national standards (the Federal standards) will control. Not even identical standards are permissible.

### *J. Clarifying Changes to Final Rule Text*

No commenter offered alternative regulatory text for consideration by the

[186] *See Massachusetts* v. *EPA,* 549 U.S. 497, 532 (2007).

[187] E.O. 13132 section 11; South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813. South Coast also states that NHTSA did not mention the Tenth Amendment in its proposal. South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813. However, South Coast does not assert that this action violates the Tenth Amendment, which is fully consistent with Federal preemption. *See* Constitution, Article VI.

[188] South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[189] 83 FR 42986, 43233 n.496 (Aug. 24, 2018).

[190] *See, e.g.,* California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873.

[191] California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873.

[192] *Id.*

[193] *Id.*

[194] *Id.; see also* Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

[195] California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873.

[196] *E.g.,* Sen. Phil Berger & Rep. Tim Moore, North Carolina General Assembly, Docket No. NHTSA–2018–0067–11961; Rep. M. Turzai, Pennsylvania House of Representatives, Docket No. NHTSA–2018–0067–11839.

[197] *See* Letter from M. Nichols, CARB to R. LaHood, DOT & L. Jackson, EPA (July 28, 2011), *available at https://www.epa.gov/sites/production/files/2016-10/documents/carb-commitment-ltr.pdf* (last visited Sept. 15, 2019) (making certain commitments for a National Program, conditioned on certain events including EPA's grant of a waiver of Clean Air Act preemption, vehicle manufacturers not challenging California's standards on the basis of EPCA preemption, and indicating that ''California reserves all rights to contest final actions taken or not taken by EPA or NHTSA as part of or in response to the mid-term evaluation'').

[198] *See* Alliance of Automobile Manufacturers, Docket No. NHTSA–2018–0067–12073; American Honda Motor Company, Inc., Docket No. NHTSA–2018–0067–11818; Association of Global Automakers, Docket No. NHTSA–2018–0067–12032; Fiat Chrysler Automobiles (FCA), Docket No. NHTSA–2018–0067–11943; Ford Motor Company, Docket No. NHTSA–2018–0067–11928; General Motors LLC, Docket No. NHTSA–2018–0067–11858; Jaguar Land Rover, Docket No. NHTSA–2018–0067–11916; Mazda Motor Company, Docket No. NHTSA–2018–0067–11727; Mitsubishi Motors RD of America, Inc. (MRDA), Docket No. NHTSA–2018–0067–12056; Subaru, Docket No. NHTSA–2018–0067–12020; Toyota Motor North America, Docket No. NHTSA–2018–0067–12150; Volkswagen Group of America, Docket No. NHTSA–2017–0069–0583.

[199] *See* Cal. Code Regs. tit. 13, section 1961.3(c).

agency on preemption. Because NHTSA is finalizing its views on preemption, it is adopting the proposed regulatory text, including an appendix. However, based on its review of comments, NHTSA is adopting a few minor, clarifying changes.

While not advocating for a change to the regulatory text, comments from South Coast and CARB persuaded us to make changes to ensure consistency with EPCA's express preemption provision, as was NHTSA's intention.[200] South Coast specifically pointed out that two provisions of the proposed regulatory text (appendix B, sections (a)(3) and (b)(3)) did not include the word ''automobiles.'' [201] Contrary to South Coast's suggestion, NHTSA's intention was not to reach beyond the statutory text. Most of the proposed regulatory text explicitly addressed automobiles. In the two provisions identified by South Coast as omitting that term, NHTSA addressed tailpipe carbon dioxide emissions and fuel economy. In context, these references address automobile emissions and automobile fuel economy. However, for clarity and consistency, NHTSA has added explicit reference to automobiles to these two provisions.

CARB also pointed out in its comments that the statute preempts laws or regulations ''related to fuel economy *standards,*'' not simply those related to fuel economy.[202] While other provisions of the proposed rule used the phrases ''relates to fuel economy standards'' or ''related to fuel economy standards,'' the word ''standards'' was inadvertently omitted from section (a)(3) of the appendix. In the final rule, NHTSA has added that word for clarity.

In addition, to ensure consistency throughout the regulatory text and with the preamble discussion, NHTSA is clarifying that a State law or regulations having either a direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions or fuel economy is a law or regulation related to fuel economy. The proposal included this statement in the proposed regulatory text: ''Automobile fuel economy is directly and substantially related to automobile tailpipe emissions of carbon dioxide.'' This provides the foundation for NHTSA's express and implied preemption analysis. NHTSA is therefore clarifying that requirements directly or substantially related to fuel economy are preempted by adding ''or substantially'' to two places in the regulatory text. This is consistent with the proposal, which explained that requirements with no bearing on fuel economy or those with only an incidental impact on fuel economy are not preempted.[203] Requirements with more than an incidental impact, *i.e.* those requirements that directly or substantially affect fuel economy are related to fuel economy and thus preempted. Therefore, this change in the regulatory text of the final rule provides additional clarity on the scope of preemption.

In addition, several references throughout the proposed regulatory text addressed a ''state law or regulation.'' Consistent with EPCA and the discussion in the notice of proposed rulemaking, NHTSA intended to address laws and regulations of States and their political subdivisions. For clarity, NHTSA revised all references in its regulatory text to cover States and their political subdivisions.

Specifically, in the rule NHTSA is finalizing in this document, appendix B, section (a)(3) reads: ''A law or regulation *of a State or political subdivision of a State* having the direct *or substantial* effect of regulating or prohibiting tailpipe carbon dioxide emissions from *automobiles* or *automobile* fuel economy is a law or regulation related to fuel economy *standards* and expressly preempted under 49 U.S.C. 32919.'' [204] Appendix B, section (b)(3) reads: ''A law or regulation *of a State or political subdivision of a State* having the direct *or substantial* effect of regulating or prohibiting tailpipe carbon dioxide emissions from *automobiles* or *automobile* fuel economy is impliedly preempted under 49 U.S.C. Chapter 329.'' [205]

Finally, NHTSA also added clarifying language to 49 CFR 531.7(b) and 533.7(b) to indicate that the references to ''section 32908'' are to section 32908 of title 49 of the United States Code.

These clarifying changes are consistent with the discussion in the preamble to NHTSA's proposed rule.

**III. EPA's Withdrawal of Aspects of the January 2013 Waiver of CAA section 209(b) Preemption of the State of California's Advanced Clean Car Program**

In this section of this joint action, EPA is finalizing its August 2018 proposal to withdraw aspects of its January 2013 waiver of Clean Air Act (CAA) section 209 preemption of the State of California's Advanced Clean Car (ACC) program. *First,* subsection A provides background regarding the ACC program. *Second,* subsection B finalizes EPA's proposed determination that it has the authority to reconsider and withdraw previously granted waivers. *Third,* subsection C finalizes EPA's proposed determination that, in light of NHTSA's determinations finalized elsewhere in this joint action regarding the preemptive effect of EPCA on state GHG and ZEV programs, EPA's January 2013 grant of a waiver of CAA preemption for those provisions of California's program was invalid, null, and void; that waiver is hereby withdrawn on that basis, effective on the effective date of this joint action. *Fourth,* subsection D, separate and apart from the determinations in subsection C with regard to the effect of EPCA preemption on the January 2013 waiver, finalizes EPA's reconsideration of, and its proposed determination that it is appropriate to withdraw, its January 2013 grant of a waiver of CAA preemption for the GHG and ZEV standards in California's ACC program for model years 2021 through 2025, based on a determination that California ''does not need [those] standards to meet compelling and extraordinary conditions'' within the meaning of CAA section 209(b)(1)(B). *Fifth,* subsection E sets forth and specifies the terms of the waiver withdrawal. *Sixth,* subsection F finalizes EPA's proposed determination that, separate and apart from the findings and determinations described above, states other than California cannot use CAA section 177 to adopt California's GHG standards. *Seventh and finally,* subsection G sets forth EPA's understanding and intention with regard to severability of, and the appropriate venue for judicial review of, this action.

*A. Background*

On January 9, 2013, EPA granted California's request for a waiver of preemption to enforce its Advanced Clean Car (ACC) program regulations under CAA section 209(b)(1).[206] 78 FR

[200] South Coast and CARB asked NHTSA to withdraw its proposal on preemption, rather than to change the text of the proposed rule. California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813. NHTSA declines to do so for the reasons discussed in this final rule.

[201] South Coast Air Quality Management District, Docket No. NHTSA–2018–0067–11813.

[202] California Air Resources Board (CARB), Docket No. NHTSA–2018–0067–11873; *see also* Joint Submission from the States of California et al. and the Cities of Oakland et al., Docket No. NHTSA–2018–0067–11735.

[203] 83 FR 42986, 43235 (Aug. 24, 2018). It is also consistent with the Supreme Court case law interpreting ''related to'' in preemption provisions, as discussed both in the proposal and this final rule. *See, e.g., Rowe,* 552 U.S. at 375.

[204] Emphases added.

[205] Emphases added.

[206] As in the proposal, this final action uses ''California'' and ''California Air Resources Board'' (or ''CARB'') interchangeably.

2112. On August 24, 2018, EPA proposed to withdraw this waiver of preemption with regard to the GHG and ZEV standards of its Advanced Clean Car (ACC) program for MY 2021–2025. 83 FR 43240. In the SAFE proposal, EPA provided extensive background on the history of CAA section 209 and waivers granted thereunder, as well as on the specific waiver which California sought for the ACC program which is at issue here, in the SAFE proposal.[207] 83 FR 43240–43242.

Since publication of the SAFE proposal, California has clarified its ''deemed to comply'' provision, under which manufacturers are afforded the option of complying with CARB's GHG standards by showing that they comply with the applicable federal GHG standards. As amended, CARB's ''deemed to comply'' provision now provides that compliance with CARB's GHG standards can be satisfied only by complying with the federal standards as those standards were promulgated in 2012. In other words, while the content of CARB's GHG standards has never been identical to the corresponding Federal standards, the ''deemed to comply'' provision as originally designed, and as it existed when EPA issued the January 2013 waiver, would have shielded automobile manufacturers from having to comply with two conflicting sets of standards unless they chose to do so. After the December 2018 amendment, however, CARB's regulations now contain within them a mechanism which will automatically impose that state of affairs the moment that the Federal government should exercise its authority to revise its standards. California has further recently announced a ''voluntary agreement'' with four automobile manufacturers that, among other things, requires the automobile manufacturers to refrain from challenging California's GHG and ZEV programs. This ''voluntary agreement'' further provides that California will accept automobile manufacturer compliance with a less stringent standard (and one that extends the phase-in of the GHG standard from 2025 to 2026) than either the California program that was the subject of the 2013 waiver or the Federal standards as promulgated in 2012. Neither California's amendment of its ''deemed to comply'' provision, nor its more recent announcement of the new ''voluntary agreement,'' constitute a necessary part of the basis for the waiver withdrawal and other actions that EPA finalizes in this document, and EPA would be taking the same actions that it takes in this document even in their absence. Nevertheless, EPA does not believe it appropriate to ignore these recent actions and announcements on the State's part, and, as discussed below, believes that they confirm that this action is appropriate.[208]

On January 9, 2013, EPA granted CARB's request for a waiver of preemption to enforce its ACC program regulations pursuant to CAA section 209(b). 78 FR 2112. The ACC program comprises regulations for ZEV, tailpipe GHG emissions standards, and low-emission vehicles (LEV) regulations[209] for new passenger cars, light-duty trucks, medium-duty passenger vehicles, and certain heavy-duty vehicles, for MY 2015 through 2025. Thus, in terms of the scope of coverage of the respective state and federal programs, the ACC program is comparable to the combined Federal Tier 3 Motor Vehicle Emissions Standards and the 2017 and later MY Light-duty Vehicle GHG Standards, with an additional mandate to force the development and deployment of non-internal-combustion-engine technology. According to CARB, the ACC program was intended to address California's near and long-term ozone issues as well as certain specific GHG emission reduction goals.[210] 78 FR 2114. See also 78 FR 2122, 2130–2131. The ACC program regulations impose multiple and varying complex compliance obligations that have simultaneous, and sometimes overlapping, deadlines with each standard. These deadlines began in 2015 and are scheduled to be phased in through 2025. For example, compliance with the GHG requirements began in 2017 and will be phased in through 2025.[211] The implementation schedule and the interrelationship of regulatory provisions with each of the three standards together demonstrates that CARB intended that at least the GHG and ZEV standards, if not also the LEV standards, would be implemented as a cohesive program. For example, in its ACC waiver request, CARB stated that the ''ZEV regulation must be considered in conjunction with the proposed LEV III amendments. Vehicles produced as a result of the ZEV regulation are part of a manufacturer's light-duty fleet and are therefore included when calculating fleet averages for compliance with the LEV III GHG amendments.'' CARB's Initial Statement of Reasons at 62–63.[212] CARB also noted ''[b]ecause the ZEVs have ultra-low GHG emission levels that are far lower than non-ZEV technology, they are a critical component of automakers' LEV III GHG standard compliance strategies.'' *Id.* CARB further explained that ''the ultra-low GHG ZEV technology is a major component of compliance with the LEV III GHG fleet standards for the overall light duty fleet.'' *Id.* CARB's request also repeatedly touted the GHG emissions benefits of the ACC program. Up until the ACC program waiver request, CARB had relied on the ZEV requirements as a compliance option for reducing criteria pollutants. Specifically, California first included the ZEV requirement as part of its first LEV program, which was then known as LEV I, that mandated a ZEV sales requirement that phased-in starting with the 1998 MY through 2003 MY. EPA issued a waiver of preemption for these regulations on January 13, 1993 (58 FR 4166 (January 13, 1993). Since this initial waiver of preemption, California has amended the ZEV requirements multiple times and EPA has

[207] A complete description of the ACC program, as it existed at the time that CARB applied for the 2013 waiver, can be found in CARB's waiver request, located in the docket for the January 2013 waiver action, Docket No. EPA–HQ–OAR– 2012–0562.

[208] EPA does not take any position at this point on what effect California's December 2018 amendment to its ''deemed to comply'' provision, or its July 2019 ''framework'' announcement, may of their own force have had on the continued validity of the January 2013 waiver. EPA may address that issue in a separate, future action.

[209] The LEV regulations in question include standards for both GHG and criteria pollutants (including ozone and PM).

[210] ''The Advanced Clean Cars program . . . will reduce criteria pollutants . . . and . . . help achieve attainment of air quality standards; The Advanced Clean Cars Program will also reduce greenhouse gases emissions as follows: by 2025, CO2 equivalent emissions will be reduced by 13 million metric tons (MMT) per year, which is 12 percent from base line levels; the reduction increases in 2035 to 31 MMT/year, a 27 percent reduction from baseline levels; by 2050, the proposed regulation would reduce emissions by more than 40 MMT/year, a reduction of 33 percent from baseline levels; and viewed cumulatively over the life of the regulation (2017–2050), the proposed Advanced Clean Cars regulation will reduce by more than 850 MMT CO2-equivalent, which will help achieve the State's climate change goals to reduce the threat that climate change poses to California's public health, water resources, agriculture industry, ecology and economy.'' 78 FR 2114. CARB Resolution 12–11, at 19, (January 26, 2012), available in the docket for the January 2013 waiver action, Document No. EPA–HQ–OAR–2012–0562, the docket for the ACC program waiver.

[211] As discussed above, California has further entered into a voluntary agreement with four automobile manufacturers that amongst other things, purports to allow compliance with a less stringent program than either the program that was the subject of the 2013 waiver or the Federal standards promulgated in 2012. *See https://www.gov.ca.gov/2019/07/25/california-and-major-automakers-reach-groundbreaking-framework-agreement-on-clean-emission-standards/* (last visited Aug. 30, 2019).

[212] Available in the docket for the January 2013 waiver decision, Docket No. EPA–HQ–OAR–2012–0562.

subsequently granted waivers for those amendments. Notably, however, in the ACC program waiver request, California also included a waiver of preemption request for ZEV amendments that related to 2012 MY through 2017 MY and new requirements for 2018 MY through 2025 MY (78 FR 2118–9). Regarding the ACC program ZEV requirements, CARB's waiver request noted that there was no criteria emissions benefit in terms of vehicle (tank-to-wheel—TTW) emissions because its LEV III criteria pollutant fleet standard was responsible for those emission reductions.[213] CARB further noted that its ZEV regulation was intended to focus primarily on zero emission drive—that is, battery electric (BEVs), plug-in hybrid electric vehicles (PHEVs), and hydrogen fuel cell vehicles (FCVs)—in order to move advanced, low GHG vehicles from demonstration phase to commercialization (78 FR 2122, 2130–31). Specifically, for 2018 MY through 2025 MY, the ACC program ZEV requirements mandate use of technologies such as BEVs, PHEVs and FCVs, in up to 15% of a manufacturer's California fleet by MY 2025 (78 FR 2114). Additionally, the ACC program regulations provide various compliance flexibilities allowing for substitution of compliance with one program requirement for another. For instance, manufacturers may opt to over-comply with the GHG fleet standard in order to offset a portion of their ZEV compliance requirement for MY 2018 through 2021. Further, until MY 2018, sales of BEVs (since MY 2018, limited to FCVs)[214] in California count toward a manufacturer's ZEV credit requirement in CAA section 177 States. This is known as the ''travel provision'' (78 FR 2120).[215] For their part, the GHG emission regulations include an optional compliance provision that allows manufacturers to demonstrate compliance with CARB's GHG standards by complying with applicable Federal GHG standards. This is known as the ''deemed to comply'' provision. Since proposal, California has amended its regulations to provide that the ''deemed to comply'' provision only applies to the standards originally agreed to by California, the federal government, and automakers in 2012. In other words, automobile manufacturers would not be able to rely on the ''deemed to comply'' provision for any revision to those 2012 standards. California has further entered into a voluntary agreement with four automobile manufacturers that amongst other things, requires the automobile manufacturers to refrain from challenging California's GHG and ZEV programs, and provides that California will accept automobile manufacturer compliance with a less stringent standard than either the California program that was the subject of the 2013 waiver or the Federal standards as promulgated in 2012.

As explained in the SAFE proposal (83 FR 83 FR 23245–46), up until the 2008 GHG waiver denial, EPA had interpreted CAA section 209(b)(1)(B) as requiring a consideration of California's need for a separate motor vehicle program designed to address local or regional air pollution problems and not whether the specific standard that is the subject of the waiver request is necessary to meet such conditions (73 FR 12156; March 6, 2008). We also explained that California would typically seek a waiver of particular aspects of its new motor vehicle program up until the ACC program waiver request. We further explained that in the 2008 GHG waiver denial, which was a waiver request for only GHG emissions standards, EPA had determined that its interpretation of CAA section 209(b)(1)(B) as calling for a consideration of California's need for a separate motor vehicle program was not appropriate for GHG standards because such standards are designed to address global air pollution problems in contrast to local or regional air pollution problems specific to and caused by conditions specific to California (73 FR 12156–60). In the 2008 GHG waiver denial, EPA further explained that its previous reviews of California's waiver request under CAA section 209(b)(1)(B) had usually been cursory and undisputed, as the fundamental factors leading to California's air pollution problems—geography, local climate conditions (like thermal inversions), significance of the motor vehicle population—had not changed over time and over different local and regional air pollutants. These fundamental factors applied similarly for all of California's air pollution problems that are local or regional in nature. In the 2008 GHG waiver denial, EPA noted that atmospheric concentrations of GHG are substantially uniform across the globe, based on their long atmospheric life and the resulting mixing in the atmosphere. EPA therefore posited that with regard to atmospheric GHG concentrations and their environmental effects, the California specific causal factors that EPA had considered when reviewing previous waiver applications under CAA section 209(b)(1)(B)—the geography and climate of California, and the large motor vehicle population in California, which were considered the fundamental causes of the air pollution in California—do not have the same relevance to the question at hand. EPA explained that the atmospheric concentration of GHG in California is not affected by the geography and climate of California. The long duration of these gases in the atmosphere means they are well-mixed throughout the global atmosphere, such that their concentrations over California and the U.S. are substantially the same as the global average. The number of motor vehicles in California, while still a notable percentage of the national total and still a notable source of GHG emissions in the State, is not a significant percentage of the global vehicle fleet and bears no closer relation to the levels of GHG in the atmosphere over California than any other comparable source or group of sources of GHG anywhere in the world. Emissions of greenhouse gases from California cars do not generally remain confined within California's local environment but instead become one part of the global pool of GHG emissions, with this global pool of emissions leading to a relatively homogenous concentration of GHG over the globe. Thus, the emissions of motor vehicles in California do not affect California's air pollution problem in any way that is different from how emissions from vehicles and other pollution sources all around the U.S. (and, for that matter, the world) do.

[213] ''There is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions.'' CARB ACC waiver request at 15 (May 2012), EPA–HQ–OAR–2012–0562–0004.

[214] This kind of ZEV technology continues to present technological challenges and in 2006, for instance, EPA granted California a waiver of its ZEV standards through the 2011MY but due to feasibility challenges declined to grant a waiver for MY 2012 and subsequent model years. See 71 FR 78190; EPA, EPA ZEV Waiver Decision Document, EPA–HQ–OAR–2004–0437 (Dec. 21, 2006).

[215] On March 11, 2013, the Association of Global Automakers and Alliance of Automobile Manufacturers filed a petition for reconsideration of the January 2013 waiver grant, requesting that EPA reconsider the decision to grant a waiver for MYs 2018 through 2025 ZEV standards on technological feasibility grounds. Petitioners also asked for consideration of the impact of the travel provision, which they argue raise technological feasibility issues in CAA section 177 States, as part of the agency's review under the third waiver prong, CAA section 209(b)(1)(C). EPA continues to evaluate the petition. As explained below, in this action EPA is not taking final action with regard to the proposed determinations under the third waiver prong. Whether and how EPA will respond to the March 2013 petition will be considered in connection with a potential future final action with respect to the proposed third prong determinations set forth in the SAFE proposal.

Similarly, the emissions from California's cars do not only affect the atmosphere in California but in fact become one part of the global pool of GHG emissions that affect the atmosphere globally and are distributed throughout the world, resulting in basically a uniform global atmospheric concentration. EPA then applied this reasoning to the GHG standards at issue in the 2008 GHG waiver denial. Having limited the meaning of this provision to situations where the air pollution problem was local or regional in nature, EPA found that California's GHG standards did not meet this criterion. Additionally, in the 2008 GHG waiver denial, EPA also applied an alternative interpretation where EPA would consider effects of the global air pollution problem in California in comparison to the effects on the rest of the country and again addressed the GHG standards separately from the rest of California's motor vehicle program. Under this alternative interpretation, EPA considered whether impacts of global climate change in California were sufficiently different from impacts on the rest of the country such that California could be considered to need its GHG standards to meet compelling and extraordinary conditions. EPA determined that the waiver should be denied under this alternative interpretation as well. 83 FR 23245–46.

In 2009, EPA reversed its previous denial and granted California's preemption waiver request for its GHG emission standards ''for 2009 and later model years.'' 74 FR 32744. EPA announced that it was returning to what it styled as the traditional interpretation of CAA section 209(b)(1)(B), under which it would only consider whether California had a ''need for its new motor vehicle emissions program as a whole,'' *id.* at 32761. It determined that California did, based on ongoing NAAQS attainment issues. *Id.* at 32762–32763. In the alternative, while not adopting either of the 2008 waiver denial's alternative approaches, EPA also determined that California needed its GHG standards as part of its NAAQS attainment strategy due to the indirect effects of climate change on ground-level ozone formation, *id.* at 32763, and that waiver opponents had not met their burden of proof to demonstrate that California climate impacts ''are not sufficiently different'' to nationwide impacts, *id.* at 32765. EPA also determined that there were no grounds to deny the waiver under CAA section 209(b)(1)(A) (whether the State's determination that its standards in the aggregate are at least as protective as federal standards) or CAA section 209(b)(1)(C) (whether ''such state standards'' and accompanying enforcement procedures are inconsistent with CAA section 202(a)). *Id.* at 32759, 32780.

*B. EPA's Authority To Reconsider and Withdraw a Previously Granted Waiver Under CAA Section 209(b)*

In this action, EPA finalizes its proposed determination that it has the authority to withdraw a waiver in appropriate circumstances. EPA explains below (in this subsection, III.B) the basis for its conclusions that it has authority to withdraw a waiver in appropriate circumstances, and (in subsections III.C and III.D) that it is appropriate for EPA to exercise that authority at this time.[216]

Agencies generally have inherent authority to reconsider their prior actions. Nothing in CAA section 209(b) indicates Congressional intent to remove that authority with respect to waivers that it has previously granted. The text, structure, and context of CAA section 209(b) support EPA's interpretation that it has this authority. And no cognizable reliance interests have accrued sufficient to foreclose EPA's ability to exercise this authority here.

In considering EPA's authority to withdraw a waiver, it is clear that EPA has authority to review and grant California's applications for a waiver based on its evaluation of the enumerated criteria in CAA section 209(b). In this action, we affirm the Agency's proposed view that the absence of explicit language with regard to withdrawal of a waiver does not foreclose agency reconsideration and withdrawal of a waiver.

As explained at proposal, California's ability to obtain a waiver under CAA section 209(b)(1) in the first instance is not unlimited. Specifically, CAA section 209(b)(1) provides that ''no such waiver will be granted'' if the Administrator finds *any* of the following: ''(A) [California's] determination [that its standards in the aggregate will be at least as protective] is arbitrary and capricious, (B) [California] does not need such State standards to meet compelling and extraordinary conditions, *or* (C) such State standards and accompanying enforcement procedures are not consistent with section [202(a)].'' CAA section 209(b)(1)(A)–(C), 42 U.S.C. 7543(b)(1)(A)–(C) (emphasis added). CAA Section 209(b)(1) is therefore, premised on EPA review and grant of a waiver prior to California's enforcement of vehicle and engine standards unless certain enumerated criteria are met.

Congress could have simply carved out an exemption from preemption under CAA section 209(b)(1), similar to the exemption it created in CAA section 211(c)(4)(B) for California fuel controls and prohibitions. Under CAA section 211(c)(4)(A), states and political subdivisions are preempted from prescribing or attempting ''to enforce, for purposes of motor vehicle emission control, any control or prohibition, respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine'' if EPA has prescribed a control or prohibition applicable to such characteristic or component of the fuel or fuel additive under CAA section 211(c)(1). EPA may waive preemption for states other than California to prescribe and enforce nonidentical fuel controls or prohibitions subject to certain conditions. Further, waivers are not required where states adopt state fuel controls or prohibitions that are identical to federal controls or for California to adopt fuel controls and prohibitions. CAA sections 211(c)(4)(A)(ii) and 211(c)(4)(B). This stands in stark contrast to CAA section 209(b), which requires EPA to make a judgment about California's request for a waiver of preemption.[217] Notably, CAA section 211(c)(4)(B) also cross-references CAA section 209(b)(1): ''(B) Any State for which application of section 7543(a) of this title has at any time been waived under section 7543(b)[218] of this title may at any time

[216] As a general matter, for purposes of determining if withdrawal is appropriate, EPA may initiate reconsideration *sua sponte* where CARB amends either a previously waived standard or accompanying enforcement procedure. 47 FR 7306, 7309 (Feb. 18, 1982). See also 43 FR 998 (January 5, 1978) (Grant of reconsideration to address portions of waived California's motorcycle program that California substantially amended). Additionally, if California acts to amend either a previously waived standard or accompanying enforcement procedure, the amendment may be considered to be within-the-scope of a previously granted waiver provided that it does not undermine California's determination that its standards, in the aggregate, are as at least as protective of public health and welfare as applicable Federal standards, does not affect its consistency with section 202(a) of the Act, and raises no new issues affecting EPA's previous waiver decisions. See, *e.g.,* 51 FR 12391 (April 10, 1986) and 65 FR 69673, 69674 (November 20, 2000).

[217] ''Noteworthy is the fact that under the terms of the Act, EPA approval of California fuel regulations *is not required. See* Act section 211(c)(4)(B), 42 U.S.C. 7545(c)(4)(B).'' (Emphasis in original.) *Motor Vehicle Mfrs. Ass'n* v. *NYS Dep. of Envt'l Conservation,* 17 F.3d 521, 527 (2d Cir. 1994).

[218] CAA section 211(c)(4)(B), 42 U.S.C. 7545(c)(4)(B). This provision does not identify California by name. Rather, it references CAA

Continued

prescribe and enforce, for the purpose of motor vehicle emission control, a control or prohibition respecting any fuel or fuel additive.'' CAA section 211(c)(4)(B).

Under the third waiver prong, CAA section 209(b)(1)(C), for example, EPA is to review the consistency of California's standards with CAA section 202(a), a provision of the Clean Air Act that EPA solely implements.[219] CAA Section 202(a) provides in relevant part that standards promulgated under this section ''shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period.''

In tying the third waiver prong to CAA section 202(a), Congress gave a clear indication that, in determining whether to grant a waiver request, EPA is to engage in a review that involves a considerable degree of future prediction, due to the expressly future-oriented terms and function of CAA section 202(a).[220] In turn, where circumstances arise that suggest that such predictions may have been inaccurate, it necessarily follows that EPA has authority to revisit those predictions with regard to rules promulgated under CAA section 202(a), the requirements of that section, and their relation to the California standards at issue in a waiver request, and, on review, withdraw a previously granted waiver where those predictions proved to be inaccurate.

Under CAA section 202(a), standards are often technology-forcing and thus involve predictions on the part of EPA with regard to future trends in technological and economic factors. This calls for ''substantial room for deference to the EPA's expertise in projecting the likely course of development.'' *Natural Resources Defense Council* v. *EPA* (*NRDC*), 655 F.2d 318, 331 (D.C. Cir. 1981) (upholding EPA's lead time projections for emerging technologies as reasonable). The D.C. Circuit has recognized that EPA might modify standards ''if the actual future course of technology diverges from expectation.'' *Id.* at 329. It cannot be that EPA has the inherent authority to revisit and revise its own determinations under CAA section 202(a), but it lacks authority to revisit those same determinations under CAA section 209(b).[221]

Thus, the structure of the statute—where State standards may only be granted a waiver under CAA section 209(b) to the extent that they are consistent with CAA section 202(a)—confirms that EPA has inherent authority to reconsider its prior determination that a request for a waiver for California standards met the criteria of CAA section 209(b). This renders untenable the stance taken by some commenters that EPA is somehow precluded from conducting a subsequent review and withdrawing a waiver even when it becomes aware that its initial predictions in this regard have proven inaccurate.

Further, as discussed in the SAFE proposal, the legislative history of CAA section 209(b) confirms that Congress intended EPA's authority under CAA section 209(b) to include the authority to withdraw a previously granted waiver under appropriate circumstances. 83 FR 43242–43243. *See* S. Rep. No. 50–403, at 34 (1967) (''Implicit in this provision is the right of the [Administrator] to withdraw the waiver at any time [if] after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of the waiver.'').

Some commenters that oppose the proposed withdrawal of the waiver concede that the agency may review California's waiver applications under the third waiver prong but then argue that such agency review is a ''narrow one.''[222] Under CAA Section 209, they contend, grants California ''maximum authority'' to set engine and vehicle standards. Commenters' objection to the instant withdrawal therefore appears to be grounded in some belief that CAA section 209(b) calls for complete deference to California. This view is erroneous. EPA has in fact previously initiated reconsideration under the third waiver prong, CAA section 209(b)(1)(C), in order to ''vacate that portion of the waiver previously granted under section 209(b)'' in response to CARB's post waiver modification for previously waived standards. 47 FR 7309. In that reconsideration action, EPA affirmed the grant of a waiver in the absence of ''findings necessary to revoke California's waiver of Federal preemption for its motorcycle fill-pipe and fuel tank opening regulations.'' 43 FR 7310. Additionally, EPA has explained that reconsideration will be initiated where leadtime concerns arise after the grant of an initial waiver. ''If California's leadtime projections later prove to have been overly optimistic, the manufacturer can ask that California reconsider its standard, if they are unsuccessful in securing such relief, the

section 209(b), which applies on its face to ''any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966.'' California is the only State that meets this requirement. *See* S. Rep. No. 90–403 at 632 (1967).

[219] EPA has explained that California's standards are not consistent with CAA section 202(a) if there is inadequate lead time to permit the development of technology necessary to meet those requirements, given appropriate consideration to the cost of compliance within that time. California's accompanying enforcement procedures would also be inconsistent with CAA section 202(a) if the Federal and California test procedures were inconsistent. Legislative history indicates that under CAA section 209(b)(1)(C), EPA is not to grant a waiver if it finds that there is: ''Inadequate time to permit the development of the necessary technology given the cost of compliance within that time period.'' H. Rep. No. 728, 90th Cong., 1st Sess. 21 (1967); ''That California standards are not consistent with the intent of section 202(a) of the Act, including economic practicability and technological feasibility.'' S. Rep. No. 403, 90th Cong. 1st Sess. 32 (1967).

[220] There is another textual indication that EPA's grant of a waiver is not limited to a snapshot in time, with the Agency having no authority to ever revisit, reconsider, and, where appropriate, modify or withdraw waivers that it has previously granted. CAA section 209(b) provides authority to waive the preemptive provision of CAA section 209(a). CAA section 209(a) forbids states from ''adop[ting] or attempt[ing] to enforce'' vehicle emission standards; so states cannot do so without or beyond the scope of a waiver. EPA must presume that ''attempt to enforce'' is not surplusage; it must mean something, and its potential meanings all suggest some ability on EPA's part to consider actions on the state's part separate from the state's ''adopt[ion]'' of statutory or regulatory provisions and submission to EPA of a waiver request for those provisions. An ''attempt to enforce'' could potentially mean either a state's attempt to *de facto* control emissions without having *de jure* codified emissions control requirements, or it could refer to a state's enforcement actions under a program that it has already ''adopt[ed].'' Under either scenario, the prohibition on ''attempt[ing] to enforce'' envisions state activity outside the scope of what can be determined by EPA from the face of a waiver submission. The prohibited activity is not limited to that which can be subject to a snapshot, one-time-only waiver application, which is further support for the conclusion that EPA has authority to reconsider its action on such applications in light of activity later in time than or outside the authorized scope of a waiver once granted.

[221] According to one commenter, ''it would be very odd if § 209(b) waivers were a one-way ratchet that could be granted but never rescinded. . . . For example, it would run contrary to the statutory scheme to require EPA to leave a waiver in place even after the compelling and extraordinary conditions that justified the waiver are fully addressed.'' Comments of the Alliance of Automobile Manufacturers at 182. EPA agrees.

[222] According to several commenters, CAA section 209(b) contains no express delegation of authority to EPA to withdraw a waiver, and in proposing to revoke a previous waiver ''EPA has arrogated to itself power only Congress can exercise.'' Comments of the Center for Biological Diversity, Conservation Law Foundation, EarthJustice, Environmental Defense Fund, Environmental Law and Policy Center, Natural Resources Defense Council, Public Citizen, Inc., Sierra Club, and Union of Concerned Scientists at 68. One commenter also argued that either EPA lacks authority to revoke a previously granted waiver or that any authority to do so is ''limited.'' ''The unique text and structure of this section *limits* EPA's authority, contrary to EPA's assertion of open-ended revocation authority in the proposal.'' Comments of the California Air Resources Board at 340.

manufacturers could petition EPA to reconsider the waiver.'' 49 FR 18895, 18896 n.104. Further, EPA has in the past repeatedly denied portions of several waiver requests.[223] EPA has also historically deferred or limited the terms of its grant of aspects of some waiver requests as a means of ensuring consistency with CAA section 202(a).[224] It is precisely these kinds of EPA actions that have forestalled withdrawal of any waiver to date—not any lack of authority on EPA's part to withdraw. None of the commenters, however, provided explanations as to why their apparent view of maximum deference to California is not implicated by EPA's authority to either deny a waiver request or to modify the terms of a waiver request in the course of granting one. And EPA's 2009 reversal of its 2008 denial supports, and demonstrates the long-held nature of, its position that EPA has authority to reconsider and reverse its actions on waiver applications.[225]

At least one commenter argued that this legislative history did not support the position that EPA has authority to withdraw a previously granted waiver because the legislative history relates to the original creation of the waiver provision in the Air Quality Act of 1967, whereas the Clean Air Act Amendments of 1977 revised language in the root text of CAA section 209(b)(1). Specifically, Congress in 1977 amended CAA section 209(b)(1) to establish as a prerequisite for the grant of a waiver that the State determine that its standards ''will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards'' for EPA to issue a waiver, rather than the original requirement that State standards be ''more stringent'' than corresponding federal standards.[226] EPA disagrees that this amendment was either intended to deprive EPA of authority to withdraw a previously granted waiver when the Administrator finds applicable one or more of the three criteria in CAA section 209(b)(1) under which a waiver is inappropriate, or that the amendment can be reasonably construed to have had such effect. There is no indication that the amendment was intended to alter EPA's authority under the original provision. Nor did the amendment alter the language of the criteria enumerated in CAA section 209(b). In any event, as previously discussed above, EPA has initiated reconsideration for purposes of revoking a waiver since the 1977 CAA amendments. See for example, 47 FR 7306 (Feb. 18, 1982) (Agency reconsideration of grant of waiver for purposes of withdrawal in response to CARB's post waiver modification for previously waived standards).

Some commenters question whether EPA has any authority at all to reconsider a previously granted waiver. It is well-settled, however, that EPA has inherent authority to reconsider, revise, or repeal past decisions to the extent permitted by law. At proposal, EPA explained that, although CAA section 209(b)(1) may not expressly communicate that EPA has authority to reconsider and withdraw a waiver, both the legislative history of the waiver provision and fundamental principles of administrative law establish that EPA necessarily possesses that authority. The authority to reconsider prior agency decisions need not be rooted in any particular ''magic words'' in statutory text. Subject to certain limitations, administrative agencies possess inherent authority to reconsider their decisions. *See ConocoPhillips Co.* v. *EPA,* 612 F.3d 822, 832 (5th Cir. 2010) (''Embedded in an agency's power to make a decision is its power to reconsider that decision.''); *Dun & Bradstreet Corp. Found.* v. *U.S. Postal Serv.,* 946 F.2d 189, 193 (2d Cir. 1991) (''It is widely accepted that an agency may, on its own initiative, reconsider its interim or even its final decisions, regardless of whether the applicable statute and agency regulations expressly provide for such review.''); *Mazaleski* v. *Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) (''[A]n agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.''); *Belville Min. Co.* v. *United States,* 999 F.2d 989, 997 (6th Cir. 1993) (''Even where there is no express reconsideration authority for an agency, however, the general rule is that an agency has inherent authority to reconsider its decision, provided that reconsideration occurs within a reasonable time after the first decision.'').

The commenters' position that EPA does not have any authority to reconsider either a grant or a denial of a waiver founders in light of these principles. As explained in the SAFE proposal, 83 FR 43242–43243, EPA does have that authority, in part because its interpretations of the statutes it administers ''are not carved in stone.'' *Chevron U.S.A.* v. *NRDC,* 467 U.S. 837, 863 (1984). An agency ''must consider varying interpretations and the wisdom of its policy on a continuing basis.'' *Id.* at 863–64. Notably, in response to CARB's request, EPA has previously reconsidered and reversed a previous waiver denial.[227] Similarly, in keeping with agency CAA section 209(b)(1) practice, EPA has reconsidered its previous decision to grant a waiver for portions of California's motorcycle program in response to a petition for reconsideration from the motorcycle industry.[228]

Other commenters assert that EPA's proposal to withdraw the waiver is solely based on a change in Presidential administration. There is no basis for this claim. While EPA noted in the SAFE proposal that the agency can review and reconsider a prior decision ''in response to . . . a change in administration,'' *National Cable & Telecommunications Ass'n* v. *Brand X Internet Services,* 545 U.S. 967, 981 (2005), we further acknowledged that ''the EPA must also be cognizant where it is changing a prior position and articulate a reasoned basis for the change.'' *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009). 83 FR 43242–43243, 43248. In keeping with the proposed waiver withdrawal, under the second waiver prong, CAA section 209(b)(1)(B), as discussed below, EPA in this document finalizes a determination that California does not

[223] 38 FR 30136 (November 1, 1973) (denial of waiver for MY 1975 HC and CO standards ''because costs of compliance within the lead time remaining is excessive.''); 43 FR 998 (January 5, 1978) (denial of waiver for MY 1978 test procedures due to insufficient lead time); 40 FR 30311 (July 18, 1975) (denial of waiver due to insufficient lead time for MY 1977).

[224] 58 FR 4166 (January 13, 1993) (deferring consideration of portions of waiver request); 67 FR 54180, 81 n.1 (August 21, 2002) (granting waiver with certain exceptions).

[225] In seeking reconsideration of the March 8, 2008 waiver denial, CARB also noted that ''EPA has the inherent authority to reconsider its previous waiver denial'' 74 FR 32747.

[226] The intent of the 1977 amendment was to accommodate California's particular concern with $NO_X$, which the State regarded as a more serious threat to public health and welfare than carbon monoxide. California was eager to establish oxides of nitrogen standards considerably more stringent than applicable Federal standards, but technological developments posed the possibility that emission control devices could not be constructed to meet both the stringent California oxides of nitrogen standard and the stringent federal carbon monoxide standard. *Motor & Equip. Mfrs. Ass'n, Inc.* v. *EPA,* 627 F.2d at 1110 n.32. EPA has explained that the phrase ''in the aggregate'' was specifically aimed at allowing California to adopt CO standards less stringent than the corresponding federal standards, while at the same time adopting more stringent $NO_X$ standards, as part of California's strategy to address ozone problems. California reasoned that a relaxed CO standard would facilitate the technological feasibility of more stringent $NO_X$ standards. 78 FR 43247.

[227] EPA reconsidered the 2008 GHG waiver denial in response to CARB's request and granted it upon reconsideration. 72 FR 32744 (July 9, 2009). See also 43 FR 998 (January 5, 1978) (Grant of reconsideration to address portions of waived California's motorcycle program that California substantially amended).

[228] 43 FR 998 (January 5, 1978).

need its GHG and ZEV standards to meet compelling and extraordinary conditions, within the meaning of those terms as they are used in the statute, that differs from its determination on the same question made in the course of granting the ACC program waiver. Additionally, the agency, in response to a request by automobile manufacturers, who have consistently expressed reservations over their ability to comply with MY 2022–2025 GHG standards, is reconsidering standards that are the compliance mechanism for CARB's MY 2022–2025 GHG standards. This is the compliance mechanism that California had provided in response to automobile manufacturers request and support for the waiver of preemption.

At proposal, EPA noted that California had given public notice that it was considering amending its ''deemed to comply'' provision to provide that that provision would be applicable only to vehicles that meet the standards originally agreed to by California, the federal government, and automakers in 2012. *See* 83 FR 43252 n.589. California finalized that amendment to its regulations after the close of the SAFE comment period, in late 2018. California more recently, in July 2019, announced a ''framework'' agreement with certain automakers that purported to establish a ''nationwide'' standards program different from *both* the 2012 Federal standards *and* from the California program for which EPA granted the January 2013 waiver. These actions on California's part, while not proposed as bases for waiver withdrawal in the August 2018 SAFE proposal, as those actions had not yet transpired at the time of proposal, and while not necessary for the finalization of this action, do provide further support for this action (although EPA does not view them as necessary predicates for this action and would be taking this action even in their absence).

Thus, contrary to some commenters' assertions, reconsideration of the grant of the waiver, and EPA's proposal to withdraw the waiver, was not solely motivated by a change in Presidential administration. The policy, technical, and legal considerations discussed in the proposal and in this final action provide the rationale for EPA's actions here. It is therefore distinguishable from the instance where, for example, an agency undertook reconsideration subsequent to a change in administration because ''the withdrawn decision was doubtful in light of changing policies.'' *Coteau Properties Co.* v. *DOI,* 53 F.3d 1466, 1479 (8th Cir. 1995).

Further, as earlier noted, California has now entered into a voluntary agreement with at least four automobile manufacturers that amongst other things, requires the automobile manufacturers to refrain from challenging California's GHG and ZEV programs, and provides that California will accept automobile manufacturer compliance with a less stringent standard than either the California program that was the subject of the 2013 waiver or the Federal standards as promulgated in 2012.[229] This agreement appears to materially depart from the existing grant of waiver for MY 2021–2025 GHG standards, is in tension with California's above-mentioned amendment of the ''deemed to comply'' provision, and raises an additional reason to question whether California ''needs'' their existing standards within the meaning of CAA section 209(b)(1)(B), given that California has announced it is proceeding to create a new ''voluntary'' program that would relax the stringency of some aspects of those standards. That is to say, California's apparent weakening of its program as it was originally submitted for waiver calls into question whether it needs that program. EPA believes that this provides additional support for its conclusion, as set forth in subsections III.B and III.D, both that it has authority to withdraw its grant of the waiver and that California does not in fact need these waived standards to meet ''compelling and extraordinary conditions,'' CAA section 209(b)(1)(B), if the State is itself already proceeding to allow departures from those waived standards.[230] EPA further believes that California cannot claim reliance interests when it is undertaking steps to alter the *status quo.*

In short, the text, structure, and history of CAA section 209(b)(1) support EPA's authority to withdraw previously granted waivers.[231] At the same time, nothing in CAA section 209(b)(1) can reasonably be read to preclude the agency from withdrawing a previously issued waiver under appropriate circumstances. EPA is not persuaded by commenters' assertions to the contrary. In this action, EPA affirms the position that the scope of review for California waivers under CAA section 209(b)(1) includes both a pre-grant review and, where appropriate, post-grant review of an approved waiver; that post-grant review may, in appropriate circumstances, result in a withdrawal of a prior waiver. A withdrawal action could be premised on any one of the three findings in CAA section 209(b)(1)(A)–(C) that render a waiver unavailable.

EPA also disagrees with some commenters' assertions that ostensible reliance interests foreclose withdrawal of the waiver for MY 2021–2025 GHG and ZEV standards. According to these commenters, ''California, and the section 177 states that have elected to adopt those standards as their own have incurred reliance interests ultimately flowing from those standards. For instance, California has incurred reliance interests because it is mandated to achieve an aggressive GHG emissions reduction target for 2030.'' [232] They further state: ''[b]ut EPA provides no justification for applying that change in policy *retroactively* to upend a five-year-old decision to which substantial reliance interests have attached.'' (Emphasis in original).[233]

The federal GHG standards that EPA promulgated in 2012 included a commitment to conduct and complete a Mid-Term Evaluation (MTE) of the GHG standards for MY 2022–2025, given the lengthy phase-in compliance period, EPA projections of control technology availability or feasibility for MY 2021–2025, and the fact that EPA promulgated those standards in a joint action with NHTSA, where NHTSA was acting under a statute which limited its promulgation of fuel economy standards to periods of five years.[234] *See NRDC,*

[229] *https://www.gov.ca.gov/2019/07/25/california-and-major-automakers-reach-groundbreaking-framework-agreement-on-clean-emission-standards/.*

[230] Again, neither California's late 2018 amendment to its ''deemed to comply'' provision, nor its July 2019 announcement of a new ''framework,'' are necessary bases for the action EPA takes in this document; instead, they provide further support for that action.

[231] In 2009, EPA reconsidered the 2008 GHG waiver denial at CARB's request and granted it upon reconsideration. 74 FR 32744. EPA noted the authority to ''withdraw a waiver in the future if circumstances make such action appropriate.'' *See* 74 FR 32780 n.222; *see also id.* at 32752–32753 n.50 (citing 50 S. Rep. No. 403, at 33–34).

[232] Comments of CARB at 83.

[233] Comments of States of California, Connecticut, Delaware, Hawaii, Iowa, Illinois, Maine, Maryland, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont and Washington, the Commonwealth of Massachusetts, Pennsylvania and Virginia, the District of Columbia, and the Cities of Los Angeles, New York, Oakland, San Francisco and San Jose at 123; Comments of CARB at 352.

[234] 40 CFR 86.1818–12(h). 77 FR 62624 (October 15, 2012). EPA notes in this regard that the Supreme Court in *Massachusetts* v. *EPA,* in rejecting the position that greenhouse gases are not air pollutants under the general definition of that term in CAA section 302 because, if they were, EPA's regulations of GHG emissions from the motor vehicle fleet could intrude on DOT's fuel economy authority, opined that ''[t]he two obligations may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.'' 549 U.S. 497, 532 (2007). In order for the two agencies to do so, they

655 F.2d at 329 (upholding EPA's lead time projections for emerging technologies as reasonable, noting a longer lead time tends to ''give[ ] the agency greater leeway to modify its standards if the actual future course of technology diverges from expectation.''). The 2012 rulemaking also established the GHG standards for MY 2021–2025 that are the subject of the ''deemed to comply'' provision. (*i.e.,* California allowed automobile manufacturers to demonstrate compliance with California's GHG standards by complying with EPA's GHG standards). The MTE construct required EPA to issue a Final Determination by April 1, 2018 regarding whether the GHG standards for MY 2022–2025 remained appropriate under CAA section 202(a).[235] Specifically, the MTE would, amongst other things, assess the relevant factors pertinent to setting standards under CAA section 202(a), such as the feasibility and practicability of the standards, costs to vehicle manufacturers and consumers, impacts on the automobile industry, emissions impacts, and safety impacts. In comments during the 2012 national GHG rulemaking, automakers supported the MTE, and several expressly predicated their support of the GHG standards for MY 2022–2025 on the MTE.[236] In the waiver action, EPA reiterated its commitment to the MTE in light of these considerations.[237]

In these circumstances, where GHG standards were being set far into the future with an explicit commitment to revisit them, where California agreed to deem compliance with certain federal GHG standards to constitute compliance with California standards, and where all parties were provided ample notice that EPA would be revisiting federal standards and, accordingly, the waiver granted for a program that acceded to those standards through the ''deemed to comply'' provision, neither the State of California nor other parties (such as automakers) have reasonable reliance interests sufficient to foreclose the extension of federal standards to California. Likewise, under CAA section 177, even though States other than California, under certain circumstances and conditions, may ''adopt and enforce'' standards that are ''identical to the California standards for which EPA has granted a waiver for such model year,'' given that Title I[238] does not call for NAAQs attainment planning as it relates to GHG standards, those States that may have adopted California's GHG standards and ZEV standards for certain MYs would also not have any reliance interests as a result of the grant of the ACC program waiver. As previously noted, CAA section 177 States also lack reliance interests sufficient to preclude reconsideration and withdrawal of the waiver both because they were on notice of the commitment to review the federal standards, as discussed above.[239] Relatedly, with the revocation of these standards in this action there will be no ''standards identical to the California standards for which a waiver has been granted'' that any state may adopt and enforce, under CAA section 177(1).[240] (States may not ''tak[e] any action that has the effect of creating a car different from those produced to meet either federal or California emission standards, a so-called 'third vehicle.' '' *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *New York State Dep't of Envtl. Conservation,* 17 F.3d 521, 528 (2d Cir. 1994)). California also did not seek approval for MY 2021–2025 GHG standards in its 2016 SIP approval request. 81 FR 39424, 27–28 (June 16, 2016).

As a general matter, ''[w]henever a question concerning administrative, or judicial, reconsideration arises, two opposing policies immediately demand recognition: The desirability of finality, on the one hand, and the public interest in reaching what, ultimately, appears to be the right result on the other.'' *Civil Aeronautics Bd.* v. *Delta Air Lines, Inc.,* 367 U.S. 316, 321–22 (1961). *See also ConocoPhillips,* 612 F.3d at 832 (5th Cir. 2010) (''Furthermore, reconsideration also must occur within a reasonable time after the decision being reconsidered was made, and notice of the agency's intent to reconsider must be given to the parties.''); *Belville Min. Co.* v. *United States,* 999 F.2d 989, 997 (6th Cir. 1993) (''Even where there is no express reconsideration authority for an agency, however, the general rule is that an agency has inherent authority to reconsider its decision, provided that reconsideration occurs within a reasonable time after the first decision.''); *Bookman* v. *United States,* 453 F.2d 1263, 1265 (Fed. Cir. 1972) (''[A]bsent contrary legislative intent or other affirmative evidence, this court will sustain the reconsidered decision of an agency, as long as the administrative action is conducted within a short and reasonable time period.'').

For the reasons stated above, there was no ''finality'' in the federal MY 2021–2025 GHG standards that EPA promulgated in 2012 in the sense required for cognizable reliance to accrue sufficient to foreclose EPA's exercise of authority to reconsider and, if appropriate, withdraw the waiver. Nor is such ''finality'' to be found in the January 2013 grant of the waiver for California's MY 2021–2025 GHG and ZEV standards. As explained at proposal, in granting the waiver for the ACC program GHG and ZEV standards, EPA had evaluated certain compliance flexibilities allowed by California under the third waiver prong, CAA section 209(b)(1)(C) (consistency with CAA section 202(a)). Specifically, EPA evaluated California regulations that included an optional compliance provision (the ''deemed to comply'' provision) that would allow automobile and engine manufacturers to demonstrate compliance with CARB's GHG standards for MY 2017–2025 by complying with applicable national or federal GHG standards. 78 FR 2136. During the waiver proceedings, most automobile manufacturers either opposed the grant of the waiver for MY 2021–2025 GHG and ZEV standards as not consistent with CAA section 202(a)[241] or premised their support for

needed to take account of the fact that DOT's fuel-economy authority faces temporal constraints that EPA's emissions authority does not. They did so through the MTE, and the MTE mechanism provided notice to all interested parties that EPA's 2012 federal standards under CAA section 202(a), and EPA's January 2013 waiver grounded in part on a finding that the State provisions subject to the waiver were compatible with CAA section 202(a), would be subject to review and possibly revision within a few years of the waiver grant. Under these circumstances, no reliance interests accrued sufficient to foreclose EPA's authority to reconsider and withdraw the waiver.

[235] The MTE process also called for a ''draft Technical Assessment Report'' (to be prepared no later than November 15, 2017), public comments on that draft report, and public comments on whether the model year 2022–2025 standards are ''appropriate'' under CAA section 202(a).

[236] 77 FR at 62636, 62652, 62785.

[237] ''EPA is committed to conducting a mid-term evaluation for MYs 2022–2025 in close coordination with NHTSA and CARB given the long-time frame in implementing standards out to MY 2025 and given NHTSA's obligation to conduct a separate rulemaking in order to establish final standards for vehicles for those years.'' 78 FR 2137.

[238] Under title I of the Clean Air Act, EPA establishes national ambient air quality standards (NAAQS) to protect public health and welfare, and has established such ambient standards for ozone, carbon monoxide, nitrogen dioxide, sulfur dioxide, lead, and particulate matter.

[239] ''This new State authority should not place an undue burden on vehicle manufacturers who will be required, in any event, to produce vehicles meeting the California standards for sale in California.'' H.R. Conf. Rep. No. 95–294, 95th Cong., 1st Sess. 337 (1977).

[240] A State may not ''make attempt[s] to enforce'' California standards for which EPA has not waived preemption. *Motor Vehicle Mfrs. Ass'n* v. *NYS Dep. of Envtl Conservation,* 17 F.3d 521, 534 (2d Cir. 1994).

[241] 78 FR 2132 (manufacturers suggested that EPA should grant California's waiver request after CARB finalized its regulatory amendments to allow for a national compliance option; manufacturers oppose granting the waiver for the ZEV program past the 2017 MY, asserting that those standards will not be feasible either in California or in the individual

Continued

those standards on California's permitting compliance through the ''deemed to comply'' provision.[242] In comments on the proposed withdrawal, California did not contest this aspect of the waiver proceedings. For example, California in its comments on the SAFE proposal, at page 57, states ''[b]ecause the federal program was expected to achieve GHG emission reductions that are equivalent to the California program, CARB modified its LEV III GHG regulation to continue to allow the 'deemed to comply' option beyond model year 2016, by accepting federal compliance with the EPA standards as sufficient to demonstrate compliance with California's standards for the 2017 through 2025 model years.'' Additionally, most automobile manufacturers indicated that they would comply with California's GHG standards through the ''deemed to comply'' provision. Both California and some automobile manufacturers also alluded to their expectations that standards would be revised in the future in light of technological feasibility and cost considerations surrounding MY 2022–2025 GHG standards.[243] [244]

Regarding whether EPA is foreclosed from reconsidering its January 2013 waver grant due to the passage of time, on January 12, 2017, well in advance of the April 2018 deadline that it had set for itself, EPA completed the Mid-Term Evaluation called for under the 2012 national GHG standards, determining that the MY 2017–2025 GHG standards promulgated in that rulemaking were appropriate. Automobile manufacturers, however, petitioned EPA for reconsideration of that January 2017 determination. In March 2017, EPA granted this petition for reconsideration. 82 FR 14671 (Mar. 22, 2017). In March 2017 California completed its own Mid-Term Evaluation review, in which it arrived at different conclusions on technological feasibility and costs for these standards than those that EPA would later reach. Subsequently, in April 2018, consistent with the timing specified in its regulations, EPA revised its finding on the appropriateness of the federal MY 2022–2025 GHG standards, concluding that those standards ''are not appropriate and, therefore, should be revised.'' [245] This finding provided notice of a reasonable possibility that these federal GHG standards would likely be changing.[246] In the April 2018 action, EPA also withdrew the January 2017 finding. 83 FR at 16077. Since then California has challenged this revised finding; that challenge is pending in the United States Court of Appeals for the District of Columbia. *California* v. *EPA,* No. 18–1114 (D.C. Cir. argued Sept. 6, 2019). Moreover, California in December 2018 amended the ''deemed to comply'' provision in its regulations after the publication of the SAFE proposal, and in July 2019 announced a putative nationwide framework for vehicle standards, as discussed above.

These procedural aspects of the federal GHG standards and the grant of a waiver for California's ACC program are indicative of the absence of the possibility of reasonable reliance in the ''finality'' of the waiver, contrary to commenters' assertion of reliance interests. For instance, as shown above, the engine and vehicle manufacturers have not only complained about the stringency of MY 2021–2025 GHG and ZEV standards, but also requested reconsideration of both the waiver as it relates to the ZEV standards, and the 2017 Mid-Term Evaluation that addresses the ''deemed to comply'' provision, which California provided in response to their request. EPA has also initiated joint rulemaking with NHTSA that proposes amended EPA GHG standards and fuel economy standards for MY 2021–2026. See, the Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks. 83 FR 42986 (Aug. 24, 2018). As also previously noted, automobile and engine manufacturers operated under the assumption that both California and national standards would, or at least could, be revised.[247] These circumstances are sufficient to put California and others on notice that standards were in flux such that they could not give rise to reasonable reliance interests. Further, CAA section 177 States do not have any reliance interests that are engendered by the withdrawal of the waiver for the MY 2021–2025 GHG and ZEV standards. As previously explained, although CAA section 177 allows States other than California to adopt standards that are promulgated by California and for which a waiver of preemption is granted by EPA pursuant to CAA section 209, CAA section 177 States may do so only subject to certain conditions and circumstances. None of these conditions and circumstances, however, are at issue in this waiver decision, in light of EPA's determination that CAA section 177 does not apply to states seeking to adopt and enforce CARB's GHG standards. As also previously noted, with the revocation of these standards in this action, there will be no ''standards identical to the California standards for which a waiver has been granted'' that any state may adopt and enforce, under CAA section 177(1).[248] States may not ''tak[e] any action that has the effect of creating a car different from those produced to meet either federal or California emission standards, a so-called 'third vehicle.' '' *Motor*

CAA section 177 States given the status of the infrastructure and the level of consumer demand for ZEVs; dealers suggest that EPA should not grant California a waiver for its ZEV and GHG emission standards past MY 2018 and 2021, respectively, asserting that technical capabilities after that time are uncertain.).

[242] ''[T]his national compliance option is integral to the commitment letters the industry and California signed in July 2011 and to the single national GHG/fuel economy program all stakeholders sought to achieve.'' 78 FR 2138.

[243] 78 FR 2128. A waiver ''will remain an important backstop in the event the national program is weakened or terminated;'' manufacturers note that both the federal and the California GHG emission standards provide for a comprehensive mid-term evaluation of the MYs 2022–2025; manufacturers clearly state that ''[a]ny amendments to California's GHG emission standards made as a result of the mid-term evaluation will require analysis to determine whether the amendments fall within the scope of this waiver, or, if not, whether they qualify for a separate waiver under Section 209(b) of the Clean Air Act.'' 78 FR 2132. *See also, e.g.,* comments of the National Automobile Dealers Association, n.43. On March 11, 2013, the Association of Global Automakers and Alliance of Automobile Manufacturers filed a petition for reconsideration of the January 2013 waiver grant, requesting that EPA reconsider the decision to grant a waiver for MYs 2018 through 2025 ZEV standards on technological feasibility grounds. Petitioners also asked for consideration of the impact of the travel provision, which they argue raise technological feasibility issues in CAA section 177 States, as part of the agency's review under the third waiver prong, CAA section 209(b)(1)(C). EPA continues to evaluate the petition. As explained below, in this action EPA is not taking final action with regard to the proposed determinations under the third waiver prong. Whether and how EPA will respond to the March 2013 petition will be considered in connection with a potential future final action with respect to the proposed third prong determinations set forth in the SAFE proposal.

[244] Since the grant of the ACC waiver program, engine and vehicle manufacturers who voiced concerns about the stringency of MY 2021–2025 GHG and ZEV standards during the waiver proceedings have requested both reconsideration of the grant of the waiver for the ZEV standards (which is a compliance mechanism for the GHG standards) and aspects of the national GHG program.

[245] Mid-Term Evaluation of Greenhouse Gas Emissions Standards for Model Year 2022–2025 Light-Duty Vehicles: Notice; Withdrawal. 83 FR 16077 (Apr. 13, 2018).

[246] 82 FR 14671 (Mar. 22, 2017).

[247] ''The manufacture of automobiles is a complex matter, requiring decisions to be made far in advance of their actual execution. The ability of those engaged in the manufacture of automobiles to obtain clear and consistent answers concerning emission controls and standards is of considerable importance so as to permit economies in production.'' S. Rep. No. 403, 90th Cong., at 730 1st Sess. (1967).

[248] A State may not ''make attempt[s] to enforce'' California standards for which EPA has not waived preemption. *Motor Vehicle Mfrs. Ass'n* v. *NYS Dep. of Envtl Conservation,* 17 F.3d 521, 534 (2d Cir. 1994).

*Vehicle Mfrs. Ass'n of U.S., Inc.* v. *New York State Dep't of Envt'l Conservation,* 17 F.3d 521, 528 (2d Cir. 1994).

California's comments argue that EPA cannot revisit its waiver with respect to the ZEV standards in particular because EPA, in a SIP approval action, approved ZEV provisions into the State's SIP. Final CARB Detailed Comments, at 351. But in so doing, EPA noted that California's *GHG* provisions were *not* part of California's SIP submission.[249] At the time, EPA explained that ''CARB has expressly excluded from the August 14, 2015 SIP submittal certain sections or subsections of California code that have been authorized or waived by EPA under CAA section 209.'' [250] Further, in the SAFE proposal, EPA explained that the proposed withdrawal of the waiver for MY 2021–2025 ZEV standards was premised in part on California's explicit indications that compliance with those standards formed part of the compliance mechanism for MY 2021–2025 GHG standards. For instance, at proposal, we explained ''because the ZEV and GHG standards are closely interrelated, as demonstrated by the description above of their complex, overlapping compliance regimes, EPA is proposing to withdraw the waiver of preemption for ZEV standards under the second and third prongs of section 209(b)(1).'' 83 FR 43243. California's responses to the SAFE proposal do not rebut the Agency's views that the ZEV standards for MY 2021–2025 are inextricably interconnected with the design and purpose of California's overall GHG reduction strategy.[251] According to California, for example, CARB's GHG standards for the 2017 through 2025 MYs are designed to respond to California's identified goals of reducing GHG emissions to 80 percent below 1990 levels by 2050 and in the near term to reduce GHG levels to 1990 levels by 2020;'' ''In 2009, CARB staff analyzed pathways to meeting California's long-term 2050 GHG reduction goals in the light duty vehicle subsector and determined that ZEVs would need to comprise nearly 100 percent of new vehicle sales between 2040 and 2050, and commercial markets for ZEVs would need to launch in the 2015 to 2020 time frame.'' Analysis in support of comments of the California Air Resources Board on the SAFE proposal, pg. 54, 59 & 83. EPA reviewed California's SIP submission, including ZEV measures, as a matter of NAAQS compliance strategy. But in the 2012–2013 CAA section 209(b) waiver proceeding, CARB presented its ZEV program to EPA solely as a GHG compliance strategy—indeed, CARB expressly stated that the ZEV program *did not confer NAAQS pollutant benefits.* ''There is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions.'' CARB ACC waiver request at 15, EPA–HQ–OAR– 2012–0562–0004.[252]

Similarly, some commenters argued that EPA reconsideration would constitute impermissible retroactive action, citing *Bowen* v. *Georgetown Univ. Hosp.,* 488 U.S. 204 (1988). However, the rulemaking which the Supreme Court held was impermissibly retroactive in that case had been proposed in February 1984 and had purported to establish reimbursement rates effective July 1, 1981. By contrast, here EPA is reconsidering a previous grant of a waiver of preemption for *future* model years 2021–2025.[253] Reconsideration of aspects of a prior adjudication whose effects have not yet ripened is not barred by *Bowen's* proscription on retroactive rulemaking—otherwise any reconsideration of agency action would likewise be barred.

For all these reasons, EPA concludes it has authority under CAA section 209 to reconsider its prior grant of the ACC waiver and to withdraw the waiver for MY 2021–2025 GHG and ZEV standards, consistent with the SAFE proposal.

*C. The Effect of Preemption Under the Energy Policy and Conservation Act (EPCA) on EPA's Previously Granted Waiver Under CAA Section 209(b) With Regard to California's GHG and ZEV Standards*

In the SAFE proposal, EPA explained its historical practice of reviewing waiver requests under the prism of CAA section 209. Specifically, EPA has ''historically declined to consider as part of the waiver process whether California standards are constitutional or otherwise legal under other Federal statutes apart from the Clean Air Act.'' 83 FR 42340. *See also Motor & Equip. Mfrs. Ass'n, Inc.* v. *EPA,* 627 F.2d 1095, 1115 (D.C. Cir. 1979) (*MEMA I*) ''[T]he Administrator operates in a narrowly circumscribed proceeding requiring no broad policy judgments on constitutionally sensitive matters. Nothing in CAA section 209 requires him to consider the constitutional ramifications of the regulations for which California requests a waiver.''). This historic position was reflected in granting the initial ACC program waiver where EPA explained: ''Evaluation of whether California's GHG standards are preempted, either explicitly or implicitly, under [the Energy Policy and Conservation Act] EPCA, is not among the criteria listed under section 209(b). EPA may only deny waiver requests based on the criteria in section 209(b), and inconsistency with EPCA is not one of those criteria.'' 78 FR 2145. But EPA, in the past, has also solicited comments on ''whether the Energy Policy and Conservation Act (EPCA) fuel economy provisions are relevant to EPA's consideration of the request and to California's authority to implement its vehicle GHG regulations'' and in response to comments opted to ''take[ ] no position regarding whether or not California's GHG standards are preempted under EPCA.'' 74 FR 32744, 32782–83 (July 8, 2008).

[249] 81 FR 39424, 27–28 (June 16, 2016).

[250] 81 FR 29427–28. ''The excluded provisions pertain to: Greenhouse Gas (GHG) exhaust emission standards 2009 through 2016 Model Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles, and 2017 and subsequent Model Passenger Cars, Light-Duty Trucks, and Medium Duty Vehicles.''

[251] Analysis in support of comments of the California Air Resources Board on the SAFE proposal, at 342. ''For example, and relevant here, California's Legislature has established an aggressive GHG emissions reduction target for 2030.'' ''The ZEV mandate is a crucial part of this strategy; it 'act[s] as the technology forcing piece of the 2016 Draft TAR program' which is necessary because 'the new vehicle fleet [in California] will need to be primarily composed of advanced technology vehicles . . . by 2035' in order to meet the State's 2050 GHG goal.'' *Id.* at 369–70 (Internal citations omitted). ''This increasing ZEV deployment is critical to achieving the statewide 2030 and 2045 GHG requirements and 2031 South Coast SIP commitments (the 2016 State SIP Strategy identified the need for light-duty vehicles to reduce $NO_X$ emissions by over 85 percent by 2031 to meet federal standards).'' *Id.* at 373.

[252] CARB in its SAFE proposal comments refers to this as an ''alleged[ ]'' statement, Final Carb Detailed Comments at 351. The SAFE proposal cited the Waiver Support Document in which CARB made this statement, 83 FR at 43248 n.580. The statement is directly quoted above. California's comments on the SAFE proposal do not contest that California's ACC waiver request expressly disclaimed criteria pollutant benefits from the ZEV program, nor do they establish that EPA is foreclosed from revisiting the grant of the waiver in light of the interpretation of 209(b)(1)(B) adopted below. EPA notes in this regard that California's approach in its ACC waiver request differed from the state's approach in its waiver request for MY 2011 and subsequent heavy-duty tractor-trailer GHG standards, where California quantified $NO_X$ emissions reductions attributed to GHG standards and explained that they would contribute to PM and ozone NAAQS attainment. 79 FR 46256, 46257 n.15, 46261, 46262 n.75 (August 7, 2014).

[253] As explained above, to the extent that NHTSA's final determination that EPCA preempts State GHG and ZEV programs, the implications of that determination for prior EPA waivers of such programs are effective upon the effective date of this joint action. Separate and apart from that analysis, to the extent that EPA is withdrawing the waiver based on its determination that the waiver does not meet the CAA section 209(b)(1)(B) criterion, that withdrawal is for model years 2021–2025, as proposed in the SAFE proposal.

In the January 2013 waiver, EPA stated: ''Evaluation of whether California's GHG standards are preempted, either explicitly or implicitly, under EPCA, is not among the criteria listed under section 209(b). EPA may only deny waiver requests based on the criteria in section 209(b), and inconsistency with EPCA is not one of those criteria. In considering California's request for a waiver, [EPA] therefore [has] not considered whether California's standards are preempted under EPCA.'' 78 FR at 2145.

EPA believes that this January 2013 statement was inappropriately broad, to the extent it suggested that EPA is categorically *forbidden* from ever determining that a waiver is inappropriate due to consideration of anything other than the ''criteria'' or ''prongs'' at CAA section 209(b)(1)(B)(A)–(C). The statements quoted above, and EPA's historical practice of disregarding issues of ''[c]onsistency with EPCA'' in the context of evaluating California's waiver applications, were made in the context of EPA acting on its own to administer CAA section 209(b) in considering such applications. The context here is different: EPA is undertaking a joint action with NHTSA. In the SAFE proposal, EPA noted that NHTSA had proposed and could well finalize a determination that California's GHG and ZEV standards are both explicitly and implicitly preempted under EPCA.[254] EPA explained that such a determination would present a threshold question as to California's ability to enforce these standards and proposed to conclude that standards preempted under EPCA cannot be afforded a waiver of preemption under CAA section 209(b). Unlike the Clean Air Act, EPCA does not allow for any waiver of its express preemption provision. EPCA contains no language that can be read to allow States to either prescribe or enforce regulations related to fuel economy standards. Consistent with this view, at SAFE proposal, NHTSA explained that, ''when a State establishes a standard related to fuel economy, it does so in violation of EPCA's preemption statute(sic) and the standard is therefore void *ab initio.*'' 83 FR 43235. At the same time, NHTSA explained that certain other GHG requirements that do not relate to fuel economy, such as regulations addressing leaking refrigerants, would likely not be preempted under EPCA. 83 FR 4324–35.

EPA does not intend in future waiver proceedings concerning submissions of California programs in other subject areas to consider factors outside the statutory criteria in CAA section 209(b)(1)(A)–(C). But the unique situation in which EPA and NHTSA, coordinating their actions to avoid inconsistency between their administration of their respective statutory tasks, address in a joint administrative action the issues of the preemptive effect of EPCA and its implications for EPA's waivers, has no readily evident analogue.[255] EPA will not dodge this question here.

Consistent with the SAFE proposal, NHTSA is finalizing a determination that EPCA preempts State GHG and ZEV standards. EPA agrees with commenters that EPA is not the agency that Congress has tasked with administering and interpreting EPCA. This is especially so because ''[t]he waiver proceeding produces a forum ill-suited to the resolution of constitutional claims.'' *MEMA I,* 627 F.2d at 1115. In the SAFE proposal, EPA took the position that it is, at a minimum, reasonable to consider NHTSA's conclusions about the preemptive effect of EPCA. To the extent that NHTSA has determined that these standards are void *ab initio* because EPCA preempts standards that relate to fuel economy, that determination presents an independent basis for EPA to consider the validity of the initial grant of a waiver for these standards, separate and apart from EPA's analysis under the criteria that invalidate a waiver request. In the context of a joint action in which our sister agency is determining, and codifying regulatory text to reflect, that a statute Congress has entrusted it to administer preempts certain State law, EPA will not disregard that conclusion, which would place the United States Government in the untenable position of arguing that one federal agency can resurrect a State provision that, as another federal agency has concluded and codified, Congress has expressly preempted and therefore rendered void *ab initio.*

This conclusion is consistent with the Supreme Court's holding in *Massachusetts* v. *EPA,* 549 U.S. 497 (2007). While this case did not address EPCA preemption, the Supreme Court anticipated that EPA and NHTSA would administer their respective authorities in a consistent manner. (''The two obligations [for NHTSA to set fuel economy standards under EPCA and for EPA to regulate motor vehicle GHG emissions under CAA section 202] may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.'' *Id.* at 532.) Considering that California cannot enforce standards that are void *ab initio,* even assuming *arguendo* that there existed a valid grant of waiver under CAA section 209(b), NHTSA's determination renders EPA's prior grant of a waiver for those aspects of California's regulations that EPCA preempts invalid, null, and void, and, to the extent that administrative action is necessary on EPA's part to reflect that state of affairs, EPA hereby withdraws that prior grant of a waiver on this basis.

EPA's finding that California's GHG and ZEV standards are preempted as a result of NHTSA's finalized determinations, issued in this joint action, with respect to EPCA's preemptive effect on State GHG and ZEV standards, is effective upon the effective date of this joint action. This finding is separate and apart from findings with respect to EPA's 2013 waiver for CARB's Advanced Clean Car Program as it pertains to its 2021 through 2025 MY relating to GHG and ZEV standards and accompanying withdrawal of the waiver, pursuant to CAA section 209(b)(1), as set forth in subsection D below; as a matter of EPA's administration of CAA section 209(b), without reference to EPCA's preemptive effect as determined by NHTSA, that withdrawal applies to 2021 through 2025 MY GHG and ZEV standards, as proposed in the SAFE proposal.[256] [257]

[254] 49 U.S.C. 32919(a). *See* 83 FR 43233.

[255] *See Massachusetts* v. *EPA.*

[256] EPA acknowledges that its action in this document may have implications for certain prior and potential future EPA reviews of and actions on state SIPs that may incorporate certain aspects of California's state program, either California's own SIPs or SIPs from states that have adopted one or more aspects of California's state program pursuant to CAA section 177. EPA will consider whether and how to address those implications, to the extent that they exist, in separate actions. But EPA believes that it is not necessary to resolve those implications in the course of this action because the effects of EPCA preemption, as set forth in subsection III.C, and the proper interpretation and application of CAA section 209(b)(1)(B) to California's GHG and ZEV program, as set forth in subsection III.D, provide sufficient reason to take this final action and that the potential implications for prior and future SIP actions are not a sufficient basis to alter the rationale for or terms of this final action. The questions of what EPCA means and what its preemptive effect on certain state regulations is, and what CAA section 209(b)(1)(B) means and what its limitations on California's ability to obtain a waiver for its state programs are, do not depend on whether one or more SIP actions pertaining to NAAQS attainment and maintenance strategies may directly or indirectly be affected by the agencies' resolution of those questions.

[257] In the August 2018 SAFE proposal, EPA solicited comment on whether one or more of the grounds supporting the proposed withdrawal of this waiver would also support withdrawing other waivers that it has previously granted. 83 FR at 43240 n.550. At this time, EPA does not intend to take action with respect to any prior waiver grants other than those specified above.

*D. Reconsideration of January 2013 Waiver and Determination That It Is Appropriate To Withdraw EPA's January 2013 Waiver of CAA Section 209 Preemption for California's GHG and ZEV Standards for Model Years 2021–2025, Pursuant to CAA Section 209(b)(1)(B)*

1. Interpretation of CAA Section 209(b)(1)(B)

Under CAA section 209(b)(1)(B), EPA cannot grant a waiver request if EPA finds that California ''does not need such State standards to meet compelling and extraordinary conditions.'' [258] In the August 2018 SAFE Proposal, EPA proposed to determine: (1) That it was reasonable and appropriate to interpret the scope of ''such State standards'' to authorize a consideration of whether California needs to have its own GHG vehicle emissions program *specifically,* rather than whether California needs any separate vehicle emissions program *at all;* and (2) that California did not ''need'' its own GHG and ZEV programs ''to meet compelling and extraordinary conditions'' within the meaning of the statute. EPA finalizes those determinations in this document.

EPA notes in this regard that regulation of emissions from new motor vehicles and new motor vehicle engines under CAA section 202(a) is triggered by a determination that ''the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines . . . cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' This ''endangerment finding,'' which triggers EPA's ability to use the CAA section 202(a) regulatory authority which CAA section 209(a) preempts the states from exercising (subject to the availability of a CAA section 209(b) preemption waiver), links (1) emission of pollutants from sources; to (2) air pollution; and (3) resulting endangerment to health and welfare.[259]

Congress enacted waiver authority for California under CAA section 209(b) against the backdrop of traditional, criteria pollutant environmental problems, under which all three links in this chain bear a particularized nexus to specific local California features: (1) Criteria pollutants are emitted from the tailpipes of the California motor vehicle fleet; (2) those emissions of criteria pollutants contribute to air pollution by concentrating locally in elevated ambient levels, which concentration, in turn; (3) results in health and welfare effects (*e.g.,* from ozone) that are extraordinarily aggravated in California as compared to other parts of the country, with this extraordinary situation being attributable to a confluence of California's peculiar characteristics, *e.g.,* population density, transportation patterns, wind and ocean currents, temperature inversions, and topography. In the case of GHG emissions from motor vehicles, however, this particularized nexus to California's specific characteristics is missing: (1) The GHG emissions from California cars are no more relevant to the pollution problem at issue (*i.e.,* climate change) as it impacts California than are the GHG emissions from cars being driven in New York, London, Johannesburg, or Tokyo; (2) the resulting air pollution, *i.e.,* elevated concentrations of GHG in the upper atmosphere, is globally mixed; (3) the health and welfare effects of climate change impacts on California are not extraordinary to that state and to its particular characteristics. Although EPA concludes that all three of these aspects are lacking in the case of GHG, EPA further concludes that it is the *connection* between all the three which is the original motivation for Congress's creation of the waiver. It is that original motivation that informs the proper understanding of what CAA section 209(b)(1)(B) requires.

It is important to note that, while this interpretation of CAA section 209(b)(1)(B) departs in major respects from the interpretation applied in the 2009 waiver denial reversal (74 FR 32744) and the 2013 waiver grant (78 FR 2112), it does not simply constitute a re-adoption of the interpretation applied in the 2008 waiver denial (73 FR 12156). The 2008 waiver denial applied what it styled as two alternative approaches to determining whether California ''need[ed]'' its own vehicle GHG emissions program to address global climate change ''to meet compelling and extraordinary conditions'': One that looked at the *causal* link between California emissions and elevated GHG concentrations, 73 FR at 12160 (styled as ''the distinct nature of global pollution as it relates to section 209(b)(1)(B)''), and an ''alternative'' approach that looked at the magnitude of California climate *effects* compared to the rest of the nation, 73 FR at 12163–12164 (''whether the potential impact of climate change resulting from these emissions and concentrations will differ across geographic areas and if so whether the likely effects in California amount to compelling and extraordinary conditions''). The 2009 waiver denial reversal, and the 2013 waiver grant, in contrast, applied an interpretation which EPA styled as a return to the ''traditional'' interpretation. Under that approach, EPA determined that California ''needs'' its own vehicle GHG emissions program ''to meet compelling and extraordinary conditions,'' a determination that was predicated on what was then EPA's view that, in the case of such later-adopted programs, satisfaction of the ''need'' criterion of CAA section 209(b)(1)(B) was effectively automatic, being derivative as it were of the State's having long ago established a ''need'' to have *some form* of its own vehicle emissions program (*i.e.,* its criteria pollutant program for which it had already received many waivers). In conjunction with this, EPA also pointed to the effects of climate change on certain criteria pollutant impacts. *See* 74 FR at 32746; 78 FR at 2125 *et seq.*

In this action, EPA adopts an interpretation of CAA section 209(b)(1)(B) that it concludes is more in accord with the text, structure, purpose, and legislative history of that provision than were either the position in the 2008 denial (because it does not separate causal issues and effects issues into alternatives) or the position the 2009 and 2013 grants (because it considers application of CAA section 209(b)(1)(B) to California's need for a GHG/climate program, rather than subordinating that consideration to California's need for a criteria pollutant program). Under this interpretation, EPA begins by noting that only one state, California, is entitled to apply under CAA section 209(b) for a waiver of the preemptive effect of CAA section 209(a). CAA section 209(a), in turn, provides that (unless a waiver is issued) no state may regulate new motor vehicle or new motor vehicle engine emissions. That authority instead is conferred on EPA under CAA section 202(a), subject to an ''endangerment finding.'' That finding requires EPA to consider the relationship between [1] sources and their emissions of *pollutants*; [2] the *pollution* to which those emissions contribute; and [3] resulting *impacts* on health and welfare. Congress has

[258] EPA notes that Congress provided no definition of the phrase ''compelling and extraordinary conditions,'' and that the phrase appears to be entirely unique, not found anywhere else in the United States Code.

[259] We therefore, also disagree with CARB's argument that EPA's reading of CAA section 209(b)(1)(B) ''ignores the statutory structure—improperly reading Section 209(b) without consideration of the relationship between Sections 202(a), 209(a) and 209(b). Specifically, EPA proposes to read Section 209(b) as excluding GHGs at the same time that it proposes to continue regulating GHGs under Section 202(a) and presumes, albeit implicitly, that Section 209(a) preempts other States from regulating GHGs.'' CARB comments at 359.

therefore, in the elements of the endangerment finding, laid out the terms of what constitutes a pollution problem to provide the appropriate and requisite predicate for federal regulation. Because CAA section 209(a) expresses Congress's judgment that vehicle emission pollution problems are presumptively appropriate only for federal regulation, with one state afforded the extraordinary treatment under CAA section 209(b) of being able to apply for a waiver from that preemption, the best, if not the only, reading of the waiver criterion under CAA section 209(b)(1)(B) is that it requires a pollution problem at the local level that corresponds in a state-specific particularized manner to the type of pollution problem that Congress required as the predicate for federal regulation.

It is against this backdrop that EPA believes the text of CAA section 209(b)(1)(B) is best interpreted. Informed by the criteria-pollutant context in which California's pre-1970 program was enacted, the legislative history, and the principle, as discussed elsewhere in this action, that differential treatment of the states by Congress in a geographically disparate way is extraordinary and is justified only by a sufficient link between that differential treatment and particularized local facts, EPA interprets Congress's command in CAA section 209(b)(1)(B), that it may not grant a preemption waiver for a California state vehicle emissions program if California does not ''need'' that program ''to meet compelling and extraordinary conditions,'' to condition the issuance of a waiver on a *state-specific* pollution problem that maps on to the elements as laid out in CAA section 202(a): [1] Emissions of pollutants; [2] resulting air pollution; [3] health and welfare effects from that resulting air pollution. EPA concludes that the interpretation of CAA section 209(b)(1)(B) it adopts in this document is the best, if not the only, reading of that provision.

The Supreme Court's opinion in *UARG,* 134 S. Ct. 2427 (2014), instructs that Clean Air Act provisions cannot necessarily rationally be applied identically to GHG as they are to traditional pollutants.[260] For the reasons set forth in this subsection, it is appropriate to consider the application of the second waiver prong, CAA section 209(b)(1)(B), to California's ''need'' *vel non* for its own GHG and ZEV programs, separate and apart from its ''need'' for its own criteria pollutant program. EPA determines, based on the application of the second waiver prong, that California does not ''need'' its own GHG and ZEV programs ''to meet compelling and extraordinary conditions,'' notwithstanding EPA's historical determinations that California does so ''need'' its own criteria pollutant programs.

Furthermore, the fact that GHG emissions may affect criteria pollutant concentrations (*e.g.,* increases in ambient temperature are conducive to ground-level ozone formation) does not satisfy this requirement for a particularized nexus, because to allow such attenuated effects to fill in the gaps would eliminate the function of requiring such a nexus in the first place and would elide the distinction between national and local pollution problems which EPA discerns as underlying the text, structure, and purpose of the waiver provision. EPA departs in this regard from the position it took in the 2009 reversal of the 2008 waiver denial, 74 FR at 32763, where it determined that ''[t]here is a logical link between the local air pollution problem of ozone and California's desire to reduce GHGs as one way to address the adverse impact that climate change may have on local ozone conditions.''

EPA further notes that elsewhere in the 2009 waiver denial reversal, EPA took the position that *Massachusetts* v. *EPA* supports the view that, because ''every small reduction is helpful in reducing [climate] concerns. . . . [A] reduction in domestic automobile emissions would slow the pace of global emissions increase no matter what happens with regard to other emissions,'' and therefore ''opponents [of the waiver] have not met their burden of demonstrating that California's motor vehicle program, or its GHG standards, does not have a *rational relationship* to contributing to amelioration of the air pollution problems in California.'' *Id.* at 32766 (emphasis added). EPA now departs from this prior position in several important respects.

*First,* to the extent that its 2009 waiver denial reversal was guided by an interpretation of the teachings of *Massachusetts* under which any reduction in GHG gives warrant for regulatory action (to include EPA's waiver approvals), that must now be weighed against the Supreme Court's subsequent 2014 *UARG* opinion, which stands for the proposition that particular CAA provisions will not necessarily apply identically in the case of GHG emissions as they do to criteria pollutant emissions.

*Second,* to the extent that EPA's 2009 waiver denial reversal framed the question under CAA section 209(b)(1)(B) as whether there is a ''rational relationship'' between California's programs and California's air pollution problems, that conflated the ''arbitrary and capricious'' test in CAA section 209(b)(1)(A) with the unique and distinct term ''need[ed] to meet compelling and extraordinary conditions'' in CAA section 209(b)(1)(B); EPA's position in this document gives that term a distinct and appropriate meaning and application.

*Third,* whereas the 2009 waiver denial reversal also noted in this passage that ''there is some evidence in the record that proffers a specific level of reduction in temperature resulting from California's regulations,'' this action notes elsewhere that the 2012 joint rule record reflected that even standards much more stringent than either the 2012 Federal standards or California's ACC program would only reduce global temperature by 0.02 degrees Celsius in 2100. As discussed elsewhere in this action, EPA concludes that this does not constitute a showing

[260] CARB is wrong to suggest in its comments that EPA's interpretation in this action of CAA section 209(b)(1)(B) is inconsistent with the Supreme Court's opinion in *Massachusetts* v. *EPA*. CARB comments at 360. *Massachusetts* held that the general, CAA-wide definition of ''air pollutant'' at CAA section 302(g) encompasses carbon dioxide, and that the text of CAA section 202(a)(1), which provides that EPA shall regulate standards for emissions of ''any air pollutant'' from new motor vehicles if EPA makes certain predicate findings (referred to colloquially as ''endangerment findings''), also encompasses carbon dioxide. 549 U.S. at 528. But CAA section 209, as a whole, in its preemption provision in 209(a), in the waiver provision in 209(b), and most specifically in the second waiver prong under CAA 209(b)(1)(B), does not contain the term ''pollutant,'' and EPA does not in this document interpret section 209 as simply establishing a distinction between criteria and GHG pollutants. Rather, for the reasons stated in this document, EPA interprets CAA section 209(b), and its extraordinary treatment afforded to one state, as requiring, in its provision in CAA section 209(b)(1)(B) that no waiver shall issue where a state does not need its own standards ''to meet compelling and extraordinary conditions,'' as requiring a state-specific, particularized nexus between the elements of a pollution problem—*i.e.,* pollutants, pollution, and impacts—as set forth in CAA section 202(a). CARB asserts that ''[t]here is no reason Section 209(b)(1)(B) should be interpreted more narrowly than Section 202(a),'' CARB comments at 360. One such reason is perfectly evident: They have different text. Another, as discussed in this action, is that CAA 209(b)(1)(B) must be read against the principle that extraordinary treatment afforded one state must be justified by ''extraordinary conditions'' in that state. Here, CARB misses the mark when it invokes *Massachusetts*'s observation that ''without regulatory flexibility, changing circumstances and scientific developments would soon render the Clean Air Act obsolete,'' quoting 549 U.S. at 532. CARB comments at 360. The Supreme Court there was discussing evolution of scientific understanding of what pollutants may pose harm. Nothing in *Massachusetts* suggests that scientific developments can alter the fundamental relationship between the States among themselves and vis-à-vis the federal government.

that California ''needs'' its standards to ''meet'' climate change, separate from the question whether climate change and its impacts on California constitute ''compelling and extraordinary conditions'' within the meaning of the statute. Further, the claim by some commenters that ''incremental progress is progress nonetheless'' does not meaningfully address the reality that the waiver would result in an indistinguishable change in global temperatures and, based on geographic variability and measurement sensitivity, likely no change in temperatures or physical impacts resulting from anthropogenic climate change in California.

EPA proposed to determine that the balance of textual, contextual, structural, and legislative history evidence supports the conclusion that the statute is ambiguous in one particular respect: Whether CAA section 209(b)(1)(B) refers to an individual standard or the California standards as a whole when referring to the Administrator's review of state standards submitted for a waiver, to determine whether the state ''needs such State standards to meet compelling and extraordinary conditions.'' We explained that ''such State standards'' in CAA section 209(b)(1)(B) is ambiguous with respect to the scope of EPA's analysis. For example, it is unclear whether EPA is meant to evaluate either the standard or standards at issue in the waiver request or all of California's standards in the aggregate. We also explained that CAA section 209(b)(1)(B) does not specifically employ terms that could only be construed as calling for a standard-by-standard analysis or each individual standard. For example, it does not contain phrases such as ''each State standard'' or ''the State standard.'' Nor does the use of the plural term ''standards'' definitively answer the question of the proper scope of EPA's analysis, given that the variation in the use of singular and plural form of a word in the same law is often insignificant and a given waiver request typically encompasses multiple ''standards.'' Thus, we explained that while it is clear that ''such State standards'' refers at least to all of the standards that are the subject of the particular waiver request before the Administrator, that phrase could reasonably be considered as referring either to the standards in the entire California program, the program for similar vehicles, or the particular standards for which California is requesting a waiver under the pending request.[261]

We did explain, however, that there are reasons to doubt that ''such State standards'' is intended to refer to all standards in California's program, including all standards that it has previously adopted and obtained waivers for, because this would limit EPA's ability to consider and act on standards that are the subject of particular waiver applications, even where that individualized consideration is reasonable or the only rational approach. Specifically, given that the term ''extraordinary'' should refer to circumstances that are specific to California, such as thermal inversions resulting from local geography and wind patterns, and primarily responsible for causing the air pollution problems that the standards are designed to address, standards which address pollution problems that lack that type of particularized nexus to California are particularly appropriate candidates for an individualized consideration. EPA affirms this view as it relates to the review of GHG standards, given that GHG emissions from in California cars, and their consequences for California, bear no particular relation to these California-specific circumstances—*i.e., global* GHG emissions in the aggregate are what present problems for California, not California-specific ones.

The waiver under CAA section 209(b) is a waiver of, and is logically dependent on and presupposes the existence of, the prohibition under CAA section 209(a), which forbids (absent a waiver) any State to ''adopt or attempt to enforce any *standard* [singular] relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part.'' States are forbidden from adopting a standard, singular; California requests waivers seriatim by submitting a standard or package of standards to EPA; it follows that EPA considers those submissions as it receives them, individually, not in the aggregate with all standards for which it has previously granted waivers. Further, reading the phrase ''such State standards'' as requiring EPA always and only to consider California's entire program in the aggregate would limit the application of this waiver prong in a way that EPA does not believe Congress intended. We explained that, under the interpretation where EPA is constrained to the aggregate approach, once EPA had determined that California needed its very first set of submitted standards to meet extraordinary and compelling conditions, EPA would never have the discretion to determine that California did not need any subsequent standards for which it sought a successive waiver—unless EPA is authorized to consider a later submission separate from its earlier finding. Moreover, as also explained at proposal, up until the ACC program waiver request, California's waiver request involved individual standards or particular aspects of California's new motor vehicle program. For example, only GHG standards were at issue in the 2008 GHG waiver request denial.[262] [263]

Several commenters disagreed with our view of ambiguity and the proposal to construe ''such state standards,'' in the context of our reconsideration and proposal to withdraw the January 2013 waiver for California's GHG and ZEV provisions, as applying to those provisions themselves, rather than California's entire, aggregate program consisting of *all* California's motor vehicle emission standards, when considering whether California needs its

[261] California suggests in its comments that EPA is ''logically inconsistent'' in that it said at proposal, 83 FR at 43246, that the CAA section 209(b)(1)(B) phrase ''such State standards'' ''refers at least to all of the standards that are the subject of the particular waiver request before the Administrator,'' while at the same time proposing to reconsider and withdraw the January 2013 grant of a waiver with respect to some, but not all, of the components of the ACC program (*i.e.,* with respect to GHG and ZEV, but not LEV). EPA disagrees that this is inconsistent. The question of how to interpret ''such state standards'' refers to the determination of what the total set of standards is with regard to which EPA will consider whether California ''needs'' those standards ''to meet compelling and extraordinary conditions.'' It is reasonable to assign that total set at the level of the waiver-request package before the Agency, rather than all the state-specific emission standards that California has ever adopted. If the consideration reveals that, within that set, California does not need *particular* subsets ''to meet compelling and extraordinary conditions''—here, because the GHG and ZEV programs lack a particularized, California-specific nexus between pollutant, pollution, and impacts, a rationale that does not apply to the LEV program, for which EPA did not propose to withdraw the waiver and is not in this document withdrawing the waiver—that is nothing unusual. And it is consistent with EPA's prior practice, as discussed in subsection III.B, of only partially granting aspects of, in combination with denial or deferral of action on other aspects of, some previous waivers. The ultimate analysis whether a waiver is appropriate is not limited to a binary, all-or-nothing determination.

[262] 73 FR 12156 (March 6, 2008).

[263] EPA determines in this document that GHG emissions, with regard to the lack of a nexus between their State-specific sources and their State-specific impacts, and California's GHG standard program, are sufficiently distinct from criteria pollutants and traditional, criteria pollutant standards, that it is appropriate for EPA to consider whether California needs its own GHG vehicle emissions program. EPA does not determine in this document and does not need to determine today how this determination may affect subsequent reviews of waiver applications with regard to criteria pollutant control programs.

GHG and ZEV provisions to meet compelling and extraordinary conditions within the meaning of CAA section 209(b)(1)(B). One commenter argued that this reading would require EPA to consider the protectiveness of California's standards by looking at them in the aggregate while also allowing EPA to consider California's ''need'' on an individual, standard-by-standard basis. Commenters also argued that EPA's historical or traditional interpretation was correct. They argued that EPA could not apply a different interpretation of ''such State standards'' given that ''such State standards'' in CAA section 209(b)(1)(B) does not relate back to the singular ''any standard'' in CAA section 209(a). They cast this reading as ''implausible,'' given that under the rule of last antecedent ''such'' should properly refer to standards in (b)(1) and not 209(a). We disagree. As explained earlier above, reading the phrase ''such State standards'' as requiring EPA always and only to consider California's entire program in the aggregate would limit the application of this waiver criterion. Specifically, it would mean that once EPA determines that California needed its very first set of submitted standards to meet extraordinary and compelling conditions, EPA would never have the discretion to determine that California did not need any subsequent standards for which it sought a successive waiver—unless EPA is authorized to consider a later submission separate from its earlier finding. Instead, it is reasonable to read CAA section 209(b) as articulating, first, that EPA shall consider the standards in the aggregate to determine if the State's determination that they are sufficiently protective is arbitrary and capricious (CAA section 209(b)(1)(A)). But, even if this first criterion for denying a waiver is not triggered, nevertheless, such a waiver shall not be granted as to such standards that are not needed to meet compelling and extraordinary conditions, under the second waiver denial criterion (CAA section 209(b)(1)(B)). Commenters' argument, in effect, inserts the word ''every'' (or ''all'') into CAA section 209(b)(1)(B) in between the words ''need'' and ''such.''

Additionally, as shown in further detail in section D.2., below, the term ''extraordinary'' refers to circumstances that are specific to California, such as thermal inversions resulting from local geography and wind patterns, and that are primarily responsible for causing the air pollution problems that the standard under waiver review is designed to address. EPA affirms the view that the term ''extraordinary'' refers primarily to factors that tend to produce higher levels of pollution: Geographical and climatic conditions (like thermal inversions) that in combination with large numbers and high concentrations of automobiles, create serious air pollution problems in California (73 FR 12156, 12159–60).

The text, context, and structure of CAA section 209(b) support EPA's reasoning that the relevant ''conditions'' are those conditions present in a particular state and that have a particularized nexus to emissions in that state. The statute calls for an examination of whether the ''State'' needs such ''state standards'' in the context of a prohibition in CAA section 209(a) of a ''state or other political subdivision'' adopting or attempting to enforce alternative standards. It would be inconsistent with the overall structure for a state's own preferred policy approach to addressing national or global—rather than local and state-specific—''conditions'' to permit a waiver from a scheme that otherwise establishes a uniform, national policy.[264]

Notably, pertinent legislative history supports this view of the text and structure of 209(b), insofar as it refers to California's ''peculiar local conditions'' and ''unique problems.'' S. Rep. No. 403, 90th Cong. 1st Sess., at 32 (1967). This legislative history also indicates that California is to demonstrate ''compelling and extraordinary circumstances sufficiently different from the nation as a whole to justify standards on automobile emissions which may, from time to time, need to be more stringent than national standards.'' *Id.* EPA views this as evidence of Congressional intent that separate standards in California are to be justified by a showing of circumstances in California that are different from circumstances in the country at large. Additionally, EPA views this legislative history as demonstrating that Congress did not intend for CAA section 209(b)(1)(B) to be based on the need for California to enact separate standards that address pollution problems of a more national or global nature. Relevant legislative history also ''indicates that Congress allowed waivers of preemption for California motor vehicle standards based on the particular effects of local conditions in California on the air pollution problems in California.'' Congress discussed ''the unique problems faced in California as a result of its climate and topography.'' H.R. Rep. No. 728, 90th Cong. 1st Sess., at 21 (1967). See also Statement of Cong. Holifield (CA), 113 Cong. Rec. 30942–43 (1967). Congress also noted the large effect of local vehicle pollution on such local problems. *See, e.g.,* Statement of Cong. Bell (CA) 113 Cong. Rec. 30946. As explained at proposal, Congress focus was on California's ozone problem, which is especially affected by local conditions and local pollution. See Statement of Cong. Smith (CA) 113 Cong. Rec. 30940–41 (1967); Statement of Cong. Holifield (CA), *id.,* at 30942. See also, *MEMA I,* 627 F.2d at 1109 (noting the discussion of California's ''peculiar local conditions'' in the legislative history). In sum and as explained at proposal, conditions that are similar on a global scale are not ''extraordinary,'' especially where ''extraordinary'' conditions are a predicate for a local deviation from national standards, under CAA section 209(b). 83 FR 43247.

As further explained in section D2., below, GHG is a globally distributed pollutant with environmental effects that are different from emissions of criteria pollutants. For example, GHG emissions from the California vehicle fleet bear no more relation to GHG emissions in California than fleet in other parts of the country. As also explained in the SAFE proposal, EPA believes that the GHG and ZEV standards are standards that would not meaningfully address global air pollution problems posed by GHG emissions, in contrast to local or regional air pollution problem with causal ties to conditions in California. Additionally, the impacts of California vehicles' GHG emissions on California are mediated through the context of the global mixture of elevated levels of GHG in the upper atmosphere. As also shown below, EPA finds that while potential conditions in California related to global climate change could be substantial, they are not sufficiently different from the potential conditions in the nation as a whole to justify separate state standards under CAA section

[264] *Cf. Ford Motor Co.* v. *EPA,* 606 F.2d 1293, 1301–02 (D.C. Cir. 1979) (''Ford is asking this court to declare that Congress intended to make standards adopted by California for its own particular problems, and never substantively reviewed for stringency or national protectiveness by federal officials, an option which auto manufacturers can choose in the rest of the country as an alternative to compliance with the federal standards which Congress determined are in the best interests of the nation. We find this reading to be wholly implausible.''). *See also id.* at 1303 (''It was clearly the intent of the Act that that determination focus on local air quality problems . . . that may differ substantially from those in other parts of the nation.'').

209(b)(1)(B).[265] In this action, EPA is reviewing a waiver for motor vehicle standards designed to address a global air pollution problem and its effects, as compared to a local or regional air pollution problem that has causal ties to conditions in California. EPA must therefore, review California's GHG standards in light of the fact that GHG emissions impacts are different from criteria pollutants themselves, and California must address their need for them as it relates to conditions in California. In sum, as explained at proposal, under our reading of ''such state standards'' and ''extraordinary and compelling conditions,'' EPA will examine California's need for GHG standards by considering levels of GHG emissions emitted from motor vehicles in California to determine if they are specific to California and contribute primarily to environmental effects that are specific to California. This review, which calls for a showing of a particularized causal link between the standards under review, emissions in California, and conditions in California, is similar to agency review of California's need for standards designed to address criteria pollutants and is further discussed in section D.2.*d,* below.[266]

CARB argues that what it characterizes as EPA's reading of ''compelling and extraordinary'' as equivalent to ''unique'' or ''sufficiently different from'' the rest of the country ''is inconsistent with Section 209(b)(1)(B), other provisions of the Clean Air Act, and the legislative history.'' CARB also asserts that EPA ''cites no case'' to support this reading. At the same time, CARB claims that EPA has either interpreted legislative history incorrectly or relies entirely on legislative history for the 1967 CAA, which does note California's ''unique problems,'' instead of legislative history for the 1977 amendments; CARB asserts that the latter legislative history is more relevant, given that the addition of section 177 in the 1977 CAA meant that Congress did not intend that Section 209(b)(1)(B) be construed as requiring ''California's problems to be entirely unique or sufficiently different from those in other States.'' CARB also contends that EPA is limiting application of CAA section 209(b)(1)(B) to smog, even though EPA has granted waivers for pollutants that do not contribute to smog, such as particulate matter. In addition, CARB maintains that what it characterizes as EPA's reading ''compelling and extraordinary conditions'' as restricted to ''local'' or ''regional'' pollutants would weaken Congress's intent that California retain its own regulatory program and continue to lead the nation as a ''laboratory of innovation.'' CARB further argues that EPA provides no support for this ''geographic distinction,'' while also casting the reading as ''illusory.'' According to CARB, both local and global pollution cause compelling and extraordinary conditions, as evidenced by provisions of the CAA that address long-range transport of emissions (beyond the state level). In sum, CARB argues that ''compelling and extraordinary conditions'' is expansive enough to be read as including GHG emissions and that EPA's ''exacting and unrealistic'' reading can only be met by ''a rare air pollution problem.'' CARB comments at 360–365.

EPA disagrees. First, as explained at proposal, the 1977 Amendments revised CAA section 209(b)(1) in only one material aspect. Specifically, California is required to determine that standards it seeks a waiver for will be ''in the aggregate, at least as protective of public health and welfare than applicable Federal standards,'' rather than the ''more stringent'' standard under 1967 Clean Air Act. 83 FR 43247 n.579. Second, there is relevant legislative history from the 1977 amendments, which describes EPA's role in reviewing California's protectiveness determination, under CAA section 209(b)(1)(A), as whether ''the State acted unreasonably in evaluating the relative risks of various pollutants in light of air quality, topography, photochemistry and climate in that State.'' This 1977 legislative history further supports a reading requiring a particularized nexus. H. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977), U.S. C.C.A.N. 1977, p. 1381. Third, in support of the proposed reading, EPA cited *MEMA I* as noting the Senate Committee discussion of California's ''peculiar local conditions'' in 1967 legislative history for this provision in upholding the grant of a waiver subsequent to the 1977 CAA amendments. . 627 F.2d at 1109, citing S.Rep. No. 403, 90th Cong., 1st Sess. 33 (1967); *see also Ford Motor Co.* v. *EPA,* 606 F.2d 1293,1303 (D.C. Cir. 1979) (''It was clearly the intent of the Act that that determination focus on local air quality problems . . . that may differ substantially from those in other parts of the nation.''). Fourth, EPA's reading of CAA section 209(b)(1)(B) has never been and is not limited to ''smog''-causing pollutants. Here, CARB's comment glosses over extensive discussion in the SAFE proposal of the phrase ''compelling and extraordinary'' including, for example, legislative history indicating that California is to demonstrate ''compelling and extraordinary circumstances sufficiently different from the nation as a whole to justify standards on automobile emissions which may, from time to time, need to be more stringent than national standards.'' 83 FR 23427, *citing* S. Rep. No. 403, 90th Cong. 1st Sess., at 32 (1967). Fifth, as shown in greater detail in section III.D, the phrase ''compelling and extraordinary conditions'' qualifies the ''need'' for California's standards. And in a statute designed to address public health and welfare, it certainly cannot mean standards that allow a state to be ''a laboratory for innovation'' in the abstract, without any connection to a need to address pollution problems. Most notably, legislative history explains that CAA section 209(b)(1) was is intended to recognize California's ''unique problems.'' For example, in originally adopting the provision, the Senate Committee on Public Works explained that ''California's *unique* problems and pioneering efforts justified a waiver of the preemption section to the State of California.'' S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (emphasis added); *see also* 113 Cong. Rec. 30948 (bound ed. Nov. 2,1967), Statement of Representative Harley Staggers, chairman of the House Interstate and Foreign Commerce Committee (explaining that ''overall national interest required administration of controls on motor vehicle emissions, with special recognition given by the Secretary to the unique problems facing California as a result of numerous thermal inversions that occur within that state because of its geography and prevailing wind patterns), ; *id.* at 30950, Remarks of Rep. Corman (''The uniqueness and the seriousness of California's problem is evident–more than 90 percent of the smog in our urban area is caused by automobiles, and in the next 15 years the number of automobiles in the state will almost double.''). Sixth, while it is

[265] *See* Fourth National Climate Assessment, Chapter 25: Southwest, *available at https://nca2018.globalchange.gov/chapter/25/. See also* Intergovernmental Panel on Climate Change (IPCC) Observed Climate Change Impacts Database, available at http://sedac.ipcc- *data.org/ddc/observed_ar5/index.html.*

[266] California argues in its comments that EPA has inappropriately reduced the scope of waiver ability under CAA section 209(b) to be narrower than the scope of express preemption under CAA section 209(a). EPA disagrees. To the extent that CAA section 209(b)(1)(B), as interpreted and applied here, precludes a waiver for California's GHG vehicle emissions and ZEV programs, that effect flows from the text and structure of this statutory section.

true that local and regional pollutants can be transported at greater geographic scales than the state level, the Clean Air Act sets out a comprehensive scheme for addressing air pollution transported to other regions; *see, e.g.,* CAA sections 126 and 110(a)(2)(D)(i). The fact that the Act addresses pollutant transport elsewhere does not expand the scope of the waiver provision. In contrast, in CAA section 209(b), Congress set out a waiver of preemption for California to address automotive pollution that give rise to local and regional air quality problems. Finally, to the extent CARB casts EPA reading as ''exacting and unrealistic,'' it mischaracterizes CAA section 209(a) and (b), which preempts states from adopting and enforcing standards for new motor vehicles and engines, with CAA section 209(b) allowing for a waiver of the preemption in 209(a) only if certain enumerated conditions are met. It is not ''a rare air pollution problem'' that satisfies the particularized nexus interpretation of CAA section 209(b)(1)(B) that EPA adopts in this document. Rather, it is the all-too-well understood and longstanding air pollution problem that California continues to face: Aggravated criteria pollution at the state and local level.

2. It Is Appropriate To Apply This Criterion to California's GHG Standards Separately, Rather Than to California's Motor Vehicle Program as a Whole

Under CAA section 209(b)(1)(B) of the Clean Air Act, the Administrator may not grant a waiver if he finds that the ''State does not need such State standards to meet compelling and extraordinary conditions.'' EPA proposed to find that CARB does not need its own GHG and ZEV standards to meet compelling and extraordinary conditions in California, on the grounds that ''compelling and extraordinary conditions'' mean environmental conditions with causes and effects particular or unique to, California whereas GHG emissions present global air pollution problems. Specifically, EPA proposed to determine that the GHG-related standards are designed to address global air pollution and its consequences, in contrast to local or regional air pollution problems with causal ties to conditions in California. EPA also proposed to find that, while effects related to climate change in California could be substantial, they are not sufficiently different from the conditions in the nation as a whole to justify separate State standards under CAA section 209(b)(1)(B). 83 FR 43248–43250. Lastly, EPA proposed to find that the State's GHG-related standards would not have a meaningful impact on the potential conditions related to global climate change. Because EPA has traditionally interpreted and applied CAA section 209(b)(1)(B) in a manner that examines whether the conditions that Congress identified (*e.g.,* topography number of vehicles, etc.) [267] still give rise to serious air quality problems in California, and thus a need for California's own motor vehicle emission control program, EPA concludes that this causal-link test is the appropriate basis on which to evaluate California's GHG emission standards under the second waiver prong, CAA section 209(b)(1)(B).[268]

In general, EPA has in the past recognized California's unique underlying conditions and serious air pollution problems when reviewing waiver requests.[269] California, and others that oppose the withdrawal of the waiver, assert that the relevant inquiry is merely whether California needs to have some form of a separate State motor vehicle emissions control program to meet compelling and extraordinary conditions, not whether any given standard is needed to meet compelling and extraordinary conditions related to that air pollution problem. On the other hand, several commenters that support a withdrawal of the waiver suggest EPA's determination should be based on whether California needs greenhouse gas standards in particular to meet compelling and extraordinary conditions, asserting that a proposed set of standards must be linked to compelling and extraordinary conditions. These commenters suggest that the Act requires EPA to look at the particular ''standards'' at issue, not the entire State program.

EPA determines that it in this context it is appropriate to review whether California needs its GHG standards to meet compelling and extraordinary conditions separately from the need for the remainder of California's new motor vehicle program, which has historically addressed criteria pollutants with a particular causal link to local and regional conditions both in the nature and quantity of emissions and in the particularized local and regional impacts of the pollution to which those emissions contribute. EPA bases this decision on the fact that California's GHG standards are designed to address global climate change problems that are different from the local pollution conditions and problems that California has addressed previously in its new motor vehicle program. The climate change problems are different in terms of the distribution of the pollutants and the effect of local California factors, including the local effect of motor vehicle emissions as differentiated from other GHG emissions worldwide on the GHG concentrations in California. In

[267] *See, e.g.,* 49 FR 18887, 18890 (May 3, 1984) (waiver decision discussing legislative history of CAA section 209).

[268] It is not appropriate for EPA to defer to California and other outside parties when EPA is interpreting its own statute. By contrast, EPA does defer to California's policy choices when it comes to choosing emissions standards that will best address the serious air quality problems and impacts on public health and welfare in California—*to the extent* that the State standards at issue will actually address pollution and its consequences that are particular to California. But the question whether the State regulations at issue actually do meet the statutory criterion of being necessary ''to meet compelling and extraordinary conditions'' in the meaning of the statute, CAA section 209(b)(1)(B), is one which EPA must answer. In this regard, EPA notes that it has previously taken the position that ''the burden of proof [lies] on the party opposing a waiver,'' and that ''the burden [is] on those who allege, in effect, that EPA's GHG emission standards are adequate to California's needs.'' 78 FR at 2117 (Jan. 2013 waiver grant). EPA notes that this previous discussion is distinguishable from the current context in two key regards. First, EPA was in 2013 analyzing third parties' opposition to a waiver, rather than conducting its own analysis of whether a previously granted waiver was appropriately granted. Second, EPA's change in position in this document does not constitute an assertion that ''EPA's GHG emission standards are [or are not] adequate to California's needs'' as a matter of policy. Rather, EPA is adopting an interpretation of CAA section 209(b)(1)(B), specifically its provision that no waiver is appropriate if California does not need standards ''to meet compelling and extraordinary conditions,'' similar to the interpretation that it adopted in the 2008 waiver denial but abandoned in the 2009 and 2013 waiver grants, and applying that interpretation to determine to withdraw the January 2013 waiver for California's GHG and ZEV program for model years 2021 through 2025. Under that interpretation, the question is not whether existing federal standards are ''adequate to California's needs,'' but whether California's standards are needed under the meaning of CAA section 209(b)(1)(B), which, as set forth in this document, requires a particularized nexus between California-specific pollutant sources, California-specific pollution contributed to thereby, and California-specific pollutants impacts caused thereby. Furthermore, we took comment on burden of proof in the proposal, *see* 83 FR at 43244 n.567. EPA believes it is not necessary to resolve that issue in this action as regardless of whether a preponderance of the evidence or clear and compelling evidence standard is applied, the Agency concludes that withdrawal of the waiver is appropriate.

[269] *See American Trucking Associations, Inc.* v. *Environmental Protection Agency,* 600 F.3d 624, 627 (D.C. Cir. 2010) (''With respect to the statutory language, EPA concluded that 'compelling and extraordinary conditions' refers to the factors that tend to cause pollution—the 'geographical and climate conditions that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems.' The expansive and statutory language gives California (and in turn EPA) a good deal of flexibility in assessing California's regulatory needs. We therefore find no basis to disturb EPA's reasonable interpretation of the second criterion. *See Chevron, USA Inc* v. *Natural Res. Def. Council,* 467 U.S. 837, 842–43.'') (citation omitted).

addition, EPA notes that under its traditional interpretation of CAA section 209(b)(1)(B), where EPA evaluates the need for a separate California new motor vehicle program, conditions such as the nature of the air quality problem may change whereby a particular motor vehicle regulation designed for a specific criteria pollutant is no longer needed to address a serious air quality problem (*e.g.,* the underlying air quality problem no longer exists). Therefore, EPA concludes that it is appropriate to examine the need for GHG standards within California's mobile source program to ensure that such standard is linked to local conditions that giving rise to the air pollution problem, that the air pollution problem is serious and of a local nature, and that the State standards at issue will meaningfully redress that local problem.[270]

This waiver decision falls within the context of a few instances of EPA applying the CAA section 209(b)(1)(B) criterion to a California waiver request for a fundamentally global air pollution problem.[271] Although EPA's review of this criterion has typically been cursory due to California needing its motor vehicle emission program due to fundamental factors leading to local and regional air pollution problems that were well established at the time of creation of the waiver provision (as discussed below), it is appropriate in this case to carefully review the purpose of CAA section 209(b)(1)(B) when applying it to the unique circumstance of California's regulation of greenhouse gases. By doing so, EPA gives meaning to Congress's decision to include this provision in CAA section 209(b).[272]

Moreover, because both CAA sections 209(b)(B) and (C) employ the term ''such state standards,'' it is appropriate for EPA to read the term consistently between prongs (B) and (C). Under CAA section 209(b)(1)(C) EPA conducts review of standards California has submitted to EPA for the grant of a waiver to determine if they are consistent with CAA section 202(a).[273] It follows then that EPA must read ''such state standards'' in CAA section 209(b)(1)(B) as a reference to the same standards in subsection (C).[274]

a. EPA Practice in Previous Waivers

In past waivers that addressed local or regional air pollution, EPA has interpreted CAA section 209(b)(1)(B) as requiring it to consider whether California needs a separate motor vehicle program to meet compelling and extraordinary conditions. Under this approach, EPA does not consider whether the specific standards at issue are needed to meet compelling and extraordinary conditions related to that air pollutant. For example, EPA reviewed this issue in detail with regard to particulate matter in a 1984 waiver decision.[275] In that waiver proceeding, California argued that EPA is restricted to considering whether California needs to have its own motor vehicle program to meet compelling and extraordinary conditions, and does not consider whether any given standard is necessary to meet such conditions. Opponents of the waiver in that proceeding argued that EPA was to consider whether California needed these PM standards to meet compelling and extraordinary conditions related to PM air pollution.

The Administrator agreed with California that it was appropriate to look at the program as a whole in determining compliance with CAA section 209(b)(1)(B). One justification of the Administrator was that many of the concerns with regard to having separate State standards were based on the manufacturers' worries about having to meet more than one motor vehicle program in the country, but that once a separate California program was permitted, it should not be a greater administrative hindrance to have to meet further standards in California. The Administrator also justified this decision by noting that the language of the statute referred to ''such state standards,'' which referred back to the use of the same phrase in the criterion looking at the protectiveness of the standards in the aggregate. He also noted that the phrase referred to standards in the plural, not individual standards. He considered this interpretation to be consistent with the ability of California to have some standards that are less stringent than the federal standards, as long as, under CAA section 209(b)(1)(A), in the aggregate its standards were at least as protective as the federal standards.

The Administrator further stated that in the legislative history of CAA section 209, the phrase ''compelling and extraordinary circumstances'' refers to ''certain general circumstances, *unique to California,* primarily responsible for causing its air pollution problem,'' like the numerous thermal inversions caused by its local geography and wind patterns. The Administrator also noted that Congress recognized ''the presence and growth of California's vehicle population, whose emissions were thought to be responsible for ninety percent of the air pollution in certain parts of California.'' [276] EPA reasoned that the term compelling and extraordinary conditions ''does not refer to the levels of pollution directly.'' Instead, the term refers primarily to the

[270] EPA notes in this regard that the position that GHG and climate are no different from criteria pollutants and criteria air pollution in terms of applicability of the CAA section 209(b) waiver regime, and specifically that no particularized nexus between in-state emissions and in-state impacts is necessary in order to meet the CAA section 209(b)(1)(B) ''need[ed] . . . to meet compelling and extraordinary conditions,'' would effectively read the term ''extraordinary'' out of the statute, or reduce it to surplusage with the term ''compelling.'' Whether GHG emissions and attendant climate impacts are, in the colloquial sense, compelling or not is not the relevant question. It is whether they are ''compelling and extraordinary'' within the reasonably interpreted meaning of that term in its context here. Inasmuch as that term in its context requires a particularized nexus between California emissions, California pollution, and California impacts, they are not.

[271] *See generally* California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Notice of Decision, January 9, 2013 Volume 78, Number 6 pp. 2211—2145; California State Motor Vehicle Pollution Control Standards; Greenhouse Gas Emissions from 2014 and Subsequent Model Year Medium- and Heavy-Duty Engines and Vehicles; Notice of Decision; December 29, 2016 Volume 81, Number 250, pp. 95982–95987; California State Motor Vehicle Pollution Control Standards; Heavy-Duty Tractor-Trailer Greenhouse Gas Regulations; Notice of Decision; August 7, 2014 Volume 79, Number 152 pp. 46256–46265; California State Motor Vehicle Pollution Control Standards; Within-the-Scope Determination for Amendments to California's Motor Vehicle Greenhouse Gas Regulations; Notice of Decision; June 14, 2011 Volume 76, Number 114 pp. 34693–34700; California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles; July 8, 2009 Volume 74, Number 129 pp. 32744–32784; California State Motor Vehicle Pollution Control Standards; Notice of Decision Denying a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles; March 6, 2008 Volume 73, Number 45 pp. 12156–12169.

[272] *See United States* v. *Menashe,* 348 US 528, 538–39 (1955) (courts must give effect to every word, clause, and sentence of a statute).

[273] ''Technology exists with which to achieve California's proposed standards for HC and CO, however, the standards are inconsistent with Section 202(a) of the Clean Air Act because the cost of compliance within the lead time remaining is excessive.'' 38 FR 30136 (November 1, 1973). *See also* 40 FR 30311 (July 18, 1975); 43 FR 998, 1001 (Jan. 5, 1978).

[274] Under CAA section 177 states may adopt and enforce motor vehicle emissions standards if ''such standards are identical to the California standards for which a waiver has been granted.'' *See, e.g., Motor Vehicle Mfrs. Ass'n* v. *NYS Dep. of Envt'l Conservation,* 17 F.3d 521, 532 (2d Cir. 1994). ''Section 177 refers to 'standards relating to control of emissions ... for which a waiver *has been granted.' Id.* In enacting § 209(b), which establishes California's preemption exception, Congress uses the same words as it did when it allowed California to set its own 'standards . . . for the control of emissions,' provided the EPA approves a waiver application. *Id.* § 7543(b)(1). Hence, the most logical reading of § 177 is that New York may adopt only those standards that, pursuant to § 209(b), California included in its waiver application to the EPA.'' (Emphasis in original).

[275] *See* 49 FR 18887 (May 3, 1984).

[276] *Id.* at 18890 (emphasis added).

confluence of factors that tend to produce higher levels of pollution of the type particular to California: ''geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems.''

The Administrator summarized that the question to be addressed in the second criterion is whether these ''fundamental conditions'' (*i.e.,* the geographical and climate conditions and large motor vehicle population) that cause air pollution continued to exist, not whether the air pollution levels for PM were ''compelling and extraordinary,'' nor the extent to which these specific PM standards will address the PM air pollution problem.

From this it can be seen that EPA's interpretation in the context of reviewing standards designed to address local or regional air pollution has looked at the local causes of the air pollution problems: Geographic and climatic conditions that turn local emissions into air pollution problems, such as thermal inversions, combined with a large number of motor vehicles in California emitting in the aggregate large quantities of emissions. Under the interpretation EPA adopts in this document, it is the particularized nexus between the emissions from California vehicles, their contribution to local pollution, and the extraordinary impacts that that pollution has on California due to California's specific characteristics, that set California apart from other areas when Congress adopted this provision.

EPA's review of this criterion has usually been cursory and not in dispute, as the fundamental factors leading to these traditional criteria air pollution problems—geography, local climate conditions (like thermal inversions), significance of the motor vehicle population—have not changed over time and over different local and regional air pollutants. These fundamental factors have applied similarly for all of California's air pollution problems that are local or regional in nature. California's circumstances of geography, climate, and motor vehicle population continue to show that it has compelling and extraordinary conditions leading to such local air pollution problems related to traditional pollutants.

California's motor vehicle program has historically addressed air pollution problems that are generally local or regional in nature. The emission standards have been designed to reduce emissions coming from local vehicles, in circumstances where these local emissions lead to air pollution in California that will affect directly the local population and environment in California. The narrow question in this waiver proceeding is whether this interpretation is appropriate when considering motor vehicle standards designed to address a global air pollution problem and its effects, as compared to a local or regional air pollution problem that has particular causal ties to conditions in California.

As EPA observed in the SAFE proposal, the agency has articulated differing interpretations of CAA section 209(b)(1)(B). Historically, EPA has interpreted this provision to require that California needs to have its own separate new motor vehicle program in the aggregate to meet compelling and extraordinary conditions in California, not whether the state needs the specific standards under consideration. In 2008, in contrast, when EPA first considered whether State GHG emission regulations meet the requirements for a CAA section 209(b) waiver, EPA determined that the better reading of CAA section 209(b)(1)(B) would be to consider whether California ''need[s]'' the particular standards at issue ''to meet compelling and extraordinary conditions,'' and the agency denied the waiver on these grounds. Then, when EPA reconsidered that denial in 2009, the agency reverted to the interpretation that it had previously applied for criteria pollutants and granted the waiver.

EPA concludes that the long and contentious history of this question, and the recent measures that California has taken even during the pendency of this administrative action to amend its State regulations beyond the form in which they were granted the waiver in 2013 and, even more recently, to purport to establish ''voluntary'' programs creating yet a third program distinct both from that for which CAA preemption was waived in 2013 and the Federal standards promulgated in 2012 and currently under review by the Federal government, confirm that extension of CAA section 209(b) waivers to State GHG and ZEV programs was inappropriate. Such waivers have led to actions by California increasingly at odds with the clear Congressional design and intent that national standards would be set by the federal government with California having an ability to apply for targeted waivers of preemption to address its own particular problems. EPA therefore views this interpretation and application of CAA section 209(b)(1)(B) set forth here as, at minimum, a reasonable one that gives appropriate meaning and effect to this provision and does not second-guess California's policy judgment notwithstanding assertions to the contrary.

b. The Distinct Nature of Global GHG Pollution as It Relates to CAA Section 209(b)(1)(B)

The air pollution problem at issue here is elevated atmospheric concentrations of greenhouse gases, and the concern is the impact these concentrations have on global climate change and the effect of global climate change on California. In contrast to local or regional air pollution problems, the atmospheric concentrations of these greenhouse gases are substantially uniform across the globe, based on their long atmospheric life and the resulting mixing in the atmosphere. The factors looked at in the past when considering waiver requests for State standards addressing criteria pollutants—the geography and climate of California, and the large motor vehicle population in California, which were considered the fundamental causes of the air pollution levels found in California—cannot form the basis of a meaningful analysis of the causal link between California vehicles' GHG emissions and climate effects felt in California. The concentration of greenhouse gases in the upper atmosphere may affect California, but that concentration is not affected in any particular way by the geography and climate of California. The long duration of these gases in the atmosphere means they are well-mixed throughout the global atmosphere, such that their concentrations over California and the U.S. are, for all practical purposes, the same as the global average. The number of motor vehicles in California, while still a notable percentage of the national total and still a notable source of GHG emissions in the State, bears no more relation to the levels of greenhouse gases in the atmosphere over California than any other comparable source or group of sources of greenhouse gases anywhere in the world. Emissions of greenhouses gases from California cars do not generally remain confined within California's local environment (and, indeed, were they to do so, rather than rise to the upper atmosphere to become well-mixed with other GHG emissions, those locally located emissions would not, by definition, contribute to the ''pollution'' that is at issue here). Instead, those GHG emissions from vehicles operating in California become one part of the global pool of GHG emissions, with this global pool of emissions leading to a relatively homogenous concentration of greenhouse gases over the globe. Thus, the emissions of motor vehicles in

California do not affect California's air pollution problem in any way different from emissions from vehicles and other pollution sources all around the world. Similarly, the emissions from California's cars do not just affect the atmosphere in California, but in fact become one part of the global pool of GHG emissions that affect the atmosphere globally and are distributed throughout the world, resulting in basically a uniform global atmospheric concentration.

Given the different, and global, nature of the pollution at issue, EPA determines that the conceptual basis underlying the practice of considering California's motor vehicle program as a whole (in the context of criteria emission regulations) does not meaningfully apply with respect to elevated atmospheric concentrations of GHGs. Therefore, EPA has considered whether it is appropriate to apply this criterion in a different manner for this kind of air pollution problem; that is, a global air pollution problem.

As previously explained, the text and relevant legislative history of CAA section 209 also supports EPA's decision to examine the application of the second waiver denial criterion (CAA section 209(b)(1)(B)) with regard to California's GHG and ZEV standards specifically in the context of global climate change. It indicates that Congress was moved to allow waivers of preemption for California motor vehicle standards based on the particular effects of local conditions in California on the air pollution problems in California. Congress discussed ''the unique problems faced in California as a result of its climate and topography.'' H.R. Rep. No. 728, 90th Cong. 1st Sess., at 21 (1967). *See also* Statement of Cong. Holifield (CA), 113 Cong. Rec. 30942–43 (1967). Congress also noted the large effect of local vehicle pollution on such local problems. *See, e.g.,* Statement of Rep. Bell (CA), 113 Cong. Rec. 30946. In particular, Congress focused on California's ozone problem, which is especially affected by local conditions and local pollution. *See* Statement of Rep. Smith (CA), 113 Cong. Rec. 30940–41 (1967); Statement of Rep. Holifield (CA), *id.* at 30942. *See also Motor & Equip. Mfrs. Ass'n, Inc.* v. *EPA* (*MEMA*), 627 F. 2d 1095, 1109 (D.C. Cir., 1979) (noting the discussion of California's ''peculiar local conditions'' in the legislative history). Congress clearly did not have in view pollution problems of a more national or global nature in justifying this provision.[277] Moreover, ''the [Clean Air] Act also differentiates between the states, despite our historic tradition that all the States enjoy equal sovereignty. Distinctions can be justified in some cases. 'The doctrine of the equality of States . . . does not bar . . . remedies for *local* evils which have subsequently appeared.' But a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets.'' *Nw. Austin Mun. Util. Dist. No. One.* v. *Holder,* 557 U.S. 193, 203 (2009) (some citations and internal quotation marks omitted) (quoting *South Carolina* v. *Katzenbach,* 383 U.S. 301, 328–29 (1966)) (ellipses and emphasis added by *Northwest Austin* Court); *see also Katzenbach,* 383 U.S. at 334 (''*exceptional conditions* can justify legislative measures not otherwise appropriate'') (emphasis added); *cf.* 42 U.S.C. 7543(b)(1)(B) (''No such waiver shall be granted if the Administrator finds that . . . . such State does not need such State standards to meet *compelling and extraordinary conditions.*'') (emphasis added). These principles support our conclusion that Congress did not intend the waiver provision in CAA section 209(b) to be applied to California measures that address pollution problems of a national or global nature, as opposed to conditions that are ''extraordinary'' with respect to California in particular—*i.e.,* those with a particularized nexus to emissions in California and to topographical or other features peculiar to California.''

c. It Is Appropriate To Apply CAA Section 209(b)(1)(B) Separately to GHG Standards

EPA concludes that in the context of reviewing California GHG related standards designed to address global climate change, it is appropriate to apply the second criterion separately for GHG standards.

The intent of Congress, in enacting CAA section 209(b) and in particular Congress's decision to have a separate CAA section 209(b)(1)(B), was to require EPA to specifically review whether California continues to have compelling and extraordinary conditions and the need for State standards to address those conditions. Thus, EPA concludes that it is appropriate to review California's GHG standards separately from the remainder of the State's motor vehicle emission control program for purposes of CAA section 209(b)(1)(B).

In this context it is appropriate to give meaning to this criterion by looking at whether the emissions from California motor vehicles, as well as the local climate and topography in California, are the fundamental causal factors for the air pollution problem—elevated concentrations of greenhouse gases—apart from the other parts of California's motor vehicle program, which are intended to remediate different air pollution concerns.

The appropriate criteria to apply therefore is whether the emissions of California motor vehicles, as well as California's local climate and topography, are the fundamental causal factors for the air pollution problem of elevated concentrations of greenhouse gases.

d. Relationship of California Motor Vehicles, Climate, and Topography to Elevated Concentrations of Greenhouse Gases in California

Under CAA section 209(b)(1)(B), EPA proposed to withdraw the waiver of preemption of the ACC program GHG and ZEV standards for MY 2021–2025 on two alternative grounds. Specifically, (1) California ''does not need'' these standards ''to meet compelling and extraordinary conditions;'' and (2) even if California does have compelling and extraordinary conditions in the context of global climate change, California does not ''need'' these standards because they will not meaningfully address global air pollution problems of the sort associated with GHG emissions. 83 FR 43248.

As previously explained, EPA proposed to determine that the balance of textual, contextual, structural, and legislative history evidence provide reasonable support for the conclusion that the statute is ambiguous in one particular respect: Whether section 209(b)(1)(B) refers to an individual standard or the California standards as a whole when referring to the Administrator's review of state standards submitted for a waiver, to determine whether the state ''needs such State standards to meet compelling and extraordinary conditions,'' and that the approach of examining the need for GHG-related standards separate from the other, traditional aspects of California's program is reasonable given, among other factors, the unique nature of the global pollutant. EPA recognizes that Congress's purpose in establishing the prohibition in CAA section 209(a) and the waiver in CAA section 209(b) was to

[277] In reference to another argument made in the 1984 waiver, while the administrative costs of a program may not increase significantly based on the addition of new standards, there is still cost in the implementation of new standards, particularly in terms of changes in design necessitated by the new standards. In any case, this issue does not appear to be relevant to the issue of whether California needs its standards to meet compelling and extraordinary conditions.

balance the benefit of allowing California significant discretion in deciding how to protect the health and welfare of its population with the burden imposed on the manufacturers of being subject to two separate motor vehicle programs and the overarching policy judgment that uniform national standards are appropriate. S. Rep. No. 403, 90th Cong. 1st Sess., at 32–33 (1967). It is clear that Congress intended this balance to be premised on a situation where California needs the State standards to meet compelling and extraordinary conditions. Thus, if EPA determines that California does not need its State GHG standards to meet compelling and extraordinary conditions, a waiver of preemption for those State standards is not permitted under the statute.

Commenters supportive of EPA's proposal to withdraw the waiver commented that California should not continue to enjoy a waiver for separate State GHG standards because those State standards are not needed to meet compelling and extraordinary conditions because there is no link between California-based motor vehicle GHG emissions and any alleged extraordinary conditions in California. These commenters state that while California spends a great deal of time discussing the effects of climate change in California, California does not link its GHG standards to those effects. They note that GHGs are not localized pollutants that can affect California's local climate, or that are problematic due to California's specific topography. Instead, emissions from vehicles in California become mixed with the global emissions of GHG and affect global climate (including California's climate) in the same way that any GHG from around the world affect global (and California) climate conditions. They claim that Congress authorized EPA to grant a waiver of preemption only in cases where California standards were necessary to address peculiar local air quality problems. They claim that there can be no need for separate California standards if the standards are not aimed at, and do not redress, a California-specific problem.

In previous waiver decisions, EPA was asked to waive preemption of standards regulating emissions that were local or regional in effect. Local air pollution problems are affected directly by local conditions in California, largely the emissions from motor vehicles in California in the context of the local climate and topography. As a result, State standards regulating such local motor vehicle emissions will have a direct effect on the concentration of pollutants directly affecting California's environment. They are effective mechanisms to reduce the levels of local air pollution in California because local conditions are the primary cause of that kind of air pollution problem. In addition, reductions in emissions from motor vehicles that occur elsewhere in the United States will not have the same impact, and often will have no impact, on reducing the levels of local air pollution in California.

By contrast, GHGs emitted by California motor vehicles become part of the global pool of GHG emissions that affect concentrations of GHGs on a uniform basis throughout the world. The local climate and topography in California have no significant impact on the long-term atmospheric concentrations of greenhouse gases in California. Greenhouse gas emissions from vehicles or other pollution sources in other parts of the country and the world will have as much effect on California's environment as emissions from California vehicles. As a result, reducing emissions of GHGs from motor vehicles in California has the same impact or effect on atmospheric concentrations of GHGs as reducing emissions of GHGs from motor vehicles or other sources elsewhere in the U.S., or reducing emissions of GHGs from other sources anywhere in the world. California's motor vehicle standards for GHG emissions do not affect only California's concentration of GHGs, but affect such concentrations globally, in ways unrelated to the particular topography in California. Similarly, emissions from other parts of the world affect the global concentrations of GHGs, and therefore concentrations in California, in exactly the same manner as emissions from California's motor vehicles.

Further, as explained in the SAFE proposal, California's claims that it is uniquely susceptible to certain risks because it is a coastal State does not differentiate California from other coastal States such as Massachusetts, Florida, and Louisiana, much less that conditions in California are any more ''extraordinary'' as compared to any other coastal States, particularly those coastal States that may possess a greater percentage of low-lying territory than California. Any effects of global climate change (*e.g.* water supply issues, increases in wildfires, effects on agriculture) could certainly affect California. But those effects would also affect other parts of the United States.[278] Many parts of the United States, especially western States, may have issues related to drinking water (*e.g.,* increased salinity) and wildfires, and effects on agriculture; these occurrences are by no means limited to California. These are among the types of climate change effects that EPA considered in the 2009 CAA section 202(a) endangerment finding which is the predicate for its authority to issue national motor vehicle GHG standards. But EPA's evaluation of whether California's standards are ''need[ed] to meet compelling and extraordinary conditions'' is not identical to its prior determination, pursuant to CAA section 202(a) whether GHG emissions from the national motor vehicle fleet contribute to pollution that may reasonably be anticipated to endanger public health or welfare. In order for a waiver request to pass muster under CAA section 209(b)(1)(B), as set forth in this document, a particularized, state-specific nexus must exist between sources of pollutants, resulting pollution, and impacts of that pollution. This is analogous to but distinct from the more abstract or general predicate finding for regulation under CAA section 202(a); if it were not distinct, then California would, under CAA section 209(b)(1)(B), *always* ''need'' a waiver for a state-specific program to ''meet'' any pollution problem that it experienced once EPA had found under CAA section 202(a) that motor vehicle emissions contribute to that pollution problem (without particular reference to that pollution problem's impact on California). This would effectively nullify the second waiver denial prong, CAA section 209(b)(1)(B).[279] California

[278] Some commenters made this same point. *See, e.g.,* Fiat Chrysler Automobiles, Docket No. EPA–HQ–OAR–2018–0283–4406 at 89; American Fuel & Petrochemical Manufacturers, Docket No. E_A–HQ–OAR–2018–0283–5648 at 34, 36. At least one recent analysis, cited by a number of commenters, has produced estimates of climate change damage that project that with respect to such matters as coastal damage, agricultural yields, energy expenditures, and mortality, California is not worse-positioned in relation to certain other areas of the U.S., and indeed is estimated to be better-positioned, particularly as regards the Southeast region of the country. *See* S. Hsiang, *et al.* ''Estimating Economic Damage from Climate Change in the United States,'' 356 Science 1362 (2017).

[279] *Cf. Ford,* 606 F.2d at 1303 n.68 (affirming EPA's refusal to allow nationwide sale of cars that meet California standards that, due to the waiver predicate that California's standards only need be as stringent as federal standards in the aggregate, were not certified as meeting national standards with respect to all pollutants) (''[Appellants] suggest to varying degrees that California is a microcosm of the entire nation and, as such, has no particularized problems the resolution of which would require emission control standards inappropriate to the rest of the country. This may or may not be completely true. The fact remains, however, that Congress expected California to be putting its interests first and there is no guarantee that those interests are congruent with the interests

would have it that the 2009 CAA section 202(a) GHG endangerment finding necessarily means California ''needs'' its own GHG program ''to meet compelling and extraordinary conditions.'' That does not follow.[280] *Cf. Utility Air Regulatory Group* v. *EPA,* 134 S. Ct. 2427 (2014) (partially reversing the GHG ''Tailoring'' Rule on grounds that the CAA section 202(a) endangerment finding for GHG emissions from motor vehicles did not compel regulation of all sources of GHG emissions under the Prevention of Significant Deterioration and Title V permit programs). 83 FR 43249.

EPA has discussed the reasons for concluding that it is appropriate to consider California's GHGs standards separately in determining whether the State needs those standards to meet compelling and extraordinary conditions, as compared to looking at its need for a motor vehicle program in general. These reasons also lead to the conclusion that California does not need these GHG standards to meet compelling and extraordinary conditions. The text, structure, and legislative history indicates that Congress's intent in the second waiver criterion, CAA section 209(b)(1)(B), was to allow California to adopt new motor vehicle standards because of compelling and extraordinary conditions in California that were causally related to local or regional air pollution levels in California. These factors—including topography and large population of motor vehicles—cause these kinds of local or regional air pollution levels in California and because of this causal link, California's motor vehicle standards can be effective mechanisms to address these local problems. Reductions outside California would lack that causal link to local or regional air quality conditions inside California.

Congress did not indicate any intent to allow California to promulgate local standards to deal with global air pollution like atmospheric concentrations of GHGs. In California's comments on the SAFE proposal, it asserted that it has a need for reductions in GHG atmospheric concentrations and therefore emissions, but the issue is not whether such reductions are needed as a matter of general policy, but whether Congress intended them to be effectuated on a State-specific basis by California through EPA granting a waiver for the GHG aspects of the State's new motor vehicle program. This type of pollution seems ill-fitted to Congress's intent to provide California with a method of handling its local air pollution concentrations and related problems with local emission control measures. EPA determines that standards regulating emissions of global pollutants like greenhouse gases were not part of the compromise envisioned by Congress in passing CAA section 209(b).[281] Moreover, even if California does have compelling and extraordinary conditions in the context of global climate change, California does not ''need'' these standards under CAA section 209(b)(1)(B) because they will not meaningfully address global air pollution problems of the sort associated with GHG emissions. As noted in the SAFE proposal, the most stringent of the regulatory alternatives considered in the 2012 final rule and FRIA (under much more optimistic assumptions about technology effectiveness), which would have required a seven percent average annual fleetwide increase in fuel economy for MYs 2017–2025 compared to MY 2016 standards, was forecast to decrease global temperatures only by 0.02 °C in 2100.[282] This conclusion was further bolstered by multiple commenters.[283] EPA therefore concludes that California's GHG and ZEV regulations do not fulfil the requirement within CAA section 209(b)(1)(B) that such regulations are ''needed'' to ''meet'' the impacts of global climate change in California, even assuming *arguendo* that those impacts do constitute ''compelling and extraordinary conditions'' within the meaning of that statutory phrase (although, to be clear, EPA is determining that those impacts do not in fact fall within that phrase's meaning). Given that Congress enacted CAA section 209(b) to provide California with a unique ability to receive a waiver of preemption, which provides California with authority that it would not otherwise have under CAA section 209, and given the specific language in CAA section 209(b)(2) pointing out the need for extraordinary and compelling conditions as a condition for the waiver, EPA determines that it is not appropriate to waive preemption for California's standards that regulate GHGs. Atmospheric concentrations of greenhouse gases are an air pollution problem that is global in nature, and this air pollution problem does not bear the same causal link to factors local to California as do local or regional air pollution problems. EPA determines that globally elevated atmospheric concentrations of GHGs and their environmental effects are not the kind of local or regional air pollution problem that fall within the scope of the ''compelling and extraordinary conditions'' encompassed by the terms of CAA section 209(b)(1)(B). As such, EPA finds that California does not need its 2021 through 2025 MY GHG-related standards to meet compelling and extraordinary conditions.[284]

---

of the nation as a whole.''). Here, California offers an inverse reflection of appellants' argument in *Ford,* but it is no more valid: Because it can marshal a list of climate impacts that it is experiencing, California insists it is entitled to a waiver for a state-specific program to address those impacts. *All* of California's problems and corresponding programs, under this logic, are ''particularized.'' If this were the case, no waiver request could ever be denied under CAA section 209(b)(1)(B), and Congress would much more likely have simply afforded California a blanket and automatic waiver. Congress did not do so, its choice not to do so should be respected and given meaning, and EPA in this document sets forth an interpretation and application of CAA section 209(b)(1)(B) that does so by articulating a required particularized nexus to State-specific facts which is present in the case of California's criteria vehicle emissions programs but lacking in the case of its GHG and ZEV ones.

[280] EPA notes in this regard that, even in the 2009 reversal of the 2008 waiver denial, the Agency was careful to distinguish its consideration of the waiver application from ''the issues pending before EPA under section 202(a) of the Act,'' *i.e.,* the then-pending endangerment finding. 74 FR at 32765. While EPA maintains the position that the CAA section 202(a) ''endangerment finding'' inquiry and the CAA section 209(b)(1)(B) inquiry are distinct, EPA notes that the 2009 waiver denial reversal (and the 2008 waiver denial itself) took pains to distinguish the two primarily because the Agency was at that time still considering whether to issue the endangerment finding. As EPA explains in this document, the two provisions are distinct, but the CAA section 202(a) predicate criteria for federal regulation do support the Agency's position that the CAA section 209(b)(1)(B) waiver prong is best interpreted as calling for a consideration whether the pollution problem at issue has a State-specific, particularized nexus between emissions, pollution, and impacts.

[281] Moreover, EPA is mindful that principles of equal sovereignty between the states ordinarily require '' 'exceptional conditions' prevailing in certain parts of the country [to] justif[y] extraordinary legislation otherwise unfamiliar to our federal system.'' *Northwest Austin,* 557 U.S. at 211.

[282] 83 FR 42986, 43216–43217.

[283] The George Washington University Regulatory Studies Center, Docket No. EPA–HQ–OAR–2018–0283–4028; Competitive Enterprise Institute, Docket No. NHTSA–2018–0067–12015.

[284] EPA disagrees with comments that suggest that California ''needs'' its GHG and ZEV programs ''to meet compelling and extraordinary conditions'' in the meaning of CAA section 209(b)(1)(B) because those programs are intended to reduce criteria pollutants emissions, separate and apart from their status as programs designed to address climate change. To take this position would not be in keeping with historical agency practice in reviewing California's waiver requests. Specifically, EPA practice is not to scrutinize California's criteria pollutant emissions reductions projections or air emissions benefits. Rather, EPA's view has been that these are matters left for California's judgments, especially given that Title I of the Clean Air Act imposes the obligation of NAAQS attainment planning on states. *See, e.g.,* 36 FR 17458; 78 FR 2134; 79 FR 46256, 46261 (Aug. 7, 2014). EPA's withdrawal action is premised on CARB's 2012 ACC program waiver request, which, as previously

Continued

e. No Findings Under CAA Section 209(b)(1)(C) Are Finalized at This Time

In the SAFE proposal, EPA proposed to determine, as an additional basis for the waiver withdrawal, that California's ZEV and GHG standards for new MY 2021 through 2025 are not consistent with section 202(a) of the Clean Air Act. That proposed determination was intertwined with the SAFE proposal's assessment with regard to the technological feasibility of the Federal GHG standards for MY 2021 through 2025 and the proposed revisions thereto. Because EPA and NHTSA are not at this time finalizing that assessment or taking final action on the proposal to revise the Federal standards, and because the finalized determinations under CAA section 209(b)(1)(B) and the discussion of the implications of EPCA preemption with regard to the waiver previously granted with respect to those standards set forth above are each independent and adequate grounds for the waiver withdrawal, EPA at this time is not finalizing any determination with respect to CAA section 209(b)(1)(C). EPA may do so in connection with potential future final action with regard to the Federal standards.

*E. Withdrawal of Waiver*

In this final action, EPA determines that the California Air Resources Board's (CARB's) regulations pertaining to greenhouse gases-related (GHG) emission standards for 2021 through 2025 model year (MY) passenger cars, light-duty trucks, and medium-duty vehicles are not needed to meet compelling and extraordinary conditions. EPA concludes that CAA section 209(b) was intended to allow California to promulgate State standards applicable to emissions from new motor vehicles to address pollution problems that are local or regional, and that have a particular nexus to emissions from vehicles in California.[285] EPA does not believe CAA section 209(b)(1)(B) was intended to allow California to promulgate State standards for emissions from new motor vehicles designed to address global climate change problems.

EPA's 2013 waiver for CARB's Advanced Clean Car Program (as it pertains to its 2021 through 2025 MY relating to greenhouse gas emissions and the ZEV mandate) is withdrawn. This is separate and apart from EPA's determination that it cannot and did not validly grant a waiver with respect to those California State measures which are preempted under NHTSA's determination in this document that EPCA preempts State GHG and ZEV programs, which, as explained above, is effective on the effective date of this joint action.

*F. States Cannot Adopt California's GHG Standards Under CAA Section 177*

At proposal, EPA explained that CAA section 177 provides that other States, under certain circumstances and with certain conditions, may ''adopt and enforce'' standards that are ''identical to the California standards for which a waiver has been granted for [a given] model year.'' 42 U.S.C. 7507. As a result, EPA proposed to determine that this section does not apply to CARB's GHG standards given that they are intended to address global air pollution. We also noted that the section is titled ''New motor vehicle emission standards in nonattainment areas' and that its application is limited to ''any State which has [state implementation] plan provisions approved under this part''—*i.e.,* under CAA title I part D, which governs ''Plan requirements for nonattainment areas.''

We received comments in support of and against our proposal. Commenters opposing our interpretation argued that CAA section 177 does not contain any text that could be read as limiting its applicability to certain pollutants only. They also argued that EPA has inappropriately relied on the heading for CAA section 177 to construe a statutory provision as well as arrogated authority to implement an otherwise self-implementing provision. We disagree with these commenters, conclude that the text (including both the title and main text), structural location, and purpose of the provision confirm that it does not apply to GHG standards, and are finalizing this determination as proposed.

Under the Clean Air Act, EPA establishes national ambient air quality standards (NAAQS) to protect public health and welfare and has established such ambient standards for the following criteria pollutants: ozone, carbon monoxide, nitrogen dioxide, sulfur dioxide, lead, and particulate matter. As also explained at proposal, areas are only designated nonattainment with respect to criteria pollutants for which EPA has issued a NAAQS, and nonattainment State Implementation Plan (SIPs) are intended to assure that those areas attain the NAAQS.

Congress added CAA section 177 in the 1977 Clean Air Act amendments cognizant that states might need to address air pollution within their boundaries similar to California but were otherwise preempted under CAA section 209(a) from setting new motor vehicle and engine standards. *See, e.g.,* H.R. Rep. No. 294, 95th Cong., 1st Sess. 309 (1977), 1977 U.S.C.C.A.N. 1077, 1388 (explaining that the Committee ''was concerned that this preemption (section 209(a) of the Act) now interferes with legitimate police powers of States''); *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *New York State Dep't of Envtl. Conservation,* 17 F.3d 521, 527 (2d Cir. 1994) (''It was in an effort to assist those states struggling to meet federal pollution standards that Congress, . . . directed in 1977 that other states could promulgate regulations requiring vehicles sold in their state to be in compliance with California's emission standards or to 'piggyback' onto California's preemption exemption.''), *citing* H.R. Rep. No. 294, 95th Cong., 1st Sess. 309–10 (1977); *id.* at 531 ((''[Section] 177 was inserted into the Act in 1977 so that states attempting to combat their own pollution problems could adopt California's more stringent emission controls.''). Relevant legislative history further identifies CAA section 177 as a means of addressing the NAAQS attainment planning requirements of CAA section 172, including the specific SIPs content and approvals criteria for EPA.[286] H.R.

discussed, only discussed the potential GHG benefits or attributes of CARB's GHG and ZEV standards program (78 FR 2114, 2130–2131). If EPA does not even scrutinize a California program's criteria pollutant emission and benefits projections when California applies for a waiver for that program *presenting it as a criteria program,* then *a fortiori* commenters' retrospective attempt to claim criteria benefits to maintain a waiver for programs that were originally presented to EPA in a waiver request that disclaimed any such benefits is not appropriate.

[285] As noted in the SAFE proposal, ''Attempting to solve climate change, even in part, through the Section 209 waiver provision is fundamentally different from that section's original purpose of addressing smog-related air quality problems.'' 83 FR 42999.

[286] The version of CAA section 172 adopted in 1977 set forth the general requirements for state plans for nonattainment areas and CAA section 172(b) set forth the ''requisite provisions'' of those plans. In drafting the provisions that would become CAA section 172(b), Congress explained that they required the Administrator, after notice and opportunity for a public hearing, to approve ''a State plan which meets the following criteria: It must identify all nonattainment areas for each pollutant. Next it must assure attainment of the national ambient air quality standard in those areas as expeditiously as practicable, but not later than December 31, 1982, for all pollutants other than photochemical oxidants. In respect to photochemical oxidants, the standard must be met as expeditiously as practicable, but not later than December 31, 1987. The plan must include a comprehensive, accurate, up-to-date inventory of actual emissions from all sources of pollutants in the area. This inventory must be revised and resubmitted every 2 years to substantiate that reasonable further progress has been achieved as a condition for permitting additional sources of pollution. Finally, the plan must identify and quantify the actual emissions which must be taken

Rep. No. 294, 95th Cong., 1st Sess. 213 (1977), 1977 U.S.C.C.A.N 1077, 1292 (''Still another element of flexibility for States that is afforded in this section is the authority for States with nonattainment areas for automotive pollutants (other than California) to adopt and enforce California new-car emission standards if adequate notice is given.'').

Contrary to commenters' assertions, therefore, the text, placement in Title I, and relevant legislative history are all indicative that CAA section 177 is in fact intended for NAAQS attainment planning and not to address global air pollution. As further explained in section D.2, GHG is a globally distributed pollutant with environmental effects that are different enough from emissions of criteria pollutants. For example, GHG emissions from fleet in California bear no more relation to GHG emissions in California than fleet in other parts of the country. Where states are now adopting standards for intents and purposes far removed from NAAQS attainment planning or more specifically directed at global air pollution, EPA as the agency charged with implementing the Clean Air Act is acting well within that role in setting out an interpretation that aligns with Congressional intent. *See Chevron U.S.A.* v. *NRDC,* 467 U.S. 837, 843 (1984) (''The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.''). This construct also comports with our reading of CAA section 209(b)(1)(B) as limiting applicability of CAA section 209(b) waiver authority to state programs that address pollutants that affect local or regional air quality and not those relating to global air pollution like GHGs.

into account by the State for purposes of deciding how to achieve reasonable further progress and assure timely attainment. Thus, the plan must consider the following factors among others: The actual emissions increases which will be allowed to result from the construction and operation of major new or modified stationary sources in the area; the actual emissions of such pollutant from unregulated sources, fugitive emissions and other uncontrolled sources; actual emissions of the pollutant from modified and existing indirect sources; actual emissions resulting from extension or elimination of transportation control measures; *actual emissions of such pollutant resulting from in-use motor vehicles* and emissions of such pollutant resulting from stationary sources to which delayed compliance orders or enforcement orders (pursuant to sec. 121 (pursuant to sec. 121 or sec 113(b)) and compliance date extension (pursuant to sec. 119) have been issued; and actual transported emissions.'' H.R. Rep. No. 294, 95th Cong., 1st Sess. 212 (1977), 1977 U.S.C.C.A.N. 1077, 1291, 1977 WL 16034 (emphasis added).

### *G. Severability and Judicial Review*

EPA intends that its withdrawal of the January 2013 waiver for California's GHG and ZEV programs on the basis of EPCA preemption, to take effect upon the effective date of this joint action, as set forth in subsection III.C, on the one hand, is separate and severable from its withdrawal of the January 2013 waiver for those programs on the basis of an interpretation and application of CAA section 209(b)(1)(B), beginning in model year 2021, as set forth in subsection III.D, on the other. EPA further intends that its withdrawal of the waiver with regard to California's GHG program is severable from its withdrawal of the waiver with regard to California's ZEV program. The basis for this distinction (*i.e.,* that EPA intends that its withdrawal of the waiver for California's GHG program and for its ZEV program should be severable from one another) is, as follows, twofold: (1) While EPA concludes for the reasons set forth in subsection III.D above that the ZEV program, as subjected to the January 2013 waiver and as presented to EPA by CARB in CARB's waiver application and supporting documents, is a GHG-targeting program and as such is susceptible to the interpretation and application of CAA 209(b)(1)(B) set forth above, EPA acknowledges that there are aspects to the analysis as it affects the state's ZEV program that are not applicable with respect to the state's GHG program; (2) in this final action, NHTSA expresses in section II above its intent that its determination that a State or local law or regulation of tailpipe greenhouse gas emissions from automobiles is related to fuel economy standards is severable from its determination that State or local ZEV mandates are related to fuel economy standards. EPA further intends that its determination with regard to the scope of CAA section 177 as set forth in subsection III.F above be severable from all other aspects of this joint action.

Pursuant to CAA section 307(b)(1), judicial review of this final action may be sought only in the United States Court of Appeals for the District of Columbia Circuit. For the reasons explained in this section, this final waiver withdrawal action is nationally applicable for purposes of CAA section 307(b)(1). To the extent a court finds this action to be locally or regionally applicable, for the reasons explained in this section, EPA determines and finds for purposes of CAA section 307(b)(1) that this final waiver withdrawal action is based on a determination of nationwide scope or effect. As also explained at proposal, CAA Section 307(b)(1) of the CAA provides in which Federal courts of appeal petitions of review of final actions by EPA must be filed. This section provides, in part, that petitions for review must be filed in the Court of Appeals for the District of Columbia Circuit if: (i) The Agency action consists of ''nationally applicable regulations promulgated, or final action taken, by the Administrator,'' or (ii) such action is locally or regionally applicable, but ''such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination.'' Additionally, we proposed to find that any final action resulting from the August 2018 SAFE proposal is based on a determination of ''nationwide scope or effect'' within the meaning of CAA section 307(b)(1). We explained that the withdrawal, when finalized, would affect persons in California and those manufacturers and/or owners/operators of new motor vehicles nationwide who must comply with California's new motor vehicle requirements. For instance, California's program provides that manufacturers may generate credits in CAA section 177 States as a means to satisfy those manufacturers' obligations to comply with the mandate that a certain percentage of their vehicles sold in California be ZEV (or be credited as such from sales in CAA section 177 States). In addition, other States have adopted aspects of California's ACC program; this decision would also affect those States and those persons in such States, which are in multiple EPA regions and federal circuits.

This final action is distinguishable from the situation faced by the D.C. Circuit in *Dalton Trucking Inc.,* v. *EPA,* 808 F.3d 875 (D.C. Cir. 2015), where the Court held that EPA's action on California's waiver request with respect to its nonroad engine program was not nationally applicable, and that EPA had not properly made and published a finding that its action was based on a determination of nationwide scope and effect. First, *Dalton Trucking* noted that no other State had ever adopted California's nonroad program, *id.* at 880; that is not the case here. Second, *Dalton Trucking* noted that the nonroad waiver final action was facially limited to fleets operating in California, *id.* at 881; the nature of the California program at issue here, with its complex credit system connected with sales in other States, is quite different. Third, *Dalton Trucking* noted that EPA in the nonroad waiver

final action did not actually make and publish a finding that that final action was based on a determination of nationwide scope and effect, *id. Dalton Trucking* expressly did *not* hold, and indeed expressly disclaimed any intent to even suggest, that EPA could not have made and published such a finding in that action. *Id.* at 882. EPA in this document does so with regard to this final action, for the reasons stated above. For these reasons, this final waiver withdrawal action is nationally applicable for purposes of CAA section 307(b)(1), or, in the alternative, EPA determines and finds for purposes of CAA section 307(b)(1) that this final waiver withdrawal action is based on a determination of nationwide scope or effect. Thus, pursuant to CAA section 307(b), any petitions for review of this final action must be filed in the Court of Appeals for the District of Columbia Circuit within 60 days from the date such final action is published in the **Federal Register**.

## IV. Regulatory Notices and Analyses

As it is relevant to many of the following discussions, it is important to clarify at the outset that this action does not finalize or otherwise affect either EPA's GHG standards or NHTSA's CAFE standards and, thus, the various impacts associated with those standards have not been considered below. Further, consistent with its past practice, EPA's withdrawal of the waiver does not add or amend regulatory text and is, therefore, subject to considerably fewer of the below discussions than NHTSA's final rule establishing regulatory text on preemption.

### *A. Executive Order 12866, Executive Order 13563*

Executive Order 12866, ''Regulatory Planning and Review'' (58 FR 51735, Oct. 4, 1993), as amended by Executive Order 13563, ''Improving Regulation and Regulatory Review'' (76 FR 3821, Jan. 21, 2011), provides for making determinations whether a regulatory action is ''significant'' and therefore subject to the Office of Management and Budget (OMB) review and to the requirements of the Executive Order.

Under section 3(f) of Executive Order 12866, NHTSA's final rule has been determined to be a ''significant regulatory action,'' but not an economically significant action. EPA's withdrawal on the waiver, however, is not a rule under E.O. 12866, as consistent with the agency's historical classification of its notices and decisions related to the waiver. However, as part of its commitment to working together with NHTSA to establish a consistent Federal program for fuel economy and GHG emissions, EPA has submitted this action to the OMB for review and any changes made in response to OMB recommendations have been documented in the docket for this action. EPA's action here, however, is not a rule as defined by Executive Order 12866, consistent with its previous actions on waiver requests, and is therefore exempt from review by the Office of Management and Budget as required for rules and regulations by Executive Order 12866. *See, e.g.,* 78 FR at 2145 (Jan. 9, 2013); 74 FR at 32784 (July 8, 2009); 73 FR at 12169 (Mar. 6, 2008).

In determining the economic impact of this action, it is important to be clear that the rule establishing new standards for the Model Years within scope of the NPRM is expected to continue to be economically significant and is, thus, anticipated, to include a full FRIA. Moreover, as EPA's action is not a rule and not subject to E.O. 12866, its consideration of costs has been limited to the role costs play under section 209. Accordingly, the following discussion only concerns the economic impact associated with NHTSA's final regulatory text clarifying its views on EPCA preemption.

As a general matter, NHTSA has determined that there may be some nonsignificant economic impact arising out of its clarification, particularly some reduction in costs, to this final rule, but the agency has not quantified any such impact in this rulemaking, which has been determined to be ''significant'' but not ''economically significant'' under Executive Order 12866. This rulemaking merely clarifies the existing statutory provisions relating to preemption that have been in effect since EPCA was enacted and does not modify any Federal requirement. As such, as in the NPRM, the agency has provided a qualitative discussion of the impacts in response to the comments, which themselves raised qualitative issues.

In the NPRM, NHTSA mentioned at a general, qualitative, level that California's currently existing GHG program and ZEV mandate lead to increased compliance costs, with some greater discussion of potential increases in costs due specifically to the ZEV mandate, which constrains an OEMs ability to meet their CAFE and GHG requirements in the most cost-effective way.

The agencies received many comments on the economic analysis as it relates to the CAFE and GHG standards, but only received a small number of comments that specifically dealt with the issue of the economic impact of the regulatory text concerning EPCA preemption. These comments, similar to how the agency addressed the issue in the NPRM, generally made qualitative and general points about the economic impact.

Many of the comments that addressed the economic impacts of preemption did so by stating that one important aspect of the ''One National Program'' established beginning in 2009 was that it would reduce regulatory cost by not allowing for the creation of different Federal and California programs, with different levels of stringency and different compliance regimes. NHTSA agrees with this concern, but this is exactly why Congress provided that any State or local law ''related to'' fuel economy is preempted. This final rule will provide more certainty on this issue than the prior approach, which would always be subject to California removing itself from the program. This is exactly what has occurred in recent months, as the State has taken action to amend the ''deemed to comply'' provision and then announced that it entered into an agreement with several automakers to apply a different set of standards on a national basis.

Various other commenters noted that the GHG program and ZEV mandate would increase compliance costs. Most of these comments only made general statements to this effect and did not provide specific or detailed information about potential costs. One commenter approvingly noted NHTSA's citation of a study that found that the ZEV mandate could potentially lead to increased costs, though the author of the cited study also commented that the cited value did not provide a complete picture of the economic effect. The agency agrees that programs such as these are likely to introduce additional costs, which, of course, was a significant part of Congress's motivation in providing NHTSA with its broad preemptive authority over fuel economy. The agency, though, like commenters, has found calculation of these costs to be challenging, as they constrain the avenues of compliance with the Federal standards without actually altering what must be, ultimately, achieved.

With regard to benefits, some commenters believed that California's GHG program and ZEV mandate could provide additional benefits, but, as with costs, these commenters did not provide detailed information about the benefits of these programs independent of the Federal standards. One commenter argued that a separate State GHG program is unlikely to have any

meaningful benefits, because of ''leakage'' from vehicles in States that adopt the California standards to vehicles in States that do not adopt this standard. Although the comment was in context of supporting the ''One National Program,'' NHTSA believes that the argument that separate State standards will have little benefit has merit. The existence of State or local laws does not in any way alter an OEM's obligation under Federal law. For instance, OEMs would likely produce more efficient vehicles for sale in California and the States that have adopted California's standards, but the increased fuel economy of these vehicles would likely be offset by less efficient vehicles produced for sale in the rest of the U.S., leading to little to no change in either fuel use or GHG emissions at a national level. Some commenters stated that the decision to preempt programs including and similar to the ZEV mandate, to the extent that those programs are related to fuel economy, would have negative benefits related to ozone-forming pollutants, though these commenters did not quantify these concerns. NHTSA notes that, as was discussed in the NPRM, California, in its 2013 waiver request, noted that the ZEV program did not provide for ozone-forming pollutants, acknowledging, ''[t]here is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions. The LEV III criteria pollutant fleet standard is responsible for those emission reductions in the fleet; the fleet would become cleaner regardless of the ZEV regulation because manufacturers would adjust their compliance response to the standard by making less polluting conventional vehicles.'' [287] NHTSA continues to believe that preemption of the programs such as the ZEV mandate will not have a significant effect, as California remains free to revise its LEV program to reduce ozone-forming emissions and seek a waiver of Clean Air Act preemption from EPA, as described above, while not violating NHTSA's preemption authority, and other States and local governments would continue to be allowed to take other actions so long as those are not related to fuel economy and are consistent with any other relevant Federal law.

The comments, therefore, reaffirm NHTSA's preliminary determination that State and Local programs including, and similar to, California's GHG and ZEV programs are likely to lead to increased compliance costs and highly uncertain, if any, benefits because they constrain the ability of OEMs to meet the Federal standard without in anyway altering their obligations under that standard. Further, the agency's decision that State or local laws such as the GHG program and ZEV mandate should be preempted is not based on any evaluation of the policy or other merits of either program, but simply the fact that these programs are clearly related to fuel economy.

*B. DOT Regulatory Policies and Procedures*

The final rule is also significant within the meaning of the Department of Transportation's Order 2100.6, ''Policies and Procedures for Rulemakings.'' Regulatory Policies and Procedures.

*C. Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)*

NHTSA's final rule is expected to be an E.O. 13771 deregulatory action, but NHTSA has not estimated any quantifiable cost savings. EPA's withdrawal is not a regulatory action and thus outside the scope of E.O. 13771.

*D. Congressional Review Act*

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this action as not a ''major rule'', as defined by 5 U.S.C. 804(2). The EPA and NHTSA will submit a rule report to each House of the Congress and to the Comptroller General of the United States.

*E. Executive Order 13211 (Energy Effects)*

Executive Order 13211 applies to any rule that: (1) Is determined to be economically significant as defined under E.O. 12866, and is likely to have a significant adverse effect on the supply, distribution, or use of energy; or (2) that is designated by the Administrator of the Office of Information and Regulatory Affairs as a significant energy action. If the regulatory action meets either criterion, the agencies must evaluate the adverse energy effects of the proposed rule and explain why the proposed regulation is preferable to other potentially effective and reasonably feasible alternatives considered. NHTSA's final rule is not subject to E.O. 13211 because it is not economically significant and is not a significant energy action. As discussed in the E.O. 12866 section, NHTSA's final rule merely clarifies the contours of its existing preemption authority and does not in any way change the existing fuel economy standards. As EPA's withdrawal is not within the scope of E.O. 12866, it is also not within scope of E.O. 13211.

*F. Environmental Considerations*

1. National Environmental Policy Act

The National Environmental Policy Act (NEPA) [288] directs that Federal agencies proposing ''major Federal actions significantly affecting the quality of the human environment'' must, ''to the fullest extent possible,'' prepare ''a detailed statement'' on the environmental impacts of the proposed action (including alternatives to the proposed action).[289] Concurrently with the NPRM, NHTSA released a Draft Environmental Impact Statement (Draft EIS) pursuant to NEPA and implementing regulations issued by the Council on Environmental Quality (CEQ), 40 CFR part 1500, and NHTSA, 49 CFR part 520. NHTSA prepared the Draft EIS to analyze and disclose the potential environmental impacts of the proposed CAFE standards and a range of alternatives (largely varying in terms of stringency). NHTSA considered the information contained in the Draft EIS as part of developing its proposal and made the Draft EIS available for public comment. For the final rule on the standards for model year 2021 through 2026 automobiles proposed in the NPRM, NHTSA will simultaneously issue a Final EIS and Record of Decision, pursuant to 49 U.S.C. 304a(b) and U.S. Department of Transportation *Guidance on the Use of Combined Final Environmental Impact Statements/ Records of Decision and Errata Sheets in National Environmental Policy Act Reviews* (April 25, 2019),[290] unless it is determined that statutory criteria or practicability considerations preclude simultaneous issuance.

NHTSA has not prepared a separate environmental analysis pursuant to NEPA for this final action on preemption. This final rule provides clarity on the scope of EPCA's preemption provision. Ultimately, the determination of whether a particular State or local law is preempted under EPCA is not determined based upon its environmental impact but solely whether it is ''related to fuel economy standards or average fuel economy standards.'' Any preemptive effect

[287] Docket No. EPA–HQ–OAR–2012–0562, PP. 15–16.

[288] 42 U.S.C. 4321–4347.

[289] 42 U.S.C. 4332. EPA is expressly exempted from the requirements of NEPA for actions under the Clean Air Act. 15 U.S.C. 793(c)(1).

[290] *https://www.transportation.gov/sites/dot.gov/files/docs/mission/transportation-policy/permittingcenter/337371/feis-rod-guidance-final-04302019.pdf.*

resulting from this final action is not the result of the exercise of Agency discretion, but rather reflects the operation and application of the Federal statute. NHTSA does not have authority to waive any aspect of EPCA preemption no matter the potential environmental impacts; rather, preempted standards are void *ab initio.* Courts have long held that NEPA does not apply to nondiscretionary actions by Federal agencies.[291] As NHTSA lacks discretion over EPCA's preemptive effect, the Agency concludes that NEPA does not apply to this action.

It bears noting that this action only concerns the question of preemption; it does not set CAFE standards. Fundamentally, this action is about which sovereign entity (*i.e.,* the Federal government or State governments) can issue standards that relate to fuel economy. EPCA is clear that this authority is restricted to the Federal government. This action provides guidance on the boundary set by Congress, as well as under principles of implied preemption. NHTSA's regulation concerning EPCA preemption is independent and severable from any particular CAFE standards adopted by NHTSA, and this action, in and of itself, is not expected to have significant environmental impacts on a national scale. As described above, OEMs would likely produce more efficient vehicles for sale in California and the States that have adopted California's standards, but the increased fuel economy of these vehicles would likely be offset by less efficient vehicles produced for sale in the rest of the U.S., leading to little to no change in either fuel use or GHG emissions at a national level. In fact, as NHTSA has not finalized any action to amend the fuel economy standards that were promulgated in 2012, California's ''deemed to comply'' provision remains operative. As OEMs are anticipated to make use of this compliance mechanism, CARB's GHG standards are functionally identical to Federal standards, and their preemption would not result in additional environmental impacts. Furthermore, as was discussed in the NPRM, California, in its 2013 waiver request, noted that the ZEV program did not provide for ozone-forming pollutants, acknowledging, ''[t]here is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions. The LEV III criteria pollutant fleet standard is responsible for those emission reductions in the fleet; the fleet would become cleaner regardless of the ZEV regulation because manufacturers would adjust their compliance response to the standard by making less polluting conventional vehicles.'' [292] Ultimately NHTSA will address potential environmental impacts of fuel economy standards in its forthcoming Final EIS that will accompany the final rule on the standards for model year 2021 through 2026 automobiles proposed in the NPRM. This action, however, does not result in significant environmental impacts to the quality of the human environment.

NHTSA intends to fully respond to all substantive comments received on the Draft EIS in the forthcoming Final EIS, consistent with CEQ regulations. NHTSA received numerous public comments on the Draft EIS that related to the revocation of California's waiver and EPCA preemption. The following summarizes and briefly addresses those comments.

Multiple commenters called NHTSA's DEIS inadequate because it did not analyze an alternative that would keep the California waiver and regulations (as well as similar regulations adopted in the District of Columbia and other States pursuant to section 177 of the CAA) in place.[293] On the other hand, one commenter noted its support for the proposition that NHTSA is not obligated under NEPA to consider a scenario that it believes Federal law does not permit.[294] As described above, NHTSA concludes that NEPA does not apply to this final rule regarding preemption. Based on this conclusion, it is immaterial whether NHTSA analyzed an alternative that would keep the California waiver and regulations in place. NHTSA lacks the discretion and authority to select such an alternative as a State or local law or regulation related to automobile fuel economy standards is void *ab initio* under the preemptive force of EPCA.

One commenter criticized NHTSA for failing to consider the criteria pollutant impacts of alternatives that keep the waiver in place and that account for California's specific electricity grid.[295] That commenter also criticized NHTSA for not fully accounting for the impacts to $NO_X$ emissions in the South Coast Air Basin as a result of revoking the waiver.[296] Another commenter noted that the nine areas NHTSA identified as suffering from ''serious'' or ''extreme'' nonattainment conditions for ozone and $PM_{2.5}$ are located in California, even though the agencies proposed to revoke or declare preempted the State's Clean Air Act waiver for GHG emissions and the State's ZEV mandate.[297] One commenter wrote that NHTSA should consider and discuss the local impacts that preempting the ZEV mandate would have on localities where ZEV sales are currently concentrated and where they will likely concentrate in the future, and particularly in California and the other States that have adopted the ZEV mandate pursuant to section 177 of the CAA.[298] While these comments are more specific about identifying potential environmental impacts, these impacts simply do not bear on the question of whether or how preemption applies. Preemption relies solely on whether the State or local law or regulation is ''related to fuel economy standards or average fuel economy standards.'' Therefore, NHTSA is not obligated to analyze or consider these environmental impacts as part of this final rule.

One commenter noted that if California's waiver is revoked, the State would be unable to address pollution issues through adoption of California's or its own standards, making it difficult to attain or maintain compliance with the Clean Air Act.[299] Another State alleged that it depends on the criteria pollutant and air toxic emission reduction co-benefits of the State's use of section 177 motor vehicle emissions standards as a control strategy in its State Implementation Plan to meet its

[291] *See, e.g., Department of Transp.* v. *Public Citizen,* 541 U.S. 752 (2004); *Milo Cmty. Hosp.* v. *Weinberger,* 525 F.2d 144 (1st Cir. 1975); *State of South Dakota* v. *Andrus,* 614 F.2d 1190 (8th Cir. 1980); *Citizens Against Rails-to-Trails* v. *Surface Transp. Bd.,* 267 F.3d 1144 (D.C. Cir. 2001); *Sierra Club* v. *Babbitt,* 65 F.3d 1502 (9th Cir. 1995).

[292] Docket No. EPA–HQ–OAR–2012–0562, Pp. 15–16. California's LEV III criteria pollution standard would not be preempted under this action.

[293] Center for Biological Diversity, Earthjustice, Environmental Law and Policy Center, Natural Resources Defense Council, Public Citizen, Inc., Safe Climate Campaign, Sierra Club, Southern Environmental Law Center, and Union of Concerned Scientists, Docket No. NHTSA–2017–0069–0550; South Coast Air Quality Management District, Docket Nos. NHTSA–2017–0069–0532 and NHTSA–2017–0069–0497; Blanca Luevanos, Docket No. NHTSA–2017–0069–0508; National Coalition for Advanced Transportation, Docket No. NHTSA–2017–0069–0597; California Office of the Attorney General et al., Docket No. NHTSA–2017–0069–0625.

[294] Alliance of Automobile Manufacturers, Docket No. NHTSA–2017–0069–0588.

[295] South Coast Air Quality Management District, Docket No. NHTSA–2017–0069–0497.

[296] South Coast Air Quality Management District, Docket No. NHTSA–2017–0069–0497.

[297] Center for Biological Diversity, Earthjustice, Environmental Law and Policy Center, Natural Resources Defense Council, Public Citizen, Inc., Safe Climate Campaign, Sierra Club, Southern Environmental Law Center, and Union of Concerned Scientists, Docket No. NHTSA–2017–0069–0550.

[298] New York State Department of Environmental Conservation, NHTSA–2017–0069–0608.

[299] Boulder County Public Health, Docket No. NHTSA–2017–0069–0499.

SIP.[300] NHTSA disagrees with the underlying premise of the comments. States and local governments are able to continue to encourage ZEVs in many different ways, such as through investments in infrastructure and appropriately tailored incentives. States and local governments cannot adopt or enforce regulations related to fuel economy standards, which include ZEV mandates, but they are able to address pollutants regulated by the Clean Air Act in numerous ways that are not preempted by Federal law. Moreover, as noted above, this action does not impact in any way the Federal standards in place for greenhouse gas emissions from automobiles and fuel economy standards. Since California and other section 177 States have ''deemed'' compliance with the Federal standards to be compliance with the State standards, this action does not have significant environmental impacts to the quality of the human environment. Any impacts associated with potential changes to Federal standards are not a result of this action and are purely speculative until the agencies finalize a change.

2. Clean Air Act Conformity Requirements as Applied to NHTSA's Action

The Clean Air Act (42 U.S.C. 7401 *et seq.*) is the primary Federal legislation that addresses air quality. Under the authority of the Clean Air Act and subsequent amendments, EPA has established NAAQS for six criteria pollutants, which are relatively commonplace pollutants that can accumulate in the atmosphere as a result of human activity. The air quality of a geographic region is usually assessed by comparing the levels of criteria air pollutants found in the ambient air to the levels established by the NAAQS (taking into account, as well, the other elements of a NAAQS: Averaging time, form, and indicator). These ambient concentrations of each criteria pollutant are compared to the levels, averaging time, and form specified by the NAAQS in order to assess whether the region's air quality is in attainment with the NAAQS. When the measured concentrations of a criteria pollutant within a geographic area are below those permitted by the NAAQS, EPA designates the region as an attainment area for that pollutant, while areas where concentrations of criteria pollutants exceed Federal standards (or nearby areas that contribute to such concentrations) are designated as nonattainment areas. Former nonattainment areas that come into compliance with the NAAQS and are redesignated as attainment are known as maintenance areas. When EPA revises a NAAQS, each State is required to develop and implement a State Implementation Plan (SIP) to address how it plans to attain and maintain the new standard. Each State with a nonattainment area is also required to submit a SIP documenting how the region will reach attainment levels within time periods specified in the Clean Air Act. For maintenance areas, the SIP must document how the State intends to maintain compliance with the NAAQS.

No Federal agency may ''engage in, support in any way or provide financial assistance for, license or permit, or approve'' any activity in a nonattainment or maintenance area that does not ''conform'' to a SIP or Federal Implementation Plan after EPA has approved or promulgated it.[301] Further, no Federal agency may ''approve, accept or fund'' any transportation plan, program, or project developed pursuant to title 23 or chapter 53 of title 49, U.S.C., in a nonattainment or maintenance area unless the plan, program, or project has been found to ''conform'' to any applicable implementation plan in effect.[302] The purpose of these conformity requirements is to ensure that Federally sponsored or conducted activities do not interfere with meeting the emissions targets in SIPs, do not cause or contribute to new violations of the NAAQS, and do not impede the ability of a State to attain or maintain the NAAQS or delay any interim milestones. EPA has issued two sets of regulations to implement the conformity requirements:

(1) The Transportation Conformity Rule [303] applies to transportation plans, programs, and projects that are developed, funded, or approved under title 23 or chapter 53 of title 49, U.S.C.

(2) The General Conformity Rule [304] applies to all other federal actions not covered under transportation conformity. The General Conformity Rule establishes emissions thresholds, or de minimis levels, for use in evaluating the conformity of an action that results in emissions increases.[305] If the net increases of direct and indirect emissions are lower than these thresholds, then the project is presumed to conform and no further conformity evaluation is required. If the net increases of direct and indirect emissions exceed any of these thresholds, and the action is not otherwise exempt,[306] then a conformity determination is required. The conformity determination can entail air quality modeling studies, consultation with EPA and state air quality agencies, and commitments to revise the SIP or to implement measures to mitigate air quality impacts.

This action is not developed, funded, or approved under title 23 or chapter 53 of title 49, U.S.C. Accordingly, this action is not subject to transportation conformity. Under the General Conformity Rule, a conformity determination is required when a Federal action would result in total direct and indirect emissions of a criteria pollutant or precursor originating in nonattainment or maintenance areas equaling or exceeding the rates specified in 40 CFR 93.153(b)(1) and (2), and the action is not otherwise exempt. As explained below, NHTSA's action results in neither direct nor indirect emissions as defined in 40 CFR 93.152.

The General Conformity Rule defines direct emissions as ''those emissions of a criteria pollutant or its precursors that are caused or initiated by the Federal action and originate in a nonattainment or maintenance area and occur at the same time and place as the action and are reasonably foreseeable.'' [307] NHTSA's action is to promulgate regulatory text and a detailed appendix, in addition to discussing the issue in this preamble to the rule, specifically to provide clarity on EPCA's preemption provision in order to give already established standards meaning, and thus is specifically exempt from general conformity requirements.[308] Moreover, this action would cause no direct emissions consistent with the meaning of the General Conformity Rule.[309] Any changes in emissions that could occur as a result of preemption would happen well after and in a different place from the promulgation of this rule. Furthermore, any such changes in emissions—especially those occurring in specific nonattainment or maintenance areas—are not reasonably foreseeable. Any such changes are

[300] Oregon Department of Environmental Quality, Docket No. NHTSA–2017–0069–0526.

[301] 42 U.S.C. 7506(c)(1) and (5).

[302] 42 U.S.C. 7506(c)(2) and (5).

[303] 40 CFR part 51, subpart T, and part 93, subpart A.

[304] 40 CFR part 93, subpart B.

[305] 40 CFR 93.153(b).

[306] 40 CFR 93.153(c).

[307] 40 CFR 93.152.

[308] 40 CFR 93.153(c)(2)(iii).

[309] *Department of Transp.* v. *Public Citizen,* 541 U.S. 752, 772 (2004) (''[T]he emissions from the Mexican trucks are not 'direct' because they will not occur at the same time or at the same place as the promulgation of the regulations.'').

unlikely because this action does not impact in any way the Federal standards in place for criteria pollutant emissions from automobiles. Further, this action does not impact the Federal standards in place for greenhouse gas emissions from automobiles or fuel economy standards. Since California and other section 177 States have ''deemed'' compliance with the Federal standards to be compliance with the State standards, it is not clear that this action (as it pertains to the State's greenhouse gas emissions standards) would result in changes to the anticipated fleet of vehicles in those States and therefore to criteria pollutant emissions. Any impacts associated with potential changes to Federal standards are not a result of this action and are purely speculative until the agencies finalize a change. Additionally, we note California's statement in its 2013 waiver request that ''[t]here is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions. The LEV III criteria pollutant fleet standard is responsible for those emission reductions in the fleet . . . .'' [310] As discussed previously, this action clarifies that criteria pollutant standards are not preempted unless they have a direct or substantial relationship to fuel economy standards. California's LEV III criteria pollution standard would not be preempted under this approach.

Indirect emissions under the General Conformity Rule are ''those emissions of a criteria pollutant or its precursors: (1) That are caused or initiated by the Federal action and originate in the same nonattainment or maintenance area but occur at a different time or place as the action; (2) That are reasonably foreseeable; (3) That the agency can practically control; and (4) For which the agency has continuing program responsibility.'' [311] Each element of the definition must be met to qualify as indirect emissions. NHTSA finds that neither of the first two criteria are satisfied for the same reasons as presented regarding direct emissions.

Furthermore, NHTSA cannot practically control, nor does it have continuing program responsibility for, any emissions that could occur as a result of preemption. ''[E]ven if a Federal licensing, rulemaking, or other approving action is a required initial step for a subsequent activity that causes emissions, such initial steps do not mean that a Federal agency can practically control any resulting emissions.'' [312] With regard to preemption, NHTSA lacks the discretion and authority to keep the California waiver and regulations in place, as a State or local law or regulation related to automobile fuel economy standards is void *ab initio* under the preemptive force of EPCA. NHTSA cannot be considered to practically control or have continuing program responsibility for emissions that could result from preemption when that result is required by Federal statute.[313] NHTSA also does not have continuing program responsibility for emissions that occur in California and other section 177 States, are regulated by the Clean Air Act, and for which the States and local governments can continue to address in numerous ways that do not conflict with Federal law.

For the foregoing reasons, this action does not cause direct or indirect emissions under the General Conformity Rule, and a general conformity determination is not required. NHTSA will address any responsibilities under the General Conformity Rule as it pertains to potential changes to the fuel economy standards in the forthcoming final rule for that action.

3. Endangered Species Act

Under Section 7(a)(2) of the Endangered Species Act (ESA), Federal agencies must ensure that actions they authorize, fund, or carry out are ''not likely to jeopardize the continued existence'' of any Federally listed threatened or endangered species or result in the destruction or adverse modification of the designated critical habitat of these species. 16 U.S.C. 1536(a)(2). If a Federal agency determines that an agency action may affect a listed species or designated critical habitat, it must initiate consultation with the appropriate Service—the U.S. Fish and Wildlife Service (FWS) of the Department of the Interior (DOI) and/or the National Oceanic and Atmospheric Administration's National Marine Fisheries Service of the Department of Commerce (together, ''the Services''), depending on the species involved—in order to ensure that the action is not likely to jeopardize the species or destroy or adversely modify designated critical habitat. *See* 50 CFR 402.14. Under this standard, the Federal agency taking action evaluates the possible effects of its action and determines whether to initiate consultation. *See* 51 FR 19926, 19949 (June 3, 1986).

Pursuant to Section 7(a)(2) of the ESA, the agencies have reviewed this action and have considered applicable ESA regulations, case law, and guidance to determine what, if any, obligations the agencies have under the ESA. The agencies have considered issues related to emissions of $CO_2$ and other GHGs and issues related to non-GHG emissions. Based on this assessment, the agencies have determined that their actions (withdrawal of California's waiver and the final rule regarding preemption) do not require consultation under Section 7(a)(2) of the ESA.

a. The Agencies Lack Discretionary Authority

NHTSA's final rule adopts regulatory text (including a detailed appendix) regarding EPCA's preemption provision, in addition to discussing the issue in this preamble to the rule, specifically to provide needed clarity on that provision. The new regulatory text provides for why any law or regulation of a State or a political subdivision of a State regulating or prohibiting tailpipe carbon dioxide emissions from automobiles is expressly and impliedly preempted by EPCA. Any preemptive effect resulting from this final action is not the result of the exercise of Agency discretion, but rather reflects the operation and application of the Federal statute. NHTSA does not have authority to waive any aspect of EPCA preemption no matter the potential impacts; rather, preempted standards are void *ab initio.*

EPA's action is to withdraw the waiver it had previously provided in January 2013 to California for that State's GHG and ZEV programs under section 209 of the Clean Air Act. This action is being undertaken on two separate and independent grounds. First, EPA has determined EPCA preemption renders its prior grant of a waiver for those aspects of California's regulations that EPCA preempts invalid, null, and void, thereby necessitating withdrawal of the waiver. Second, EPA concludes that CAA section 209(b)(1)(B), which provides that EPA shall not issue a waiver if California does not ''need'' separate state standards ''to meet compelling and extraordinary conditions,'' was not intended to allow California to promulgate State standards for emissions from new motor vehicles designed to address global climate change problems. Therefore, California does not meet the necessary criteria to receive a waiver for these aspects of its program. Similar to NHTSA, these decisions are not discretionary, but rather reflect EPA's conclusion that EPCA preemption and the requirements

[310] Docket No. EPA–HQ–OAR–2012–0562, pp. 15–16.

[311] 40 CFR 93.152.

[312] 40 CFR 93.152.

[313] *See Public Citizen,* 541 U.S. at 772–3.

of the Clean Air Act prohibit the granting of a waiver to California.

The Supreme Court has held that Section 7(a)(2) of the ESA and its implementing regulations apply only to actions in which there is discretionary Federal authority.[314] In *National Association of Home Builders,* EPA considered the requirement of Section 402(b) of the Clean Water Act that EPA transfer certain permitting powers to State authorities upon an application and a showing that nine specified criteria had been met. The Court concluded that the ESA did not operate as a ''tenth criterion.'' [315] According to the Court: ''While the EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out [the] enumerated statutory criteria, the statute clearly does not grant it the discretion to add another entirely separate prerequisite to that list. Nothing in the text of [the statute] authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application.'' [316]

The agencies believe this holding applies to the instant action as well. As this action results from nondiscretionary authorities, the Section 7(a)(2) implementing regulations expressly exclude them from coverage. Neither ECPA nor the Clean Air Act include the protection of threatened or endangered species as a consideration for the application of preemption (which operates by statute) or the prohibition on the granting of a waiver (under the enumerated statutory criterion in CAA section 209(b)(1)(B)). Although there is some judgment in considering the application of EPCA and the CAA, neither action involves the type of discretion that would require a Section 7(a)(2) consultation by the agencies with the Services.

b. Any Effects Resulting From the Agencies' Actions Are too Attenuated for Consultation To Be Required

In addition, the agencies have considered the potential effects of this action to listed threatened or endangered species or designated critical habitat of these species and concludes that any such effects are too attenuated to require Section 7(a)(2) consultation. The agencies base this conclusion both on the language of the Section 7(a)(2) implementing regulations and on the long history of actions and guidance provided by DOI.

The Section 7(a)(2) implementing regulations require consultation if a Federal agency determines its action ''may affect'' listed species or critical habitat.[317] The Services' current regulations define ''effects of the action'' in relevant part as ''the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline.'' [318] Further, they define indirect effects as ''those that are caused by the proposed action and are later in time, but still are reasonably certain to occur.'' [319]

The Services' recently published final rule revising the definition of ''effects of the action'' to be ''all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur.'' [320] In the preamble to the final rule, the Services emphasized that the ''but for'' test and ''reasonably certain to occur'' are not new or heightened standards.[321] In this context, '''but for' causation means that the consequence in question would not occur if the proposed action did not go forward . . . . In other words, if the agency fails to take the proposed action and the activity would still occur, there is no 'but for' causation. In that event, the activity would not be considered an effect of the action under consultation.'' [322] As the Services do not consider these to be changes in their longstanding application of the ESA, these interpretations apply equally under the existing regulations (which are effective through September 25, 2019) and the new regulations (which are effective beginning September 26, 2019).

Any potential effects of this action to threatened or endangered species or designated critical habitat would be a result of changes to GHG or criteria air pollutant emissions. In the next section, the agencies discuss why this action is not anticipated to result in changes to GHG or criteria air pollutant emissions. However, even if such changes to emissions were to occur, the agencies do not believe resulting impacts to listed species or critical habitat satisfy the ''but for'' test or are ''reasonably certain to occur.''

GHG emissions are relevant to Section 7(a)(2) consultation because of the potential impacts of climate change on listed species or critical habitat. For example, one comment to the NPRM documented the potential impacts of climate change on federally protected species and included a five-page table of species listed during 2006 to 2015 for which the commenters claim climate change was a listing factor.[323] However, the agencies believe this comment inappropriately attributes the entire issue of climate change, including all GHG emissions no matter which sector generated them, to NHTSA and EPA's actions.[324] In fact, the commenter demonstrates the very issue with doing so: There is no ''but for'' causation associated with EPA's revocation of California's waiver and NHTSA's final rule on preemption, as the impacts of climate change will occur regardless of this action. Furthermore, even if this action results in changes to GHG emissions, such changes would be extremely small compared to global GHG emissions. There is no scientific evidence that sufficiently ''connects the dots'' between those changes in emissions and any particular impact to a listed species or critical habitat; thus, any impacts are not ''reasonably certain to occur.'' States (such as California) and local governments may also continue to encourage ZEVs in numerous ways that do not conflict with

[314] *National Ass'n of Home Builders* v. *Defenders of Wildlife,* 551 U.S. 644, 673 (2007) (''Applying *Chevron,* we defer to the Agency's reasonable interpretation of ESA [section] 7(a)(2) as applying only to 'actions in which there is discretionary Federal involvement or control.' '' (quoting 50 CFR 402.03)).

[315] *National Ass'n of Home Builders,* 551 U.S. at 649.

[316] *Id.* at 671.

[317] 50 CFR 402.14(a). The Departments of the Interior and Commerce recently issued a final rule revising the regulations governing the ESA Section 7 consultation process. 84 FR 44966 (Aug. 27, 2019). The new regulations take effect on September 26, 2019. As discussed in the text above, the agencies do not believe that the change in regulations has any effect on the agencies' analysis here.

[318] 50 CFR 402.02.

[319] *Id.*

[320] 50 CFR 402.02, as amended by 84 FR 44976, 45016 (Aug. 27, 2019) (effective Sept. 26, 2019).

[321] 84 FR at 44977 (''As discussed in the proposed rule, the Services have applied the 'but for' test to determine causation for decades. That is, we have looked at the consequences of an action and used the causation standard of 'but for' plus an element of foreseeability (*i.e.,* reasonably certain to occur) to determine whether the consequence was caused by the action under consultation.'').

[322] *Id.*

[323] Center for Biological Diversity, Sierra Club, and Public Citizen, Inc., Docket No. NHTSA–2018–0067–12378.

[324] *See, e.g.,* 78 FR 11766, 11785 (Feb. 20, 2013) (''Without the requirement of a causal connection between the action under consultation and effects to species, literally every agency action that contributes GHG emissions to the atmosphere would arguably result in consultation with respect to every listed species that may be affected by climate change.'').

Federal law, which may also prevent any alleged impact from these actions.

Similarly, with regard to criteria air pollutants, States are still subject to the Clean Air Act, which requires limitations on emissions of those pollutants. Furthermore, since California and other Section 177 States have ''deemed'' compliance with the Federal standards to be compliance with the State standards, it is not clear that this action would result in changes to emissions. Any impacts associated with potential changes to Federal standards are not a result of this action and are purely speculative until the agencies finalize a change. We again note California's statement in its 2013 waiver request that ''[t]here is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions. The LEV III criteria pollutant fleet standard is responsible for those emission reductions in the fleet . . . .'' [325] As discussed previously, this action clarifies that criteria pollutant standards are not preempted unless they have a direct or substantial relationship to fuel economy standards. California's LEV III criteria pollution standard would not be preempted under this approach, and that program's benefits are anticipated to remain in place.

The agencies have also considered the long history of actions and guidance provided by DOI. To that point, the agencies incorporate by reference Appendix G of the MY 2012–2016 CAFE standards EIS.[326] That analysis relied on the significant legal and technical analysis undertaken by FWS and DOI. Specifically, NHTSA looked at the history of the Polar Bear Special Rule and several guidance memoranda provided by FWS and the U.S. Geological Survey. Ultimately, FWS concluded that a causal link could not be made between GHG emissions associated with a proposed Federal action and specific effects on listed species; therefore, no Section 7(a)(2) consultation would be required.

Subsequent to the publication of that Appendix, a court vacated the Polar Bear Special Rule on NEPA grounds, though it upheld the ESA analysis as having a rational basis.[327] FWS subsequently issued a revised Final Special Rule for the Polar Bear.[328] In that final rule, FWS provided that for ESA section 7, the determination of whether consultation is triggered is narrow and focused on the discrete effect of the proposed agency action. FWS wrote, ''[T]he consultation requirement is triggered only if there is a causal connection between the proposed action and a discernible effect to the species or critical habitat that is reasonably certain to occur. One must be able to 'connect the dots' between an effect of a proposed action and an impact to the species and there must be a reasonable certainty that the effect will occur.'' [329] The statement in the revised Final Special Rule is consistent with the prior guidance published by FWS and remains valid today.[330] Ultimately, EPA and NHTSA are not able to make a causal link for purposes of Section 7(a)(2) that would ''connect the dots'' between this action, vehicle emissions from motor vehicles affected by this action, climate change, and particular impacts to listed species or critical habitats. Therefore, no Section 7(a)(2) consultation is required.

c. The Agencies' Actions Would Have No Effect on Listed Species and Designated Critical Habitat

In addition to the foregoing a Section 7(a)(2) consultation is not required because this action will have no effect on a listed species or designated critical habitat. This notification and final rule only address the issues of California's waiver and preemption; they do not set CAFE standards. Fundamentally, this action is about which sovereign entity (*i.e.,* the Federal government or State governments) can issue standards that relate to fuel economy. EPCA is clear that this authority is restricted to the Federal government. This action provides clarity on the boundary set by Congress, as well as under principles of implied preemption.

As previously described, absent this action, OEMs would likely produce more efficient vehicles for sale in California and the States that have adopted California's standards, but the increased fuel economy of these vehicles would likely be offset by less efficient vehicles produced for sale in the rest of the U.S., leading to little to no change in either fuel use or GHG emissions at a national level. Further, as EPA and NHTSA have not finalized any action to amend the Federal GHG and fuel economy standards that were promulgated in 2012, California's ''deemed to comply'' provision remains operative. As OEMs are anticipated to make use of this compliance mechanism, CARB's GHG standards are functionally identical to Federal standards, and their preemption would not result in additional environmental impacts. Any impacts associated with potential changes to Federal standards are not a result of this action and are purely speculative until the agencies finalize a change.

Finally, we again note California's 2013 waiver request statement that there is no criteria emissions benefit associated with the ZEV program because the LEV III criteria pollution standard is responsible for those emissions reductions. This action clarifies that criteria pollutant standards are not preempted unless they have a direct or substantial relationship to fuel economy standards. California's LEV III criteria pollution standard would not be preempted under this approach. Therefore, those benefits are anticipated to remain in place.

For the foregoing reasons, automobile emissions are not anticipated to change as a result of this action. Even if they do, any change would be so minimal as to be unlikely to pose any effects on a listed species or critical habitat. Because any effect on a listed species or critical habitat is not reasonably certain to occur, the agencies conclude that there will be no effect on listed species or critical habitat under the Section (7)(a)(2) implementing regulations, and no Section 7(a)(2) consultation is required for this action.

4. National Historic Preservation Act (NHPA)

The NHPA (54 U.S.C. 300101 *et seq.*) sets forth government policy and procedures regarding ''historic properties''—that is, districts, sites, buildings, structures, and objects included on or eligible for the National Register of Historic Places. Section 106 of the NHPA requires federal agencies to ''take into account'' the effects of their actions on historic properties.[331] The agencies conclude that the NHPA is not applicable to this action because a rule regarding the preemption of State laws and a decision to revoke California's waiver are not the type of activities that have the potential to cause effects on historic properties. This conclusion is supported by the lack of discretion over

[325] Docket No. EPA–HQ–OAR–2012–0562, pp. 15–16.

[326] Available on NHTSA's Corporate Average Fuel Economy website *https://one.nhtsa.gov/Laws-&-Regulations/CAFE-%E2%80%93-Fuel-Economy/Final-EIS-for-CAFE-Passenger-Cars-and-Light-Trucks,-Model-Years-2012%E2%80%932016.*

[327] *In re: Polar Bear Endangered Species Act Listing and Section 4(D) Rule Litigation,* 818 F. Supp. 2d 214 (D.D.C. Oct. 17, 2011).

[328] 78 FR 11766 (Feb. 20, 2013).

[329] 78 FR at 11784–11785.

[330] *See* DOI Solicitor's Opinion No. M–37017, ''Guidance on the Applicability of the Endangered Species Act Consultation Requirements to Proposed Actions Involving the Emissions of Greenhouse Gases'' (Oct. 3, 2008).

[331] Section 106 is now codified at 54 U.S.C. 306108. Implementing regulations for the Section 106 process are located at 36 CFR part 800.

preemption and the underlying justification for the withdrawal of the waiver to California, the fact that any causal relationship between effects on historic properties as a result of emissions from the sale and operation of motor vehicles in California and section 177 States and this action are too attenuated, and the conclusion that impacts are not reasonably foreseeable.[332]

5. Fish and Wildlife Conservation Act (FWCA)

The FWCA (16 U.S.C. 2901 *et seq.*) provides financial and technical assistance to States for the development, revision, and implementation of conservation plans and programs for nongame fish and wildlife. In addition, the Act encourages all Federal departments and agencies to utilize their statutory and administrative authorities to conserve and to promote conservation of nongame fish and wildlife and their habitats. The agencies conclude that the FWCA is not applicable to this action because it does not involve the conservation of nongame fish and wildlife and their habitats.

6. Coastal Zone Management Act (CZMA)

The Coastal Zone Management Act (16 U.S.C. 1451 *et seq.*) provides for the preservation, protection, development, and (where possible) restoration and enhancement of the nation's coastal zone resources. Under the statute, States are provided with funds and technical assistance in developing coastal zone management programs. Each participating State must submit its program to the Secretary of Commerce for approval. Once the program has been approved, any activity of a Federal agency, either within or outside of the coastal zone, that affects any land or water use or natural resource of the coastal zone must be carried out in a manner that is consistent, to the maximum extent practicable, with the enforceable policies of the State's program.[333]

The agencies conclude that the CZMA is not applicable to this action because it does not involve an activity within, or outside of, the nation's coastal zones that affects any land or water use or natural resource of the coastal zone. This conclusion is supported by the lack of discretion over preemption and the underlying justification for the withdrawal of the waiver to California, the fact that any causal relationship between effects on coastal zones as a result of emissions from the sale and operation of motor vehicles in California and section 177 States and this action are too attenuated, and the conclusion that impacts are not reasonably foreseeable.[334]

7. Floodplain Management (Executive Order 11988 and DOT Order 5650.2)

These Orders require Federal agencies to avoid the long- and short-term adverse impacts associated with the occupancy and modification of floodplains, and to restore and preserve the natural and beneficial values served by floodplains. Executive Order 11988 also directs agencies to minimize the impact of floods on human safety, health and welfare, and to restore and preserve the natural and beneficial values served by floodplains through evaluating the potential effects of any actions the agency may take in a floodplain and ensuring that its program planning and budget requests reflect consideration of flood hazards and floodplain management. DOT Order 5650.2 sets forth DOT policies and procedures for implementing Executive Order 11988. The DOT Order requires that the agency determine if a proposed action is within the limits of a base floodplain, meaning it is encroaching on the floodplain, and whether this encroachment is significant. If significant, the agency is required to conduct further analysis of the proposed action and any practicable alternatives. If a practicable alternative avoids floodplain encroachment, then the agency is required to implement it.

In this action, the agencies are not occupying, modifying and/or encroaching on floodplains. The agencies, therefore, conclude that the Orders are not applicable to this action.

8. Preservation of the Nation's Wetlands (Executive Order 11990 and DOT Order 5660.1a)

These Orders require Federal agencies to avoid, to the extent possible, undertaking or providing assistance for new construction located in wetlands unless the agency head finds that there is no practicable alternative to such construction and that the proposed action includes all practicable measures to minimize harms to wetlands that may result from such use. Executive Order 11990 also directs agencies to take action to minimize the destruction, loss or degradation of wetlands in ''conducting Federal activities and programs affecting land use, including but not limited to water and related land resources planning, regulating, and licensing activities.'' DOT Order 5660.1a sets forth DOT policy for interpreting Executive Order 11990 and requires that transportation projects ''located in or having an impact on wetlands'' should be conducted to assure protection of the Nation's wetlands. If a project does have a significant impact on wetlands, an EIS must be prepared.

In this action, the agencies are not undertaking or providing assistance for new construction located in wetlands and conclude that these Orders do not apply to this action.

9. Migratory Bird Treaty Act (MBTA), Bald and Golden Eagle Protection Act (BGEPA), Executive Order 13186

The MBTA (16 U.S.C. 703–712) provides for the protection of certain migratory birds by making it illegal for anyone to ''pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export'' any migratory bird covered under the statute.[335]

The BGEPA (16 U.S.C. 668–668d) makes it illegal to ''take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import'' any bald or golden eagles.[336] Executive Order 13186, ''Responsibilities of Federal Agencies to Protect Migratory Birds,'' helps to further the purposes of the MBTA by requiring a Federal agency to develop a Memorandum of Understanding (MOU) with the Fish and Wildlife Service when it is taking an action that has (or is likely to have) a measurable negative impact on migratory bird populations.

The agencies conclude that the MBTA, BGEPA, and Executive Order 13186 do not apply to this action because there is no disturbance, take, measurable negative impact, or other covered activity involving migratory birds or bald or golden eagles involved in this rulemaking. This conclusion is supported by the lack of discretion over preemption and the reasons underlying justification for the withdrawal of the waiver to California, the fact that any causal relationship between effects on migratory birds or bald or golden eagles as a result of emissions from the sale

[332] *See* the discussions regarding NEPA, Clean Air Act Conformity, and the ESA.

[333] 16 U.S.C. 1456(c)(1)(A).

[334] *See* the discussions regarding NEPA, Clean Air Act Conformity, and the ESA.

[335] 16 U.S.C. 703(a).

[336] 16 U.S.C. 668(a).

and operation of motor vehicles in California and section 177 States and this action are too attenuated, and the conclusion that impacts are not reasonably foreseeable.[337]

10. Department of Transportation Act (Section 4(f))

Section 4(f) of the Department of Transportation Act of 1966 (49 U.S.C. 303), as amended, is designed to preserve publicly owned park and recreation lands, waterfowl and wildlife refuges, and historic sites. Specifically, Section 4(f) provides that DOT agencies cannot approve a transportation program or project that requires the use of any publicly owned land from a public park, recreation area, or wildlife or waterfowl refuge of national, State, or local significance, or any land from a historic site of national, State, or local significance, unless a determination is made that:

(1) There is no feasible and prudent alternative to the use of land, and

(2) The program or project includes all possible planning to minimize harm to the property resulting from the use.

These requirements may be satisfied if the transportation use of a Section 4(f) property results in a de minimis impact on the area.

NHTSA concludes that Section 4(f) is not applicable to its final rule here because this rulemaking is not an approval of a transportation program or project that requires the use of any publicly owned land.

11. Executive Order 12898: ''Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations''

Executive Order (E.O.) 12898 (59 FR 7629 (Feb. 16, 1994)) establishes Federal executive policy on environmental justice. Its main provision directs Federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations and low-income populations in the United States.

The agencies have determined that this action will not have disproportionately high and adverse human health or environmental effects on minority or low-income populations because it does not change existing Federal standards. This conclusion is supported by the lack of discretion over preemption and the underlying justification for the withdrawal of the waiver to California, the fact that any causal relationship between effects on minority or low-income populations as a result of emissions from the sale and operation of motor vehicles in California and section 177 States and this action are too attenuated, and the conclusion that impacts are not reasonably foreseeable.[338]

12. Executive Order 13045: ''Protection of Children From Environmental Health Risks and Safety Risks''

This action is not subject to E.O. 13045 (62 FR 19885, April 23, 1997) because it is not an economically significant regulatory action as defined by E.O. 12866, and the agencies have no reason to believe that the environmental health or safety risks related to this action may have a disproportionate effect on children because it does not change existing Federal standards. This conclusion is supported by the lack of discretion over preemption and the underlying justification for the withdrawal of the waiver to California, the fact that any causal relationship between effects on children as a result of emissions from the sale and operation of motor vehicles in California and section 177 States and this action are too attenuated, and the conclusion that impacts are not reasonably foreseeable.[339]

*G. Regulatory Flexibility Act*

Pursuant to the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.,* as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996), whenever an agency is required to publish a notice of proposed rulemaking or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions). No regulatory flexibility analysis is required if the head of an agency certifies the proposal will not have a significant economic impact on a substantial number of small entities. SBREFA amended the Regulatory Flexibility Act to require Federal agencies to provide a statement of the factual basis for certifying that a proposal will not have a significant economic impact on a substantial number of small entities.

This joint action only concern the question of preemption; the joint action does not set CAFE or emissions standards themselves. Further, as the California waiver withdrawal is not a rulemaking, it is not subject to the RFA. Accordingly, only NHTSA's final rule establishing regulatory text related to preemption is at issue in this action. NHTSA has considered the impacts of this document under the Regulatory Flexibility Act and certifies that this rule would not have a significant economic impact on a substantial number of small entities. One commenter, Workhorse Group, Inc. (Workforce), in comments echoed by a trade association, argued that it was a small business and would be affected the preemption provisions because it would no longer be able to earn and sell credits under the ZEV mandates established by California and the other 177 States. This argument is not persuasive, as the preemption regulation has no direct effect on Workforce or any other similar entity because it does not regulate any private entity, but instead clarifies the agency's views on what State or local laws are preempted. Thus, any effect on Workhorse or any other similar entities is, at most, indirect. Any effect is even further attenuated by the fact that small entities such as Workhorse are not even subject to a ZEV mandate, but choose to participate in the program voluntarily.

Additionally, in keeping with previous waiver actions, EPA's action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities. *See* 78 FR at 2145 (Jan. 9, 2013); 74 FR at 32784 (July 8, 2009); 73 FR at 12169 (Mar. 6, 2008).

*H. Executive Order 13132 (Federalism)*

Executive Order 13132 requires federal agencies to develop an accountable process to ensure ''meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications.'' The Order defines the term ''Policies that have federalism implications'' to include regulations that have ''substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.'' Under the Order, agencies may not issue a regulation that has federalism implications, that imposes substantial direct compliance costs, unless the Federal government

[337] *See* the discussions regarding NEPA, Clean Air Act Conformity, and the ESA.

[338] *See* the discussions regarding NEPA, the Clean Air Act Conformity, and the ESA.

[339] *See* the discussions regarding NEPA, the Clean Air Act Conformity, and the ESA.

provides the funds necessary to pay the direct compliance costs incurred by State and local governments, or the agencies consult with State and local officials early in the process of developing the proposed regulation. The agencies complied with Order's requirements and discuss their response to comments in the above sections.

*I. Executive Order 12988 (Civil Justice Reform)*

Pursuant to Executive Order 12988, "Civil Justice Reform," [340] NHTSA has determined that this final rule does not have any retroactive effect.

*J. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This final rule does not have tribal implications, as specified in Executive Order 13175 (65 FR 67249, November 9, 2000). This rule will be implemented at the Federal level. Thus, Executive Order 13175 does not apply to this rule. Two commenters raised issues associated with this Executive Order. Issues raised in these comments related to the standards will be addressed that forthcoming rulemaking. One commenter, in an apparent reference to the preemption actions being finalized in this document, argued that the NPRM would weaken tribal abilities to set GHG standards. This is incorrect: The finalization of the EPCA preemption provisions merely clarifies the law that any law or regulation of a State or political subdivision of a State "related to" fuel economy is preempted, while EPA's decision in this document only affects a State, not a Tribal government.

*K. Unfunded Mandates Reform Act*

Section 202 of the Unfunded Mandates Reform Act of 1995 (UMRA) requires Federal agencies to prepare a written assessment of the costs, benefits, and other effects of a proposed or final rule that includes a Federal mandate likely to result in the expenditure by State, local, or tribal governments, in the aggregate, or by the private sector, of more than $100 million in any one year (adjusted for inflation with base year of 1995). Adjusting this amount by the implicit gross domestic product price deflator for 2016 results in $148 million (111.416/75.324 = 1.48).[341] This final rule will not result in the expenditure by State, local, or Tribal governments, in the aggregate, or by the private sector of more than $148 million annually.

*L. Regulation Identifier Number*

The Department of Transportation assigns a regulation identifier number (RIN) to each regulatory action listed in the Unified Agenda of Federal Regulations. The Regulatory Information Service Center publishes the Unified Agenda in April and October of each year. You may use the RIN contained in the heading at the beginning of this document to find this action in the Unified Agenda.

*M. National Technology Transfer and Advancement Act*

Section 12(d) of the National Technology Transfer and Advancement Act (NTTAA) requires NHTSA and EPA to evaluate and use existing voluntary consensus standards in its regulatory activities unless doing so would be inconsistent with applicable law (*e.g.,* the statutory provisions regarding NHTSA's vehicle safety authority, or EPA's testing authority) or otherwise impractical.[342] As this action does not affect the CAFE or GHG standards, it is not subject to the NTTAA.

*N. Department of Energy Review*

49 U.S.C. 32902(j)(2) requires that "Before taking final action on a standard or an exemption from a standard under this section, the Secretary of Transportation shall notify the Secretary of Energy and provide the Secretary of Energy a reasonable time to comment." As this action does not establish a standard or provide an exemption, it is not subject to this requirement. However, NHTSA has submitted this action to OMB for interagency review and, thus, the Department of Energy has been afforded the opportunity to review.

*O. Paperwork Reduction Act*

The Paperwork Reduction Act (PRA) of 1995, Public Law 104–13,[343] gives the Office of Management and Budget (OMB) authority to regulate matters regarding the collection, management, storage, and dissemination of certain information by and for the Federal government. It seeks to reduce the total amount of paperwork handled by the government and the public. The PRA requires Federal agencies to place a notice in the **Federal Register** seeking public comment on the proposed collection of information. This action includes no information collections. The information collections associated with the CAFE and GHG programs will be discussed in the final rule that will establish CAFE and GHG standards.

*P. Privacy Act*

In accordance with 5 U.S.C. 553(c), the agencies solicited comments from the public to better inform the rulemaking process. These comments are posted, without edit, to *www.regulations.gov,* as described in DOT's system of records notice, DOT/ALL–14 FDMS, accessible through *www.transportation.gov/privacy.*

*Q. Judicial Review*

NHTSA and EPA undertake this joint action under their respective authorities pursuant to the Energy Policy and Conservation Act and the Clean Air Act, mindful of the Supreme Court's statement in *Massachusetts* v. *EPA,* 549 U.S. 497, 532 (2007), that "there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency." Pursuant to Clean Air Act section 307(b), any petitions for judicial review of this action must be filed in the United States Court of Appeals for the D.C. Circuit by November 26, 2019. Given the inherent relationship between the agencies' actions, any challenges to NHTSA's regulation should also be filed in the United States Court of Appeals for the D.C. Circuit.

**List of Subjects in 49 CFR Parts 531 and 533**

Fuel economy.

**Regulatory Text**

In consideration of the foregoing, under the authority of 49 U.S.C. 322, 32901, 32902, and 32903, and delegation of authority at 49 CFR 1.95, NHTSA amends 49 CFR chapter V as follows:

## PART 531—PASSENGER AUTOMOBILE AVERAGE FUEL ECONOMY STANDARDS

■ 1. The authority citation for part 531 continues to read as follows:

**Authority:** 49 U.S.C. 32902, delegation of authority at 49 CFR 1.50.

■ 2. Add § 531.7 to read as follows:

**§ 531.7 Preemption.**

(a) *General.* When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.

[340] 61 FR 4729 (Feb. 7, 1996).

[341] Bureau of Economic Analysis, National Income and Product Accounts (NIPA), Table 1.1.9 Implicit Price Deflators for Gross Domestic Product. *https://bea.gov/iTable/index_nipa.cfm.*

[342] 15 U.S.C. 272.

[343] Codified at 44 U.S.C. 3501 *et seq.*

(b) *Requirements must be identical.* When a requirement under section 32908 of title 49 of the United States Code is in effect, a State or a political subdivision of a State may adopt or enforce a law or regulation on disclosure of fuel economy or fuel operating costs for an automobile covered by section 32908 only if the law or regulation is identical to that requirement.

(c) *State and political subdivision automobiles.* A State or a political subdivision of a State may prescribe requirements for fuel economy for automobiles obtained for its own use.

**Appendix to Part 531 [Designated as Appendix A to Part 531 and Amended]**

■ 3. Designate the appendix to part 531 as appendix A to part 531 and in newly designated appendix A, remove all references to ''Appendix'' and add in their place ''Appendix A.''

■ 4. Add appendix B to part 531 to read as follows:

**Appendix B to Part 531—Preemption**

(a) Express Preemption:

(1) To the extent that any law or regulation of a State or a political subdivision of a State regulates or prohibits tailpipe carbon dioxide emissions from automobiles, such a law or regulation relates to average fuel economy standards within the meaning of 49 U.S.C. 32919.

(A) Automobile fuel economy is directly and substantially related to automobile tailpipe emissions of carbon dioxide;

(B) Carbon dioxide is the natural by-product of automobile fuel consumption;

(C) The most significant and controlling factor in making the measurements necessary to determine the compliance of automobiles with the fuel economy standards in this part is their rate of tailpipe carbon dioxide emissions;

(D) Almost all technologically feasible reduction of tailpipe emissions of carbon dioxide is achievable through improving fuel economy, thereby reducing both the consumption of fuel and the creation and emission of carbon dioxide;

(E) Accordingly, as a practical matter, regulating fuel economy controls the amount of tailpipe emissions of carbon dioxide, and regulating the tailpipe emissions of carbon dioxide controls fuel economy.

(2) As a law or regulation related to fuel economy standards, any law or regulation of a State or a political subdivision of a State regulating or prohibiting tailpipe carbon dioxide emissions from automobiles is expressly preempted under 49 U.S.C. 32919.

(3) A law or regulation of a State or a political subdivision of a State having the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is a law or regulation related to fuel economy standards and expressly preempted under 49 U.S.C. 32919.

(b) Implied Preemption:

(1) A law or regulation of a State or a political subdivision of a State regulating tailpipe carbon dioxide emissions from automobiles, particularly a law or regulation that is not attribute-based and does not separately regulate passenger cars and light trucks, conflicts with:

(A) The fuel economy standards in this part;

(B) The judgments made by the agency in establishing those standards; and

(C) The achievement of the objectives of the statute (49 U.S.C. Chapter 329) under which those standards were established, including objectives relating to reducing fuel consumption in a manner and to the extent consistent with manufacturer flexibility, consumer choice, and automobile safety.

(2) Any law or regulation of a State or a political subdivision of a State regulating or prohibiting tailpipe carbon dioxide emissions from automobiles is impliedly preempted under 49 U.S.C. Chapter 329.

(3) A law or regulation of a State or a political subdivision of a State having the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is impliedly preempted under 49 U.S.C. Chapter 329.

## PART 533—LIGHT TRUCK FUEL ECONOMY STANDARDS

■ 5. The authority citation for part 533 continues to read as follows:

**Authority:** 49 U.S.C. 32902; delegation of authority at 49 CFR 1.50.

■ 6. Add § 533.7 to read as follows:

**§ 533.7 Preemption.**

(a) *General.* When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.

(b) *Requirements must be identical.* When a requirement under section 32908 of title 49 of the United States Code is in effect, a State or a political subdivision of a State may adopt or enforce a law or regulation on disclosure of fuel economy or fuel operating costs for an automobile covered by section 32908 only if the law or regulation is identical to that requirement.

(c) *State and political subdivision automobiles.* A State or a political subdivision of a State may prescribe requirements for fuel economy for automobiles obtained for its own use.

**Appendix to Part 533 [Designated as Appendix A to Part 533 and Amended]**

■ 7. Designate appendix to part 533 as appendix A to part 533 and in newly redesignated appendix A, remove all references to ''Appendix'' and add in their place ''Appendix A''.

■ 8. Add appendix B to part 533 to read as follows:

**Appendix B to Part 533—Preemption**

(a) Express Preemption:

(1) To the extent that any law or regulation of a State or a political subdivision of a State regulates or prohibits tailpipe carbon dioxide emissions from automobiles, such a law or regulation relates to average fuel economy standards within the meaning of 49 U.S.C. 32919.

(A) Automobile fuel economy is directly and substantially related to automobile tailpipe emissions of carbon dioxide;

(B) Carbon dioxide is the natural by-product of automobile fuel consumption;

(C) The most significant and controlling factor in making the measurements necessary to determine the compliance of automobiles with the fuel economy standards in this part is their rate of tailpipe carbon dioxide emissions;

(D) Almost all technologically feasible reduction of tailpipe emissions of carbon dioxide is achievable through improving fuel economy, thereby reducing both the consumption of fuel and the creation and emission of carbon dioxide;

(E) Accordingly, as a practical matter, regulating fuel economy controls the amount of tailpipe emissions of carbon dioxide, and regulating the tailpipe emissions of carbon dioxide controls fuel economy.

(2) As a law or regulation of a State or a political subdivision of a State related to fuel economy standards, any state law or regulation regulating or prohibiting tailpipe carbon dioxide emissions from automobiles is expressly preempted under 49 U.S.C. 32919.

(3) A law or regulation of a State or a political subdivision of a State having the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is a law or regulation related to fuel economy standards and expressly preempted under 49 U.S.C. 32919.

(b) Implied Preemption:

(1) A law or regulation of a State or a political subdivision of a State regulating tailpipe carbon dioxide emissions from automobiles, particularly a law or regulation that is not attribute-based and does not separately regulate passenger cars and light trucks, conflicts with:

(A) The fuel economy standards in this part;

(B) The judgments made by the agency in establishing those standards; and

(C) The achievement of the objectives of the statute (49 U.S.C. Chapter 329) under which those standards were established, including objectives relating to reducing fuel consumption in a manner and to the extent consistent with manufacturer flexibility, consumer choice, and automobile safety.

(2) Any law or regulation of a State or a political subdivision of a State regulating or prohibiting tailpipe carbon dioxide emissions from automobiles is impliedly preempted under 49 U.S.C. Chapter 329.

(3) A law or regulation of a State or a political subdivision of a State having the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is impliedly preempted under 49 U.S.C. Chapter 329.

Issued on September 19, 2019 in Washington, DC, under authority delegated in 49 CFR 1.95 and 501.4

Dated: September 19, 2019.

**James C. Owens,**

*Acting Administrator, National Highway Traffic Safety Administration.*

Dated: September 19, 2019.

**Andrew R. Wheeler,**

*Administrator, Environmental Protection Agency.*

[FR Doc. 2019–20672 Filed 9–26–19; 8:45 am]

**BILLING CODE 4910–59–P**